**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CNTRST Debt Recovery, | ) | |
| Bruce Teitelbaum | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, L.L.C., and | ) | |
| BOULDER HILL APARTMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs, CNTRST Debt Recovery ("CDR"), and Bruce Teitelbaum ("Bruce" and CDR collectively are the "Plaintiffs"), for their Complaint against Defendants Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA" and YRY and Ybarra are the Defendants), state as follows:

### NATURE OF THE CASE

1.  Ybarra is an individual with a long history of using straw companies to fraudulently obtain loans from Centrust Bank ("Centrust"), to disguise his ownership interest in such companies as part of a scheme to avoid paying his debts, to harass and threaten Plaintiffs and other with baseless litigation, and to defraud at least one court.

2.  Plaintiffs commenced this case to (a) protect themselves from further harassment by Defendants and (b) recover damages from Defendants for their past litigation abuses directed to Plaintiffs.

3.  From 2006 to 2008, Ybarra was employed by Centrust Bank as a Vice President and loan officer. During his tenure, Ybarra repeatedly used straw entities to conceal his

ownership and control over Centrust borrowers. Ybarra even acted as Centrust's loan officer for such loans without revealing his control over the borrowers. In addition, Ybarra received bribes, made undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent.

4. Eventually, the Office of the Comptroller of Currency (the "OCC") discovered Ybarra's illegal activities and commenced enforcement proceedings against him pursuant to 12 U.S.C. § 1818. To avoid prosecution by the OCC, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust.

5. Predictably, Ybarra and his companies also defaulted on the loans Centrust made to them. In 2010, Centrust sued Ybarra to collect the debts. In that litigation, Centrust was awarded judgments totaling more than $2.6 million. Ybarra has never satisfied the judgments.

6. Instead, shortly after Centrust's judgments were entered against him, Ybarra implemented an asset protection plan designed to shield his assets from Centrust and potentially other creditors. Pursuant to his asset protection plan, Ybarra used straw companies to retain de facto ownership and control over a wide range of assets, including apartments located in Montgomery, Illinois.

7. With respect to the Montgomery apartments, Plaintiffs believe that:

    i)    BHA was organized on May 20, 2015, and in exchange for $100, it received its interest in the Montgomery apartments;

    ii)    BHA is 100% owned and controlled by YRY;

    iii)    Ybarra manages YRY;

    iv)    Ybarra's wife and kids or their trusts are the nominal owners of YRY;

v)    Ybarra exercises many of the indicia of ownership for YRY and derives benefits from such entities by, on information and belief, using the funds of YRY to pay the attorneys that represent him;

vi)    In supplemental proceedings, the attorney for YRY and BHA has acted as if they represent Ybarra, instead of YRY and BHA;

vii)    Ybarra represented in a 2018 wire transfer authorization form that he was the "Owner" of YRY;

viii)    Ybarra, as the manager of YRY, entered into a loan with T2 Boulder Hill Montgomery, LLC for approximately $9 million and he guaranteed the loan, although his wife denied that fact under oath;

ix)    Ybarra is the president and secretary of the Boulder Hills Condominium Association; and

x)    Ybarra has a direct or indirect interest in the profits, losses, or cash flow of YRY and has asserted that he has no income himself.

8.  Based on this information or similar information, and based upon Ybarra's well-established strategy of using others to shield his ownership interests in assets, Plaintiffs reasonably concluded that the equity in YRY and BHA could be accessed to recover the amount that Ybarra owed to Centrust.

9.  As a result, Plaintiffs assisted Centrust in its efforts to collect its judgment from the Montgomery apartments pursuant to post-judgment proceedings before the state court. Plaintiffs believed the post-judgment proceedings would have been successful if they had been completed, but Centrust never completed the proceedings. Before Centrust could complete the post-judgment proceedings, Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV").

10. Plaintiffs believe PTCV is another of Ybarra's straw companies. Once PTCV acquired the judgments against Ybarra, those judgments were no longer held by an adverse entity

{00196848}                                       3

or a creditor seeking to recover from Ybarra. Instead, those judgments were held by a friendly creditor with no intention of pursuing collection from Ybarra. Rather than deeming the judgments satisfied, however, Defendants opted to use the judgments offensively. They pretended in a state court proceeding that PTCV was a third party whose sole interest was to collect on the judgments against Ybarra.

11. Defendants thus positioned PTCV as the putative judgment creditor that was pursuing Ybarra in state court to collect judgment of more than $5 million. They did this for no legitimate purpose. Instead, Defendants opted to use the judgments to launch an offensive action against Plaintiffs and other (a) to prolong the state court proceedings and increase the burden upon Plaintiffs and Centrust; (b) so that the state court would be fooled into believing (which it was) that YRY and BHA needed extensive discovery from Plaintiffs, Centrust and others to protect YRY and BHA from PTCV's judgment collection efforts, and (c) to engineer a resolution of the state-court proceedings that would bolster Defendants anticipated malicious-prosecution suit. This was all a ruse, however, because parties that Defendants controlled owned PTCV. PTCV thus had no intention of ever collecting from Ybarra or YRY or BHA.

12. In the end, Defendants' fraud upon the state court was partially successful. They did manage to prolong the state-court proceedings long enough to issue several abusive discovery requests to Plaintiffs and others, but the bizarre, non-adversarial conduct of Ybarra's straw companies eventually aroused the state court's suspicions. The state court authorized Plaintiffs to investigate the collusion between PTCV, Defendants and others. The prospect of an investigation promptly ended the scheme to defraud the state court and to abuse the state court proceedings. To avoid being unmasked, Defendants caused the attachment proceedings to end and retreated from the state court.

13. In this case, the Plaintiffs are seeking to end Defendants' abuse of legal proceedings once and for all. Plaintiffs are seeking a declaration that Defendants do not have any legitimate claim against Plaintiffs for malicious prosecution or abuse of process. Plaintiffs are also seeking to recover damages from Defendants for Defendants abuse of process in connection with the state-court proceedings.

## Parties

14. CDR is an Illinois corporation. Its office is located in Northbrook, Illinois.

15. Teitelbaum is a resident of Highland Park, Illinois and is a citizen of Illinois.

16. Ybarra is an individual that, upon information and belief, is domiciled in Texas and is a citizen of Texas. Upon information and belief, Ybarra intends to remain in Texas.

17. YRY is a Delaware limited liability company. Upon information and belief, YRY's members are all citizens of Texas either because they are individuals that reside in Texas with the intent to remain, or because they are trusts with trustees that reside in Texas with the intent to remain.

18. BHA is an Illinois limited liability company with only one member: YRY.

## Jurisdiction

19. The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

20. This Court has personal jurisdiction over Defendants because they have each regularly conducted business in Illinois, they have each owned property in Illinois (either directly

or indirectly), and they were each involved in the transactions and events described below (which occurred in Illinois).

## Factual Background

B.    Ybarra's Misconduct as a Centrust Loan Officer

21. From 2006 to 2008, Ybarra was employed as a loan officer and Vice President by Centrust.

22. In his capacity as a loan officer, Ybarra was required to evaluate, authorize, and/or recommend the approval of loans that would be in Centrust's best interests to make.

23. As a loan officer, Ybarra was also responsible for monitoring a portfolio of existing Centrust loans for the purpose of making, authorizing, and/or recommending any necessary actions or adjustments by the bank, such as loan extensions, modifications, or collection activities.

24. As a loan officer, Ybarra was prohibited from receiving any undisclosed personal benefits from Centrust customers, such as bribes or kickbacks. He was also prohibited from having any undisclosed personal business dealings with Centrust customers.

25. As a loan officer, Ybarra was required to disclose any material ownership interest he held in Centrust's customers or prospective customers.

26. As a loan officer, Ybarra was required to place Centrust's interests ahead of his own when dealing with Centrust's customers. He was undoubtedly prohibited from releasing Centrust's collateral without its knowledge or consent.

27. Ybarra did not faithfully discharge his duties as a Centrust loan officer. According to the OCC, Ybarra engaged in a pattern and practice of misconduct during his tenure

at Centrust which included personal dishonesty, breaches of fiduciary duties, unjust enrichment, and flagrant disregard for banking laws. Ybarra's misconduct caused Centrust to suffer substantial losses.

28. In 2012, the OCC initiated an enforcement proceeding against Ybarra based on his fraudulent activities (the "OCC Case"). The OCC Case culminated in the entry of a consent order against Ybarra (the "Consent Order") on January 22, 2013 which barred him from any future involvement with an insured depository institution and required him to reimburse Centrust for some of its losses. A true and correct copy of the Consent Order is attached hereto as **<u>Exhibit A</u>**.

29. According to the Consent Order, Ybarra's misconduct as a Centrust loan officer included:

i) Employing a straw borrower to conceal from Centrust that he owned a controlling interest in an entity that received a $1.4 million loan from the bank;

ii) Purchasing an undisclosed controlling interest in a company that had received several loans from Centrust and acting as the loan officer for the company both before and after his acquisition of the undisclosed controlling interest;

iii) Purchasing an undisclosed controlling interest in a Centrust borrower and thereafter acting as the bank's loan officer with respect to several additional loans the bank made to the borrower;

iv) Receiving a bribe from a Centrust borrower in exchange for inducing the bank to make an uncollectable loan to the borrower;

v) Receiving a bribe from a property seller in exchange for inducing Centrust to finance the purchase of the seller's property with an uncollectable loan;

vi) Making several undisclosed high-interest, short-term loans to a Centrust borrower with his own personal funds;

vii)   Purchasing an undisclosed controlling interest in a company that had
       received several loans from Centrust and acting as the loan officer for
       the company both before and after his acquisition of the undisclosed
       controlling interest;

viii)  Purchasing an undisclosed controlling interest in a Centrust borrower
       and thereafter acting as the bank's loan officer with respect to several
       additional loans the bank made to the borrower;

ix)    Recording a personal mortgage against a property that was already
       security for a Centrust loan; and

x)     Releasing Centrust's mortgage in a property without its knowledge or
       consent.

**B.     CENTRUST'S JUDGMENTS AGAINST YBARRA**

30. During his tenure at Centrust, Ybarra also obtained loans (collectively, the

"Loans") totaling more than $2.5 million from the bank for entities that he owned and controlled,

including:

i)     <u>Loan 427</u>.  Loan number *****427 ("Loan 427") was made to Fox
       Valley II, a Series of Develco Investments, L.L.C., an Illinois limited
       liability company ("Fox Valley II").  The loan was memorialized by a
       promissory note dated August 31, 2009 for the principal amount of
       $659,652.63.  Ybarra personally guaranteed the loan.  Ybarra was the
       sole member and manager of Fox Valley II.

ii)    <u>Loan 763</u>.  Loan number *****763 ("Loan 763") was made to
       Higgins-G&W, a Series of Develco Investments, L.L.C., an Illinois
       limited liability company ("Higgins-G&W").  The loan was
       memorialized by a promissory note dated October 25, 2007 for the
       principal amount of $380,000.  Ybarra personally guaranteed the loan.
       Ybarra was the sole member and manager of Higgins-G&W.

iii)   <u>Loan 766</u>.  Loan number *****766 ("Loan 766") was made to
       Higgins-AW, a Series of Develco Investments, L.L.C., an Illinois
       limited liability company ("Higgins-AW").  The loan was
       memorialized by a promissory note dated October 25, 2007 for the
       principal amount of $1,130,000.  Ybarra personally guaranteed the
       loan.  Ybarra was the sole member and manager of Higgins-AW.

iv)    <u>Loan 769</u>.  Loan number *****769 ("Loan 769") was made to
       Higgins-NP, a Series of Develco Investments, L.L.C., an Illinois

limited liability company ("Higgins-NP"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $152,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-NP.

v) <u>Loan 826</u>. Loan number *****826 ("Loan 826") was made to Fox Valley II. The loan was memorialized by a promissory note dated August 31, 2009 for the principal amount of $199,998.97. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

31. Ybarra and his companies eventually defaulted on the Loans. As a result, Centrust initiated several lawsuits (collectively, the "Collection Lawsuits") against Ybarra in the Circuit Court of Cook County, Illinois (the "Circuit Court"). In the Collection Lawsuits, the Circuit Court entered judgements in favor of Centrust against Ybarra for more than $2.6 million (collectively, the "Judgments") as follows:

i) <u>Case No. 50077</u>. In Circuit Court case number 10-L-50077 ("Case Number 50077"), Centrust obtained a money judgment concerning Loan 766 against Ybarra on January 28, 2010 for $1,142,414.88, plus costs.

ii) <u>Case No. 50078</u>. In Circuit Court case number 10-L-50078 ("Case Number 50078"), Centrust obtained a money judgment concerning Loan 763 against Ybarra on January 28, 2010 for $384,565.22, plus costs.

iii) <u>Case No. 50079</u>. In Circuit Court case number 10-L-50079 ("Case Number 50079"), Centrust obtained a money judgment concerning Loan 769 against Ybarra on January 28, 2010 for $154,275.77, plus costs.

iv) <u>Case No. 50286</u>. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 427 against Ybarra on February 26, 2010 for $710,583.95, plus costs.

v) <u>Case No. 50287</u>. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 826 against Ybarra on February 26, 2010 for $216,135.04, plus costs.

C.    Centrust's Agreement with CDR.

32. In February 2012, Commercial Bancshares Corp. acquired a controlling interest in Centrust's parent company.  In connection with the acquisition, Centrust's management team also changed.

33. After Centrust's new management team assumed control of the bank, they discovered the Judgements remained unsatisfied and began making efforts to collect them.

34. Nevertheless, despite its best efforts, Centrust was unable to collect the Judgements.  By the summer of 2015, the amount Ybarra owed to Centrust based on the Judgments had increased to more than $3.3 million.

35. Given Ybarra's prior history of employing straw entities and concealing his assets, Centrust reasonably suspected Ybarra might be employing similar tactics to protect his assets from Centrust.  However, Centrust was unable to figure out exactly where Ybarra may have hidden his assets.

36. Centrust had all but given up trying to locate Ybarra's assets when Bruce contacted them in 2015 and informed Centrust that Ybarra (a) was his former business associate and (b) was concealing his assets from his creditors.  Bruce also indicated he was willing to retain an attorney to represent Centrust in collection proceedings against Ybarra if Centrust would agree to share the recovery with him.

37. Eventually, on or about August 18, 2015, Centrust and CDR entered into an Agreement of Creditors (the "Agreement") that gave CDR the authority to collect the Judgments on behalf of Centrust.  A true and correct copy of the Agreement is attached hereto as **Exhibit B**.

38. Under the terms of the Agreement, CDR promised to openly share with Centrust whatever information CDR possessed or acquired regarding the location of Ybarra's assets. CDR also agreed to retain and pay for lead counsel to jointly represent Centrust and CDR in all post-judgment collection actions.

39. In exchange for CDR's engagement of joint counsel for the parties, as well as CDR's agreement to openly share information with Centrust regarding Ybarra's assets, Centrust granted CDR the right to receive 70% of any amount recovered with respect to the Judgments.

D.     Ybarra's Asset Protection Plan

40. In or about 2011, Ybarra created an elaborate asset protection plan designed to conceal and shield his assets from creditors.

41. In connection with his plan, Ybarra created YRY to act as a holding company for many (probably most) of his assets. YRY operated as a central vehicle in Ybarra's asset protection scheme.  It was apparently designed to own and control most (perhaps all) of Ybarra's business ventures and investments.

42. Ybarra made himself manager of YRY, thereby vesting himself with complete control over the management of YRY's affairs.  Ybarra also gave himself and his wife 100% beneficial ownership of YRY. Thus, YRY was 100% owned (directly or indirectly) and controlled by Ybarra.

43. Ybarra also briefly owned 2.5% of YRY—taking an assignment of the interest from his wife before quickly turning around and assigning his 2.5% interest to an insurance trust created as part of his asset protection scheme.

44. To further shield his assets, Ybarra also created several subsidiary entities that were owned and controlled by him (indirectly through YRY).

    E.    <u>BHA and the Boulder Hill Apartments</u>

45. BHA is one of YRY's subsidiaries that Ybarra created to shield his assets from his creditors. BHA is the record owner of most of the units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments (the "Apartments"). Through YRY and BHA, Ybarra indirectly owns and controls the Apartments. On information and belief, Ybarra also is attempting to gain control of the remaining units in the complex through his role as president of the Boulder Hill Condominium Association.

46. YRY is the sole manager of BHA, thereby vesting Ybarra with complete de facto control over the management of BHA's affairs. YRY is also the sole member of BHA, which means Ybarra and his wife beneficially own 100% of BHA.

47. Bruce also owned (directly or indirectly) some membership interest in BHA. He transferred that to YRY prior to entering into the Agreement with Centrust. Bruce's former affiliation with BHA afforded him insight regarding how Ybarra uses BHA and YRY to conceal his assets.

    F.    <u>Post-Judgment Pursuit of the Apartments</u>

48. Following Centrust's execution of the Agreement, CDR engaged the firm of Kluever and Platt ("K.P.") and then Markoff Law, L.L.C. ("Markoff") to collect the Judgments and generally pursue collection activities against Ybarra. In connection with its engagement, K.W. and Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments.

49. Among other things, counsel instituted post-judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and others. Eventually, Markoff was able to confirm that Ybarra is the beneficial owner of the Apartments through YRY and BHA.

50. For example, Markoff discovered YRY filed a tax return in which it indicated Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital. A true and correct copy of the tax return Markoff discovered is attached hereto as **Exhibit C**.

51. Markoff also discovered BHA's Operating Agreement, which indicates YRY is BHA's sole member and manager. A true and correct copy of BHA's Operating Agreement is attached hereto as **Exhibit D**.

52. Markoff also discovered BHA received a quitclaim deed (the "Deed") for most of the Apartments from an Illinois limited liability company named Boulder Hill Condominiums, L.L.C. ("BHC") in or about 2018. A true and correct copy of the Deed is attached hereto as **Exhibit E**. According to the Deed, BHC's manager was YRY, YRY's manager was Ybarra, and BHC received less than $100 from BHA in exchange for the Deed.

53. In discovery, Markoff was also able to obtain a copy of BHC's Operating Agreement. Predictably, BHC's Operating Agreement indicated that YRY was BHC's sole member and manager. A true and correct copy of BHC's Operating Agreement is attached hereto as **Exhibit F**.

54. Based on the information Markoff was able to develop through discovery, as well as Ybarra's history of employing straw companies to conceal his assets, Markoff reasonably concluded Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly

shield the Apartments from his creditors. Markoff also reasonably believed it could develop facts establishing the Apartments were transferred to BHA to hinder, delay, or defraud Ybarra's creditors. As a result, Markoff ultimately recommended to Centrust that it institute proceedings in the Collection Lawsuits to attach the Apartments.

55. Centrust accepted Markoff's recommendation. As a result, Centrust authorized Markoff to file a Motion for Judicial Determination and Other Relief Pursuant to 735 ILCS 5/2-1401 (the "Motion for Judicial Determination") on its behalf in Case 50077. A true and correct coy of the Motion for Judicial Determination – which was filed on May 30, 2019 – is attached hereto as **Exhibit G**. In the Motion for Judicial Determination, Centrust sought to attach the Apartments and have them sold to satisfy its Judgments.

56. In December of 2019, YRY and BHA filed adverse claims with respect to the Motion for Judicial Determination. They asserted that their rights are superior to any rights that Centrust or Plaintiffs can claim in BHA, YRY and the Boulder Hill Apartments.

57. As adverse claimants, YRY and BHA sought and were granted the right to an evidentiary hearing and to conduct extensive discovery regarding the claim that the equity in YRY and/or BHA could be attached by Centrust to satisfy the judgments Ybarra owed to Centrust.

58. The parties never completed discovery regarding the Motion for Judicial Determination, nor did the Circuit Court ever conduct a final evidentiary hearing regarding the motion, or rule on the motion.

59. Before any of that could happen, Centrust assigned the Judgments to ABS. ABS. was then approached by an entity controlled by Defendants known as PTCV and then assigned

the Judgments to PTCV. PTCV then substituted into the Collection Actions as the judgment

creditor and was granted the right to conduct discovery in support of the Motion for Judicial

Determination. As Plaintiffs allege below, PTCV eventually withdrew the Motion for Judicial

Determination rather than have its involvement in a fraudulent scheme exposed.

G.     Ybarra's Continued Use of Straw Entities

60. Although the parties never completed discovery regarding the Motion for Judicial

Determination, further evidence did emerge in the Collection Actions of Ybarra's use of straw

entities to conceal his assets and implement his hidden agendas.

61. Specifically, it appears one or more of the Defendants were involved in

establishing PTCV to acquire the Judgements from ABS. One or more of the Defendants then

had PTCV, YRY, and BHA pose in the Collection Actions as adverse parties to keep the post-

judgment proceedings in Case 50077 alive, not for the purpose of satisfying the Judgments, but

rather for the surreptitious purpose of conducting discovery regarding a potential malicious-

prosecution or abuse of process suit Defendants planned to bring against Centrust for having

attempted to attach the equity in the Apartments to satisfy the Judgements. Counsel for YRY and

BHA made their true purpose clear by sending to Centrust a letter threatening such litigation

against Plaintiffs, Centrust, Markoff Law and KP.

62. In connection with this scheme, upon information and belief, Ybarra had YRY and

BHA issue burdensome discovery requests to Centrust, CDR, Bruce, KP, and Markoff that

primarily focused on their past efforts to collect the Judgments, rather than the merits of the

pending Motion for Judicial Determination. Meanwhile, Ybarra had PTCV keep the Motion for

Judicial Determination alive for the sole purpose of giving the Circuit Court the false impression

{00196848}

15

that there was a pending adverse claim among YRY, BHA, and PTCV regarding the Apartments that would require adjudication.

63. Eventually, the Circuit Court grew suspicious that Ybarra, YRY, BHA, and PTCV were colluding and might not truly be adverse parties. This happened when Plaintiffs pointed out in the context of their motion for discovery sanctions and their motion to quash the discovery served upon them that:

i) PTCV never took any concrete steps to prosecute the Motion for Judicial Determination;

ii) PTCV never conducted any discovery to support the pending Motion for Judicial Determination or defend against the adverse claims of YRY and BHA concerning the Apartments;

iii) PTCV relied on the discovery of YRY and BHA, which were supposedly PTCV's adversaries;

iv) PTCV exhibited tremendous passivity, if not indifference, towards YRY, BHA, and the outcome of proceedings concerning the Motion for Judicial Determination;

v) Ybarra's former counsel appeared to have some continuing, behind-the-scenes role in orchestrating the litigation strategies of YRY, BHA, and PTCV;

vi) PTCV's lead attorney in Case 50077 had a long-time, close working relationship with Ybarra's former counsel;

vii) PTCV's principal office is located at the law firm that represented PTCV in Case 50077;

viii) The individuals behind the ownership and management of PTCV could not be determined from its filings with the Illinois Secretary of State.

ix) PTCV was formed in the fall of 2020 by the law firm that represented it in Case 50077;

x) CDR and Teitelbaum tried to determine who owned PTCV from ABS., but ABS. refused to disclose that information;

xi)    One of PTCV's attorneys never appeared in Case 50077 after CDR and Teitelbaum filed a motion for sanction against her; and

xii)    Ybarra, PTCV, YRY, and BHA never denied they have a friendly relationship.

64. Due to its suspicions, the Circuit Court entered an order on May 3, 2021 granting Centrust, CDR, Teitelbaum, and Markoff leave to conduct discovery in connection with the motion for sanctions to ferret out the potential collusion among Ybarra, PTCV, YRY, and BHA that Plaintiffs had identified. A true and correct copy of the Circuit Court's May 3, 2021 order is attached hereto as **Exhibit H**.

65. Almost immediately after the Circuit Court entered its May 3, 2021 order authorizing discovery into the relationship between PTCV and Defendants, these entities submitted a joint proposed agreed order to the Circuit Court that would withdraw the Motion for Judicial Determination and withdraw the adverse claims of YRY and BHA. On information and belief, Defendants submitted the joint order to effectively terminate the Collection Actions because they did not want to have their fraud upon the Circuit Court exposed by Plaintiffs, Centrust and Markoff.

H.    YRY and BHA's Threats Against Plaintiffs

66. YRY and BHA have also repeatedly threatened Plaintiffs with legal action.

67. According to YRY and BHA, they intend to sue Plaintiffs for "abusive" and "frivolous" prosecution of the Motion for Judicial Determination and certain related matters. A true and correct copy of a notice of claim (the "Notice of Claim") that YRY and BHA's attorneys sent to Centrust regarding their alleged claims is attached hereto as **Exhibit I**.

68. YRY and BHA served the Notice of Claim more than seven months ago. In the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their

{00196848}    17

claims and they expressly stated that claims would be filed against Plaintiffs. YRY and BHA have repeated their threats of litigation, but they have never actually filed a lawsuit.

69. Ybarra is the party responsible for causing YRY and BHA to threaten Plaintiffs with litigation.

70. YRY and BHA also have conceded in pleadings they intend to pursue claims against Plaintiffs. Plaintiffs objected to a broad subpoena YRY and BHA served upon Plaintiffs ostensibly in connection with the Motion for Judicial Determination by pointing out that PTCV had no intention of ever pursuing the Motion for Judicial Determination and that the subject discovery was solely in aid of the litigation that Defendants intended to bring once they had completed their discovery. Rather than denying this was their ulterior motive, YRY and BHA tried to have their cake and eat it too. They apprised the Circuit Court that CDR's "binary distinction between evidence for … defending against the motion to forcibly sell the Boulder Hill Apartments on the one hand, and on the other hand, evidence to support a claim for Adverse Claimants' damages—is too simplistic."

### Count I – Declaratory Judgment (No Malicious Prosecution)

71. Plaintiffs incorporate by reference Paragraphs 1 through 70 of their Complaint.

72. As alleged above, there is a substantial controversy between Plaintiffs and Defendants regarding the issue of whether Plaintiffs maliciously prosecuted claims in the Circuit Court concerning the Apartments. Defendants assert Plaintiffs maliciously prosecuted the Motion for Judicial Determination and certain related matters in the Circuit Court, whereas Plaintiffs deny they maliciously prosecuted the Motion for Judicial Determination or any other matter in the Circuit Court.

73. As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Plaintiffs, whereas Plaintiffs are seeking to avoid paying any damages to Defendants.

74. As alleged above, the controversy between Plaintiffs and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim and repeatedly indicated they would be filing a lawsuit against Plaintiffs.

75. Under the Declaratory Judgment Act, this Court may resolve the controversy between Plaintiffs and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of malicious prosecution.

76. In this regard, Plaintiffs respectfully submits that they did not maliciously prosecute any claims against Defendants in the Collection Lawsuits.

77. As alleged above, Plaintiffs did not commence or continue any cause of action against Defendants in the Collection Lawsuits that was terminated in Defendants' favor.

78. Nor did Plaintiffs commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause.

79. Instead, Plaintiffs merely attempted to attach the Apartments because they reasonably suspected Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield his assets from his creditors. As alleged above, there is an abundance of documentary proof that readily reveals Ybarra directly or indirectly owns and controls YRY and BHA. Moreover, Ybarra has a long history of employing straw companies to shield his assets and implement his hidden agendas.

80. In addition, as alleged above, BHA received the Apartments for less than $100 from another company (BHC) directly or indirectly owned and controlled by Ybarra. As a result, Plaintiffs also reasonably suspected the Apartments were transferred to BHA with the intent to hinder, delay, or defraud Ybarra's creditors.

81. Given these facts and circumstances, Defendants do not have any valid claim against Ybarra for malicious prosecution.

WHEREFORE, Plaintiffs respectfully ask this Court to enter an order:

A.    Declaring Plaintiffs did not commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause;

B.    Declaring Defendants have no valid claim against Plaintiffs for malicious prosecution or otherwise concerning the Collection Lawsuits or Apartments; and

C.    Granting Plaintiffs such further relief as this Court deems just.

### Count II – Declaratory Judgment (No Abuse of Process)

82. Plaintiffs incorporate by reference Paragraphs 1 through 81 of their Complaint.

83. As alleged above, there is a substantial controversy between Plaintiffs and Defendants regarding the issue of whether Plaintiffs committed an abuse of process in connection with the Collection Lawsuits. Defendants assert the Motion for Judicial Determination and certain related matters pursued by Plaintiffs in the Circuit Court were an abuse of process, whereas Plaintiffs deny any such abuse of process ever occurred.

84. As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Plaintiffs, whereas Plaintiffs are seeking to avoid paying any damages to Defendants.

85. As alleged above, the controversy between Plaintiffs and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim on Plaintiffs and repeatedly threatened to file a lawsuit against Plaintiffs.

86.  Under the Declaratory Judgment Act, this Court may resolve the controversy between Plaintiffs and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of abuse of process.

87. In this regard, Plaintiffs respectfully submit they did not commit any abuse of process in the Collection Lawsuits.

88. Plaintiffs had no ulterior purpose or motive for pursuing the Motion for Judicial Determination, seeking attachment of the Apartments, or attempting to collect the Judgments. Plaintiffs' sole objective was the satisfaction of the Judgments by proper legal means.

89.  Furthermore, Plaintiffs did not employ any legal process in the Collection Lawsuits that was not proper in the regular prosecution of those proceedings.

90. As a result, Defendants have no valid claim for abuse of process against Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court to enter an order:

A.      Declaring Plaintiffs did not have any ulterior motive or purpose for pursuing any of the matters it pursued in the Collection Actions;

B.      Declaring Plaintiffs did not employ any legal process in the Collection Lawsuits that was not proper in the regular course of those proceedings;

C.      Declaring Defendants have no valid claim against Plaintiffs for abuse of process or otherwise concerning the Collection Lawsuits or Apartments; and

{00196848}                                21

D.       Granting Plaintiffs such further relief as this Court deems just.

## Count III – Abuse of Process (Against Defendants)

91. Plaintiffs incorporate by reference Paragraphs 1 through 90 of their Complaint.

92. As alleged above, Defendants caused YRY and BHA's counsel to serve discovery requests on Plaintiffs in connection with the Collection Lawsuits.

93. Defendants pretended the discovery requests were served for the purpose of developing evidence to defeat the Motion for Judicial Determination and prevent PTCV from attaching the Apartments. However, Defendants' true purpose and motive for serving the discovery on Plaintiffs was to develop evidence for a subsequent lawsuit against Plaintiffs and others.

94. As alleged above, Defendants also conspired to perpetuate the post-judgment proceedings in Case 50077 even though there was no legitimate adverse claim among PTCV, YRY, and BHA regarding the Motion for Judicial Determination or Apartments.

95. The post-judgment proceedings should have ended in August or September of 2020, after PTCV acquired the Judgements. At that time there was no longer jurisdiction over the post-judgment proceedings because there was no longer a case or controversy between adverse parties.

96. Defendants litigated the proceedings in the Circuit Court after PTCV acquired the Judgments for the sole purpose of keeping those proceedings alive so they could pursue unrelated discovery designed to develop evidence for subsequent litigation against Plaintiffs and others.

97. It was not proper for Defendants to serve abusive discovery on Plaintiffs in the Collection Lawsuits for information that was unrelated to the claims pending in those cases, nor was it proper for Defendants to prolong the post-judgment proceedings when there was no legitimate controversy among them regarding the Motion for Judicial Determination or Apartments.

98. Plaintiffs have suffered significant damage because of Defendants' abuse of process in the Collection Lawsuits, including, without limitation, attorneys' fees and costs related to the Collection Lawsuits and above-referenced abusive discovery.

99. Plaintiffs' damages exceed $75,000.

WHEREFORE, Plaintiffs respectfully request this Court to enter an order awarding damages to Plaintiffs and such other relief as this Court deems just.

### JURY DEMAND

Plaintiffs hereby demand a jury trial on all matters triable by jury alleged in their Complaint.

Dated: May 19, 2021

Respectfully submitted,

**CNTRST Debt Recovery and Bruce Teitelbaum**

By: /s/ William J. Factor
One of Their Attorneys

William J. Factor (6205675)
Isaiah Fishman
**FACTORLAW**
105 W. Madison Street
Suite 1500
Chicago, IL 60602
(312) 878-6146