UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 C 2576 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| RUBEN YBARRA, YRY HOLDINGS, LLC, | ) | |
| and BOULDER HILL APARTMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CNTRUST DEBT RECOVERY and | ) | |
| BRUCE TEITELBAUM, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 21 C 2702 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| RUBEN YBARRA, YRY HOLDINGS, LLC, | ) | |
| and BOULDER HILL APARTMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiffs Centrust Bank, N.A. ("Centrust"), CNTRUST Debt Recovery ("CDR"), and Bruce Teitelbaum filed two separate but almost identical lawsuits against Defendants Ruben Ybarra, YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA"), which are both pending before this Court.[1] Plaintiffs seek declarations that Defendants do not have any legitimate claim against them for malicious prosecution or abuse of process pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. They also bring affirmative claims for abuse of process against Defendants. Defendants have moved to dismiss both cases pursuant to

---

[1] Given the similarities between the cases, including the almost identical nature of the complaints and briefing on the motions to dismiss, the Court addresses these cases together and refers to Centrust, CDR, and Teitelbaum collectively as "Plaintiffs."

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Although the Court has diversity jurisdiction over Plaintiffs' claims, the Court dismisses the DJA claims as unripe for review. Plaintiffs may proceed on their abuse of process claims, however, given that they have sufficiently alleged the elements of the claim.

## BACKGROUND[2]

From 2006 to 2008, Ybarra worked for Centrust as a vice president and loan officer. Ybarra used straw entities to conceal his ownership and control over Centrust borrowers, as well as received bribes from borrowers to obtain Centrust loans. The Office of the Comptroller of the Currency ("OCC") investigated Ybarra's actions. To avoid prosecution, Ybarra entered into a consent order with the OCC on January 22, 2013 that barred Ybarra from the banking industry and required him to make restitution to Centrust.

Ybarra and his companies defaulted on their Centrust loans, prompting Centrust to file several collection lawsuits against Ybarra in 2010 in the Circuit Court of Cook County, Illinois. The state court entered judgments for Centrust and against Ybarra for over $2.6 million. By summer 2015, Ybarra owed Centrust over $3.3 million on the judgments. Around that time, Teitelbaum approached Centrust, informing it that Ybarra also owed him money and was concealing his assets from creditors. Teitelbaum indicated a willingness to retain an attorney to represent himself and Centrust in collection proceedings against Ybarra if Centrust would share any recovery with Teitelbaum. Teitelbaum then formed CDR and entered into an agreement with Centrust on August 18, 2015 that gave CDR authority to collect the judgments on

---

[2] The Court takes the facts in the background section from Plaintiffs' complaints and the exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (Rule 12(b)(6)); *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (Rule 12(b)(1)).

Centrust's behalf. Centrust gave CDR the right to receive 70% of any amounts recovered on the judgments after reimbursement for legal expenses.

Instead of satisfying the judgments, Ybarra created straw companies to retain de facto ownership and control over various assets, including apartments located in the Boulder Hill Apartments in Montgomery, Illinois (the "Montgomery apartments"). These straw companies included YRY, a holding company for Ybarra's assets and in which he and his wife have 100% beneficial ownership, as well as BHA, a YRY subsidiary. BHA owns the Montgomery apartments. Teitelbaum had some interest in BHA prior to entering into the August 18, 2015 agreement with Centrust.

After Centrust and CDR executed their agreement, CDR instituted post-judgment proceedings against Ybarra by serving citations to discover assets on Ybarra and others. Through these post-judgment proceedings, Centrust and CDR discovered that, through other shell companies, Ybarra transferred the Montgomery apartments to BHA for less than $100 in 2018. Centrust and CDR also learned that Ybarra has a 100% interest in YRY's profits, losses, and capital, and that YRY had control over BHA. Based on this information, in May 2019, Centrust and CDR sought to attach the Montgomery apartments and have them sold to satisfy the judgments in state court. But before those proceedings concluded, Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). ABS then sold the judgments to PTCV Development, LLC ("PTCV"), which ultimately withdrew the attachment proceedings.

After PTCV acquired the judgments, it became clear that Ybarra controls PTCV and established it to acquire the judgments from ABS. Ybarra then had PTCV, YRY, and BHA act as adverse parties to continue the post-judgment proceedings in order to obtain discovery from Plaintiffs and their counsel, discovery that focused on their attempts to collect the judgments.

CDR and Teitelbaum, joined by Centrust, raised concerns about the abusive nature of the discovery with the court and their concern that PTCV was not truly adverse to Ybarra, YRY, or BHA. Plaintiffs pointed out, among other things, that PTCV was not taking steps to prosecute the attachment request, PTCV was not conducting any discovery but instead was relying on YRY and BHA's discovery requests, and Ybarra's former counsel and PTCV's attorney had a long-standing relationship. The state court then entered an order on May 3, 2021 that allowed Plaintiffs and their counsel to conduct discovery regarding whether a justiciable controversy continued to exist and whether PTCV, Ybarra, YRY, and BHA "are engaging in a cooperative, non-adversarial enterprise." No. 21-2576, Doc. 1 at 114. In the order, the court also noted that YRY and BHA had "conceded that, at least in part, they intend to use materials discovered through supplementary proceedings pending before this Court to develop claims against third parties." *Id.* at 105. Soon thereafter, Ybarra, PTCV, YRY, and BHA submitted a joint proposed agreed order withdrawing the attachment request, as well as YRY and BHA's adverse claims.

While these proceedings were ongoing, YRY and BHA threatened Centrust with legal action, providing Centrust with a notice of claim on October 8, 2020. In the notice of claim, YRY and BHA stated that Centrust "and its lawyers, agents, and collection partners have engaged in an unrelenting, abusive, and frivolous litigation campaign to obtain ownership and control of" the Montgomery apartments despite Ybarra never owning them. *Id.* at 116. YRY and BHA indicated that the letter "should be considered as a notice of a claim under any policies of insurance issued to the Bank and its officers and directors." *Id.* YRY and BHA claimed Plaintiffs acted intentionally and negligently, contending that Centrust was liable "for the negligent, intentional, abusive, and malicious acts of CNTRST since (i) CNTRST is the Bank's agent, and (ii) the Bank and CNTRST are partners." *Id.* at 118. YRY and BHA indicated they

had incurred damages in excess of $1.5 million, including attorneys' fees and costs incurred in the post-judgment proceedings, damages for tortious interference with existing contract and prospective economic advantage, and the need to refinance a loan at a significantly higher interest rate. Finally, the letter included a document preservation request for all materials related to the post-judgment proceedings and Centrust's relationship with CDR, Ybarra, YRY, and BHA. Centrust notified its insurer of YRY and BHA's threat of a claim against it. Although YRY and BHA have repeated their litigation threat a number of times since the letter, they have not yet filed suit against Plaintiffs.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule

12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Subject Matter Jurisdiction

Initially, the Court addresses Defendants' argument that Plaintiffs have not sufficiently alleged a basis for this Court's subject matter jurisdiction. The DJA does not provide the Court with an independent basis of jurisdiction. *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018). Plaintiffs recognize this fact, asserting that diversity jurisdiction provides the required independent basis for their DJA and abuse of process claims. Diversity jurisdiction exists in cases where the amount in controversy exceeds $75,000 and the plaintiffs and defendants are citizens of different states. 28 U.S.C. § 1332(a)(1). Defendants challenge Plaintiffs' allegations concerning YRY and Teitelbaum's citizenship. In their reply, however, Defendants concede that Plaintiffs have sufficiently alleged YRY's citizenship, and, as CDR and Teitelbaum point out, they have sufficiently alleged that Teitelbaum is an Illinois citizen. Thus, complete diversity exists between Plaintiffs and Defendants.

As for the amount in controversy, the Court considers whether the case, not each claim, satisfies the $75,000 minimum. *See Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004) ("If the complaint as filed puts more than $75,000 at issue, then a district court has jurisdiction and may resolve on the merits every legal theory and aspect of damages. Whether § 1332

supplies subject-matter jurisdiction must be ascertained at the outset; events after the suit begins do not affect the diversity jurisdiction."). Defendants argue that it is inconceivable that Plaintiffs' damages for responding to discovery in the post-judgment proceedings exceed $75,000 and that the Court cannot consider Defendants' claim that they incurred over $1.5 million in damages. Because Defendants have challenged Plaintiffs' jurisdictional allegations, Plaintiffs must demonstrate the facts by a preponderance of the evidence. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006). The amount in controversy for a DJA claim "is measured by the value of the object of the litigation," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977), in other words, the "'pecuniary result' that would flow to the plaintiff (or defendant) from the court's granting the injunction or declaratory judgment," *Am.'s MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 786 (7th Cir. 2004) (citation omitted). Even assuming that Plaintiffs have not sufficiently supported the allegation that their discovery costs exceeded $75,000, because the damages for the DJA claims are those Defendants would assert against Plaintiffs in an affirmative case, the Court finds that the amount in controversy is met given Defendants' contention in the notice of claim that Plaintiffs' actions have caused them over $1.5 million in damages, an amount that Defendants do not contest. Therefore, diversity jurisdiction provides the required independent basis for the Court to exercise jurisdiction over Plaintiffs' claims.

## II.     Declaratory Judgment Claims

The DJA provides that "[i]n a *case of actual controversy* within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). Defendants challenge whether an actual controversy exists under the ripeness doctrine,

which also implicates jurisdiction under Article III. *See Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (requirement of "case of actual controversy" under DJA is coextensive with Article III's limit of federal jurisdiction to "cases" and "controversies"). This requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1038 (N.D. Ill. 2014) (citation omitted) (internal quotation marks omitted). Courts look for real and substantial disputes that specific relief can solve and that are ripe enough that a court can see "what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *ASI Acquisition, LLC v. Rayman*, No. 01 C 165, 2002 WL 335311, at *3 (N.D. Ill. Feb. 28, 2002) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff*, 344 U.S. 237, 243, (1952)) (internal quotation marks omitted). "The central perception is that courts should not render decisions absent a genuine need to resolve a real dispute." *Novae Underwriting, Ltd. v. Cunningham Lindsey Claims Mgmt., Inc.*, No. 07 C 5278, 2008 WL 4542988, at *2 (N.D. Ill. Apr. 1, 2008) (quoting 13A Charles Alan Wright et al., Federal Practice and Procedure § 3532.1 (2d ed. 1984)).

Plaintiffs argue that they have a reasonable apprehension that Defendants will file suit against them based on Plaintiffs' alleged tortious conduct in the post-judgment proceedings. *See GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 620 (7th Cir. 1995) (where a "declaratory judgment plaintiff files an action in anticipation of a threatened action by the declaratory judgment defendant, the real and immediate possibility of such litigation is sufficient to create a justiciable controversy"). But the Court does not find that Plaintiffs have sufficiently suggested the existence of an actual controversy at this time, instead presenting a "merely speculative" fear of litigation. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002) ("The declaratory

judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative."). True, YRY and BHA sent Centrust a notice of claim in October 2020, requesting that Centrust place its insurer on notice of a potential claim against it and requesting a litigation hold, but Defendants have taken no action since then that indicates an intention to assert any claims against Plaintiffs.[3] "[T]he threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment: as other courts have noted, the Declaratory Judgment Act 'is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse.'" *Id.* (citation omitted). That is all the Court has before it here: an attempt by Plaintiffs to obtain a friendly venue for resolution of a potential future lawsuit. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993) ("[A] suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed and the case allowed to proceed in the usual way.").

Further, aside from the uncertainty that accompanies waiting to see if Defendants do indeed file suit, Plaintiffs have not identified any harm they face if the Court does not entertain their requests for declaratory relief. *See Hyatt*, 302 F.3d at 711–12 ("It is hard to see what harm Hyatt would have suffered by waiting for Coco to sue, other than the normal uncertainty a defendant experiences while the statute of limitations is running and there is a possibility of a later obligation to pay money damages. Early resolution of a threat of litigation, in a friendly forum, is no doubt of value to a potential defendant, but the statute requires an 'actual' controversy."); *Nuclear Eng'g Co. v. Scott*, 660 F.2d 241, 252 (7th Cir. 1981) ("Uncertain or

---

[3] Indeed, as Defendants point out, YRY and BHA directed the notice of claim only to Centrust. Although the letter discusses actions taken by CDR and Teitelbaum, CDR and Teitelbaum have not received any similar communication of Defendants' intention to file suit against them.

9

speculative business injury, on the other hand, will not support a finding that an 'actual controversy' exists."), *overruled on other grounds by Groves v. United States*, 941 F.3d 315 (7th Cir. 2019). This is not a case like *Hyatt*, where the plaintiff "legitimately needed a declaration of its 'rights and other legal relations' in order to go forward with the project in question." 302 F.3d at 712; *Deutsche Leasing USA, Inc. v. Hamp's Enters., LLC*, No. 14 C 6112, 2015 WL 536010, at *3 (N.D. Ill. Feb. 6, 2015) ("Even if the threat of litigation were real and immediate, that threat alone would not create an actual controversy because DLUSA had not pled facts that show that it 'legitimately needed a declaration of its rights and other legal relations in order to go forward' with its business." (quoting *Hyatt*, 302 F.3d at 712)). Nor is this case analogous to *Norfolk Southern Railway Co. v. Guthrie*, which Plaintiffs cite, where the Court found the declaratory plaintiff sufficiently alleged a real and immediate threat of litigation based on the declaratory defendant's prior history of filing suit against railroads seeking to pursue disciplinary investigations of its employees. 233 F.3d 532, 535 (7th Cir. 2000). While Defendants did indicate an intention to use the discovery obtained in the post-judgment proceedings to pursue claims against third parties, Plaintiffs point to no instances where Defendants have actually filed suit in similar situations for malicious prosecution or abuse of process. Because litigation remains "merely speculative," the Court does not find that Plaintiffs' DJA claims present ripe questions for resolution by this Court at this time.[4] *See State Auto Prop. & Cas. Ins. Co. v. Williams*, No. 20-CV-1420, 2021 WL 2106488, at *5 (C.D. Ill. Mar. 15, 2021) (no immediate

---

[4] Further, the DJA does not create a right to relief but instead provides the Court with discretion to exercise jurisdiction. *See Haze v. Kubicek*, 880 F.3d 946, 951 (7th Cir. 2018) (the DJA "says only that the court '*may* declare the rights and other legal relations of any interested party, not that it *must* do so'" (citation omitted)). The DJA accords federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007)). The Court's exercise of "discretion under the Declaratory Judgment Act does not turn on the existence of parallel proceedings." *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 378–79 (7th Cir. 2010). Because the Court finds the DJA claims not ripe for review, it need not address the appropriateness of exercising jurisdiction over those claims.

controversy under DJA where the defendant had not made a recent demand on the plaintiffs and documents suggesting the potential for litigation occurred over two years prior).

### III. Abuse of Process

This leaves Plaintiffs' claim that Defendants engaged in abuse of process by serving abusive discovery on Plaintiffs in the post-judgment proceedings. Plaintiffs allege that Defendants' true purpose in serving the discovery was to develop evidence for a lawsuit against them instead of to develop evidence to defeat the attachment request. In Illinois, "[a]buse of process is defined as the misuse of the legal process to accomplish some purpose outside the scope of the process itself." *Farwell v. Senior Servs. Assocs., Inc.*, 2012 IL App (2d) 110669, ¶ 21 (citation omitted). "[A]n abuse of process claim requires proof of two elements: (1) the existence of an ulterior motive or purpose; and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings." *McDuffie v. Loney*, No. 16 C 8860, 2017 WL 6039949, at *3 (N.D. Ill. Dec. 6, 2017) (quoting *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 372 (7th Cir. 1998)). The first element requires allegations "that show that the defendant instituted proceedings against him for an improper purpose, such as extortion, intimidation, or embarrassment." *Kumar v. Bornstein*, 354 Ill. App. 3d 159, 165 (2004). To satisfy the second element, Plaintiffs must allege that Defendants "used the court's process 'to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing that [it] could not legally be compelled to do.'" *Slep-Tone Ent. Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 909 (N.D. Ill. 2014) (alteration in original) (quoting *Kumar*, 354 Ill. App. 3d at 165).

First, Defendants argue that their issuance of discovery does not constitute process as understood by Illinois courts. In this context, process "is used in the literal, legal sense of

11

something issued by the court . . . under its official seal," not "in the general sense—as in 'the legal process' of suing someone, prosecuting the case, [or] receiving judgment, etc." *Id.* at 908–09 (alterations in original) (citation omitted). Defendants argue that, absent a subpoena, discovery does not constitute "process" given that it does not obtain jurisdiction over a person or property and is not issued by the court. Indeed, some courts have indicated that process generally requires "the court to acquire or to exercise its jurisdiction over a person or over specific property." *See, e.g.*, *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill. App. 3d 177, 183 (2003); *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 969 (1972). But "an arrest is not a required element of abuse of process." *Kumar*, 354 Ill. App. 3d at 166; *see also Am. Transp. Grp., LLC v. Power*, No. 17 C 7692, 2018 WL 1993204, at *7 (N.D. Ill. Apr. 27, 2018) ("[N]either an indictment nor an arrest is a necessary element to bring an abuse of process claim under Illinois law."). Although Defendants argue that Plaintiffs only allege actions in the normal prosecution of a civil case, the Court disagrees that the pleadings so suggest. Given Plaintiffs' allegations concerning the subpoenas used to serve at least some of the alleged abusive discovery, the Court concludes that they used "process," as understood in the context of an abuse of process claim, in connection with obtaining discovery from Plaintiffs. *See Masouridis v. Ocasek*, 2019 IL App (1st) 181407-U, ¶ 21 (treating subpoena to appear for discovery deposition as process).

But this does not end the inquiry, because Illinois requires allegations that process "has been used to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing that he or she could not legally be compelled to do." *Kumar*, 354 Ill. App. 3d at 168; *Holiday Magic*, 4 Ill. App. 3d at 969 ("To constitute an abuse of the process in the legal sense, there must be some act in use of the process which is not

12

proper in the regular course of the proceedings."); *Forza Techs., LLC v. Premier Rsch. Labs, LP*, 2015 IL App (1st) 142640-U, ¶ 19 ("While Illinois law has yet to address the issuance of subpoenas specifically as a basis for an abuse of process claim, Illinois law nonetheless clearly requires allegations of 'some act in the use of legal process not proper' in order to sufficiently allege a cause of action for abuse of process. This is an element of the tort itself, and any otherwise proper procedural act, including issuing subpoenas, cannot alone constitute an abuse of process." (quoting *Kumar*, 354 Ill. App. 3d at 165)). Additionally, to satisfy the first element, Plaintiffs must allege that Defendants used process for an improper purpose. *Kumar*, 354 Ill. App. 3d at 165 ("In order to satisfy the first element, a plaintiff must plead facts that show that the defendant instituted proceedings against him for an improper purpose, such as extortion, intimidation, or embarrassment."). Defendants argue that they used discovery subpoenas for their intended purpose, to discover information to help them defend against the request to attach the Montgomery apartments, and that their motive for obtaining the information does not give rise to an abuse of process claim. *See Forza Techs., LLC*, 2015 IL App (1st) 142640-U, ¶ 19 ("Plaintiff has failed to show how defendants' mere issuance of the subpoenas in defending a federal lawsuit brought by plaintiff constitutes an ulterior motive sufficient to state an abuse of process claim."). Plaintiffs respond, however, that once PTCV acquired the judgments, any proper purpose for the subpoenas disappeared because no adversity existed among the parties. Indeed, Defendants acknowledged in the post-judgment proceedings that they intended to use the subpoenas in part to develop claims against other parties, and the allegations suggest that PTCV continued the post-judgment proceedings for that purpose and not because it actually intended to continue prosecuting the attachment request. Further, the court presiding over the post-judgment proceedings authorized Plaintiffs to investigate whether Defendants used subpoenas against

13

Plaintiffs for an improper purpose, with Defendants and PTCV submitting a joint proposed agreed order withdrawing the attachment request and YRY and BHA's adverse claims shortly thereafter to moot further inquiry into Defendants' allegedly improper actions. These allegations sufficiently suggest that Defendants colluded with PTCV to prolong the post-judgment proceedings in order to obtain information to which they otherwise would not have been entitled so as to harass Plaintiffs and use the information they gathered to pursue claims of their own against Plaintiffs. *See Landau v. Schneider*, 154 Ill. App. 3d 875, 878 (1987) ("[T]he defendant must have intended to use the action to accomplish some result which could not be accomplished through the suit itself."). Although Plaintiffs may have difficulty proving that their claim meets the narrow confines of the abuse of process tort, at this stage, the Court finds they have sufficiently alleged the required elements to proceed to discovery on the claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss [No. 21-2576, Doc. 16; No. 21-2702, Doc. 12]. The Court dismisses Plaintiffs' declaratory judgment claims without prejudice.

Dated: December 15, 2021

                                                            SARA L. ELLIS
                                                            United States District Judge