IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CNTRST DEBT RECOVERY and BRUCE TEITELBAUM, | ) ) ) | |
| Plaintiffs/Counter-Defendants | ) | Case No. 21-cv-02702 |
| | ) | |
| v. | ) | Hon. Judge Sara L. Ellis |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, LLC and BOULDER HILL APARTMENTS, LLC | ) ) | Hon. Magistrate Judge Maria Valdez |
| | ) | |
| Defendants/Counter-Plaintiffs | ) | |

**COUNTER-PLAINTIFFS' RESPONSE TO
COUNTER-DEFENDANTS' MOTION TO DISMISS**

**NOW COME** Defendants / Counter-Plaintiffs, RUBEN YBARRA, YRY HOLDINGS, LLC and BOULDER HILL APARTMENTS, LLC (collectively "Counter-Plaintiffs") by and through one of their attorneys, Christopher V. Langone, and file this *Counter-Plaintiffs' Response to Counter-Defendants' Motion to Dismiss* (the "Motion").

**FACTS**

Counter-Defendants,' CNTRST DEBT RECOVERY and BRUCE TEITELBAUM's (collectively "Counter-Defendants"), so-called "Statement of Facts" is chock full of ad hominem attacks on one of the Counter-Plaintiffs, Ruben Ybarra. Some examples of Counter-Defendants' pejorative adjectives and hyperbolic characterizations, include: "thumb[ing] his nose at the judicial process," "disdain for accepting responsibility," "always the cunning litigant," "galling," "illicit scheme," "fake suit," "lies," "disingenuousness," and "heinous breaches of duty." Counter-Defendants also make numerous factual assertions that go beyond the factual allegations of the Counterclaim, and are not supported with any citation (not that it would be proper to be attaching and citing evidence on a Rule 12 motion). Some examples are:

1

- This agreement made sense because CDR's owner, Bruce Teitelbaum, understood Ruben Ybarra used straw companies to hide his assets and Centrust Bank had thus far been thwarted in its attempts to find any assets to satisfy the Judgments.

Allegations regarding what Bruce Teitelbaum did or did not understand are not in the Counterclaim, nor part of any record that can be considered on a Rule 12 motion.

- This type of arrangement is common.

There are no allegations in the Counterclaim regarding whether agreements such as the Champertous Agreement are or are not "common."

- The delivery of that letter plainly telegraphed the Ybarra Group's strategy, which was to try to figure out a way to launch a new wave of litigation to harass, oppress and exact revenge upon Centrust Bank and the CDR Parties for having the audacity to think Ruben should pay his debts

This is not a proper inference to draw in a Rule 12 motion.

- Eventually, Ruben Ybarra's signature strategy—being happy to pay his attorneys more than the amount of debt owed before conceding a dime to a creditor—had the desired effect.

There are no allegations in the counterclaim that Ruben Ybarra is "happy to pay his attorneys more than the amount of debt owed before conceding a dime to a creditor" or that this is a "signature strategy."

- Ruben Ybarra also used fraud and deception to obtain discovery in the Supplementary Proceeding.

There are no allegations in the counterclaim, and certainly no admission from Counter-Plaintiffs, that Ruben Ybarra did anything improper – let alone use "fraud and deception" to obtain discovery in the Supplemental Proceeding.

- CDR determined that it was no longer interested in funding the legal fees needed to prove that Ruben Ybarra was the real owner of the Apartments through his ownership of YRY Holdings.

There are no allegations in the counterclaim regarding CDR's "determinations" regarding why it did, or did not act a certain way. Counter-Plaintiffs have pled generally that CDR had malicious

intent, as they are entitled. Counter-Plaintiffs are confident this Court will disregard the improper

statements and attacks and thus will not engage Counter-Defendants improper argument

unsupported factual contentions and self-serving inferences in detail.

There is, however, one "factual statement" the Counter-Plaintiffs do want to address in a

little more detail; this is the assertion that:

> the record shows that the Ybarra Group successfully obtained considerable
> discovery from the Citation Proceedings based upon their contention that they
> needed discovery from Centrust Bank and CDR to establish that Ruben Ybarra did
> not own YRY Holdings and, instead, its legitimate owner was Ruben's wife,
> Yolanda Ybarra.

[Motion to Dismiss, at p. 9]. This is not supported by any citation to the record, nor it the

supposed representation even quoted. It seems that this request is being twisted. Clearly,

Counter-Plaintiffs' would be entitled to seek discovery that Counter-Defendants knew that

Ruben had no interest in YRY. What Counter-Defendants knew (or did not know) can only

be ascertained from discovery from them. Evidently Ruben's statement that held no interest

in YRY did not satisfy Counter-Defendants – so he needed discovery to prove that they

knew what they would not admit.

## ARGUMENT

### I.     There is no "public policy" basis to dismiss a lawsuit.

Counter-Defendants begin their legal argument with the curious and unprecedented

argument that the Counterclaim should be dismissed on "public policy" grounds. (Counter-

Defendants also improperly advance an argument regarding the affirmative defense of estoppel,

which is addressed in Section I-B, below).

#### A.      There is no case law or basis to dismiss a complaint on "policy" grounds

Relying primarily on *Palmateer* – the case that recognized the tort of retaliatory

discharge – Counter-Defendants attempt to construct some novel theory of retaliatory dismissal. This is evidently based on a Counter-Defendants'-invented legal doctrine that it would be improper to allow a "counterclaim to stand" because it "adds insult to injury." [Motion at p. 10]. There is, of course, no federal case law that says that YRY and BHA's claims (or even Ruben's claim) should be dismissed because Ruben was a bad boy. Counter-Defendant's argument seems to be: because "Ruben Ybarra grievously breached his duties as an officer of Centrust Bank" then he can never sue Bruce Teitelbaum (?!) And, evidently, neither can YRY, or BHA. "The acts he committed are punishable with severe penalties," claim Counter-Defendants; so, therefore, the Ybarra Group can't sue? There is no case under Rule 12 that says a court can "dismiss counterclaims because they are antagonistic to sound public policy goals." [Motion at 9]. There is no principled basis to dismiss a lawsuit in order to effectuate "scorn." [*Id*. at p. 10]

   If Counter-Defendants believe there may exist an equitable defense of unclean hands, they can properly interpose such a defense and seek to adduce evidence to support it.

   **B.     <u>Judicial estoppel is an affirmative defense</u>**

   Counter-Defendants also argue that the counterclaim should be dismissed on the basis of judicial estoppel. Judicial estoppel, however, is an affirmative defense. *Vehicle Market Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 989 (10th Cir. 2014)("judicial estoppel is an affirmative defense that its proponent must prove"); *Thompson v. O'Bryant*, No. 08 C 68, 2008 U.S. Dist. LEXIS 35317, at *5 (N.D. Ill. Apr. 30, 2008)("judicial estoppel is an affirmative defense," citing Fed. R. Civ. P. 8(c). Consequently, a plaintiff is not required to assert its absence in order to state a legally cognizable claim. *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004)(a complaint's legal sufficiency is not compromised simply because it does not anticipate or otherwise preemptively address potential defenses. *Xechem, Inc. v. Bristol-Myers*

4

*Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004). It is improper to grant a motion to dismiss on the basis that an affirmative defense exists. *See Deckard v. General Motors Corp.,* 307 F.3d 556, 560 (7th Cir. 2002).

Moreover, as in *Toepper v. Medicredit, Inc.*, No. 18-cv-8195, 2019 U.S. Dist. LEXIS 74158 (N.D. Ill. May 2, 2019), even if judicial estoppel is not an affirmative defense, the Court should not dismiss plaintiff's claim on that basis because Counter-Defendant has not established, or even discussed, the elements, i.e.: (1) whether the party's current position is clearly inconsistent with its prior position; (2) whether the party succeeded in persuading a court to accept her earlier position; and (3) whether the party would derive an unfair advantage if she were not judicially estopped. *See Janusz v. City of Chi.*, 832 F.3d 770, 776 (7th Cir. 2016). As in *Toepper* "Defendant has not bothered to address these issues in its motion."

Finally, there is no factual support for the claim. Apart from the fact that reliance of facts outside of the counterclaim is improper on a Rule 12 motion, there is no evidence of the purported representations that supposedly support estoppel. Counter-defendants assert that the "Ybarra Group" "argued in the Supplementary Proceedings that they needed extensive discovery to prove that Ruben Ybarra did not indirectly own the Apartments." As noted above, there is no citation to the "record" where this claim is supposedly made. Nor is there a showing of judicial reliance on the statement, or prejudice to the Counter-Defendants.

## II.     Counter-Defendants state a cause of action for champerty.

As the United States Supreme Court has explained, the cause of action for maintenance, champerty, and barratry are closely related: "[P]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus,* 436 U.S. 412,

5

424 n.15, (1978). See also, *Johnson v. Wright,* 682 N.W.2d 671, 675 (Minn. Ct. App. 2004)(quoting Black's Law Dictionary 224 (7th ed. 1999)( Champerty is "an agreement between a stranger to a lawsuit and a litigant by which the stranger pursues the litigants claims as consideration for receiving part of any judgment proceeds."); *Reichhart v. City of New Haven*, 674 N.E. 2d 27, 32 n.3 (Ind. Ct. App. 1996)(Indiana defines champerty and maintenance as "the aiding of a litigant by a stranger having no interest, direct or remote, direct or remote, immediate or contingent on an agreement with the party in interest, whereby the stranger is to receive part of the thing in dispute").

New York's highest court described the history of the tort of chancery in *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726, 733-34, 709 N.Y.S.2d 865, 869, 731 N.E.2d 581, 585 (2000), explaining:

> The "champerty" concept is based on a type of French feudal tenure in land, a "champart," in which the fee for use of the land was neither in money nor ordinary service in kind. The tenant-by-champart was a partial owner of the land bound to share any rents and profits with the grantor, but the grantor took the risk that the crops might fail and that there would be no return. Anyone who then obtained a legal interest in that grant of land would also take a share of the profits in champart (*see,* Radin, *Maintenance By Champerty,* 24 Cal L Rev 48, 61-62 [1935]).
> \*     \*     \*
> Even as the feudal system faded, English law retained the word "champart" as a metaphor to indicate a disapproval of lawsuits brought "for part of the profits" of the action (*see, id.,* at 63; *see also,* Winfield, *The History of Maintenance and Champerty,* 35 LQ Rev 50 [1919]).

94 N.Y.2d at 734, 709 N.Y.S.2d at 869, 731 N.E.2d at 585 (ultimately sustaining the cause of action and reversing the trial court's dismissal). Because the claim existed at English Common Law, it applies in Illinois. 5 ILCS 50. Like one court held relative to South Dakota, because "[t]here [has been no statutory or judicial repudiation of the common law remedy of champerty … this court must hold that the doctrines of champerty and maintenance currently appl[ies]." *McKellips v. Mackintosh*, 475 N.W.2d 926, 929 (S.D. 1991). See also, *Puckett v. Empire Stove Co.,* 539

6

N.E.2d 420, 427 (Ill. App. Ct. 1989)("Champerty and maintenance have been disapproved by the

courts as against public policy because a litigious person could harass and annoy others if allowed

to purchase claims for pain and suffering and pursue the claims as an assignee").

Defendant argues that the tort of maintenance was abolished. This is not correct as was

explained in *Weigel Broadcasting Co. v. Topel*:

> First, a careful reading of both *Brush v. City of Carbondale*, 229 Ill. 144, 151, 82
> N.E. 252, 254 (1907) and *Newkirk v. Cone*, 18 Ill. 449, 454 (1857), indicates that
> only the common law *offense* (meaning crime) of maintenance was abolished. A
> common law action for the tort of maintenance remains. *Berlin v. Nathan*, 64 Ill.
> App. 3d 940, 955, 381 N.E.2d 1367, 1377, 21 Ill. Dec. 682 (1st Dist. 1978), *cert.
> denied*, 444 U.S. 828, 62 L. Ed. 2d 36, 100 S. Ct. 53 (1979).

1985 U.S. Dist. LEXIS 23862, at *16-17 (N.D. Ill. Aug. 19, 1985). Moreover, in *Medallion*

*Products v. H.C.T.V., Inc.*, the court sustained the cause of action, holding:

> Maintenance is akin to an action for malicious prosecution. *Weigel,* 1985 U.S. Dist.
> LEXIS 23862, 1985 WL 2360, at *6. However, there are differences. For example,
> intervention or an unwarranted defense of an action may give rise to the tort of
> maintenance. *Weigel,* 1985 U.S. Dist. LEXIS 23862, 1985 WL 2360, at
> *6. Additionally, maintenance "reaches the person who instigates, rather than
> directly participates in, another party's intermeddling in the
> proceedings." *Weigel,* 1985 U.S. Dist. LEXIS 23862, 1985 WL 2360, at *6. An
> important element of malicious prosecution that is present in the tort of
> maintenance is the alleged intermeddling must be without merit. *Weigel,* 1985 U.S.
> Dist. LEXIS 23862, 1985 WL 2360, at *6. In *Weigel,* the plaintiff's maintenance
> claim was dismissed because the plaintiff failed [*14] to allege its success in
> proceedings brought against it by the Federal Communications
> Commission. *Weigel,* 1985 U.S. Dist. LEXIS 23862, 1985 WL 2360, at
> *6. However, at the pleadings stage, a complainant is not required to demonstrate
> all the elements of a claim. *See Swierkiewicz,* 534 U.S. at 511. Here, the NPI
> Defendants have sufficiently stated a cause of action for the tort of maintenance.
> Therefore, Plaintiffs' motion to dismiss this claim is denied.

2007 U.S. Dist. LEXIS 24379, at *12-14 (N.D. Ill. Mar. 29, 2007). The *Weigel* court explained

the contours of the tort thusly:

> . . . the tort of maintenance is not limited to the *institution* of judicial proceedings;
> intervention or an unwarranted defense of an action may also give rise to the tort.
> Second, maintenance reaches the person who *instigates*, rather than directly

participates in, another party's intermeddling in the proceedings. One important element of malicious prosecution does carry over to the tort of maintenance. "The laws against champerty, maintenance and barratry are aimed at the prevention of multitudinous and useless lawsuits and at the prevention of speculation in lawsuits." *Berlin*, 64 Ill. App. 3d at 956, 381 N.E.2d at 1378. While it need not show malice or the lack of probable cause (which are both required in actions for malicious prosecution), Weigel must show that the alleged intermeddling was without merit.

1985 U.S. Dist. LEXIS 23862, at *17-18 (N.D. Ill. Aug. 19, 1985). So as can be seen, there is clearly a tort of champerty and maintenance. Counter-Defendants argument that only parties to the contract can assert the defense of maintenance are clearly in the context of asserting champerty as an affirmative defense to a champertous contract. For instance, Centrust Bank could conceivably refuse to pay CNTRST and Teitelbaum their percentage of any collection (should there have been one) on the basis of a champertous (i.e., illegal) contract. But the fact that champerty can only be used as a defense by contracting parties does not mean it cannot be asserted as a tort by those proximately injured thereby. Cf. *Smart Communs. Holding, Inc. v. Global Tel-Link Corp.*, No. 1:21-CV-01708, 2022 U.S. Dist. LEXIS 64999, at *9 (M.D. Pa. Apr. 7, 2022)(the Commonwealth Court's holding in *Westmoreland Cnty. v. Rta Grp.*, 767 A.2d 1144, 1148 (Pa. Commw. Ct. 2001)(affirming summary judgment on an affirmatively plead champerty claim— which is a specific type of maintenance claim—persuades the court that there is at least a possibility that Pennsylvania courts recognize that maintenance can be maintained as an affirmative cause of action)

*Kelley v. Blanchard*, 34 R.I. 57, was a Rhode Island case with facts somewhat similar to those herein. In *Blanchard* the plaintiff brought suit to set aside a foreclosure sale from one Frank Whittaker to Emma Blanchard. 82 A. at 728. The plaintiff had no actual interest in the property aside from his knowledge that the notice of foreclosure was in some way legally insufficient. *Id.* He approached Whittaker and offered to finance the cost of invalidating the

foreclosure and redeeming the property in return for a portion of the profits that might be realized from an eventual sale of the property. *Id.* The Rhode Island Supreme Court upheld the trial court's finding that the agreement was champertous and allowed the tort to proceed. Note that in *Blanchard* the Plaintiff was not a party to the mortgage contract either.

On court held, "[t]hus, the key to a claim of maintenance appears to be the amount of control over the claims for an improper purpose." *Achrem v. Expressway Plaza Ltd. P'ship,* 112 Nev. 737, 917 P.2d 447, 449 (Nev. 1996). It is for this reason that the allegation about the statement, in an interrogatory answer, that Centrust "was not involved with any post-judgment court filings and therefore has no knowledge of the same" is important. [Counterclaim at ¶ 45]. It shows "control" by Counter-Defendants. As does, "Centrust states that it was not involved in engaging or compensating any of the aforementioned attorneys." [*Id.*] The Counterclaim stated, "[o]nly discovery can reveal the truth in this regard, as this statement is undermined by emails from McMahon (unless he was only acting in an individual capacity, and not as an agent of the Bank, when he sent them)," as remains the case at this Rule 12 stage. Counter-Plaintiffs arguments are for summary judgment, if at all.

The counterclaim alleges that Teitelbaum was an officious intermeddler. [Complaint at ¶ 129]. *Interstate Collection Agency v. Kuntz,* 181 N.W. 234, 242 (N.D. 1970)("while the authorities differ as to all the ingredients essential to constitute champerty, they seem agreed that the gist of the offense is the malicious or officious intermeddling in a suit in which the intermeddler has no interest") One court put it very colorfully, as follows: "[H]e who promotes or excites unjust[] suits, although an offender of high rank, is not exclusively so. The busy-body, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means to extort money, is no less an offender against public justice." *State v. Chitty,* 17 S.C.L.

(1 Bail.) 379, 400 (1830)("[H]e who promotes or excites unjust[] suits, although an offender of high rank, is not exclusively so. The busy-body, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means to extort money, is no less an offender against public justice." This describes Mr. Teitelbaum, as alleged in the Counterclaim.

**III.     The Counterclaim adequately alleges claims against Teitelbaum notwithstanding his creation of a shell LLC to use as a vehicle to implement his scheme. The Countercomplaint adequately notifies Teitelbaum that individual liability is plausibly being sought against him both as a co-conspirator and because CNTRST was a mere "shell" / alter-ego.**

The legal authority cited in Section III of the Motion are banal platitudes that individual and corporate existence are distinct, and corporations (and LLCs) typically shield individual officers from liability. All true of course, unless there is alter-ego liability, or veil piercing. CNTRST was clearly an alter-ego of Teitelbaum. CNTRST is a single member LLC that was not meaningfully capitalized and does not conduct any "business" other than suing Counter-Defendants. The Counterclaim does specifically allege CNTRST was a "shell," and a mere vehicle through which to effectuate the Champertous Scheme. [Complaint at ¶ 10].

If alter ego were the only basis to keep Teitelbaum in the case individually (and the Court find Paragraph 10 insufficient), Counter-Plaintiffs would request leave to amend to elaborate on alter-ego theory. (Like explicitly plead veil-piercing, if need be). But that said, Counter-Plaintiffs do believe the "mere shell" allegation is sufficient to put Teitelbaum on notice that Counter-Plaintiffs are seeking to hold him liable on an alter-ego theory in addition to as a co-conspirator. All members of a conspiracy are jointly and severally liable. *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 874 n.2 (7th Cir. 1971) (parties to a civil conspiracy are jointly and severally liable for injuries to plaintiff). If Counter-Plaintiffs can prove that Teitelbaum was part

10

of a conspiracy, he can still be held liable for the later actions of co-conspirators (CNRTUST and

Centrust Bank and McMahon) that harmed the plaintiff (in this case Counter-Plaintiff) during the

limitations period. See, *e.g., In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d

599, 616 (7th Cir. 1997)(defendant could be held jointly liable for later acts of co-conspirators

where it did not withdraw from conspiracy). *Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th

Cir. 2012). Defendant does not challenge the sufficiency of Counter-Plaintiffs' conspiracy

allegations.

**IV.**    **The abuse of process claim is pled sufficiently, for the same reasons articulated by this Court in denying Counter-Plaintiffs own motion to dismiss (in their capacity as Defendants). Indeed, Counter-Defendants' Counterclaim is even stronger than Plaintiff's complaint, because Ruben Ybarra was actually arrested.**

It is ironic that Counter-Defendants are now parroting back some of the same arguments

and concepts Defendants / Counter-Plaintiffs' articulated in moving to dismiss their complaint

against Ybarra, YRY and BHA. If this Court dismisses the complaint by Ybarra it would have to

do so on the same grounds it rejected when it denied Ybarra's motion to dismiss articulating some

of these same arguments. Defendants cannot have it both ways.

In denying the Defendants / Counter-Plaintiff's motion to dismiss the Court noted process

was used because a subpoena was issued. Here, a rule to show cause and body attachment were

issued (resulting in Ruben's arrest). This is clearly use of process. Counter-Plaintiffs recognize

that, like Plaintiff-Counter-Defendants, they also "may have difficulty" ultimately prevailing. But

like with Plaintiffs / Counter-Defendants they have sufficiently alleged improper motive.

Ybarra stands on the sufficiency of the allegations regarding motive, which can be pled

generally regardless. Whether "wanting to own an apartment building" is sufficient motive (and,

of course, whether discovery reveals more evidence of motive) is a question to be resolved on a

Rule 56 motion, not a Rule 12 motion. The Counterclaim alleges that they Defendants and their

co-conspirators abused the citation process to take advantage of "old Man White's" failing memory and cognition, coupled with knowingly filing certificates of service to addresses they knew were wrong (so they could submit facially valid certificates of service to show the court, knowing full well there was no actual service), all in order to get Ruben arrested on a bench warrant after setting him up on a rule to show cause. Then, when Ruben did show – and as he was being perp walked – Teitelbaum snapped a picture as a trophy. [Complaint at ¶ 77].

**V.      Counter-Defendants adequately plead for intentional interreference with contract and interference with prospective economic advantage (collectively the "Interference Counts"). If the Court adopts Counter-Defendants state-court oriented fact pleading arguments, then Counter-Defendants request leave to replead the interference counts.**

"Federal Rule of Civil Procedure 8(a)(2)" generally requires only a plausible 'short and plain' statement of the plaintiff's claim," showing that the plaintiff is entitled to relief. *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1346 (Fed. Cir. 2018), citing *Skinner v. Switzer*, 562 U.S. 521(2011)." To meet this requirement, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; put another way, the plaintiff must do more than plead facts " 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the plaintiff's allegations. *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) "the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met." *Bill of Lading Transmission Systems Patent Litigation*, 681 F.3d at 1323, 1335 (Fed. Cir. 2012).

Although Counter-Defendants argue the Motion as if it was some kind of state court fact-pleading, Counter-Plaintiffs have pled more than sufficient facts from which a cause of action for tortious

interference with contract can be made. Counter-Plaintiffs specifically identified its contractual relationship (Note and Mortgage) with lender T2 for $9 million. [Counterclaim at ¶¶ 138-139]. The Counterclaim alleges that in September 2018, Teitelbaum and his co-conspirators arranged for the Bank to file an "emergency motion" to appoint a receiver for the Boulder Hill Apartments [Counterclaim at ¶¶ 140-141]. As a result, BHA's operating account would be frozen for the month during which the receiver motion was pending. [Counterclaim at ¶ 142]. Having a receiver appointed would be a breach of the contract with T2. So by moving for a receiver, Counter-Defendants were seeking to induce a breach of the contract with T2 and otherwise interfering with BHA's relationship with its lender.

The Counterclaim also pleads that around that same time, Judge McGing denied a similar motion brought by CNTRST, mentioning the *Shayarin* Case, the release of Shayarin and the fact Teitelbaum received $1.16 million dollars; the *Shayarin* Case was dismissed with prejudice, and "as a result, the [Shayarin] case was dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Defendants [YRY] now control." [Counterclaim at ¶ 143]. CNTRST did not appeal the order denying its motion for receiver. [Counterclaim at ¶ 144]. Moreover, on October 16, 2018, the Bank did not proceed to hearing in Case Number 50077 on its emergency motion to appoint receiver of the Boulder Hill Apartments. [Counterclaim at ¶ 145]. These allegations show bad faith by Counter-Defendants. Some red flag indicators of such being mentioned by Judge McGing, as pled.

Given this, the conduct by co-conspirator the Bank, in not diligently pursuing and eventually (after 8 months) abandoning the receiver motion, shows Counter-Defendants did not really want a receiver appointed, but rather simply to undermine BHA's relationship with its lender.

13

On June 4, 2019, the Bank withdrew finally the motion to appoint a receiver for the Boulder Hill Apartments, which had been fully briefed since early October 2018. [Counterclaim at ¶ 146]. Nonetheless, the Bank did not agree to withdraw or vacate the portion of the briefing schedule which froze BHA's operating account. [Counterclaim at ¶ 147]. The freezing of that account caused substantial economic damage to Counter-Plaintiffs. [Counterclaim at ¶ 148]. Counter-Defendants intentionally and unjustifiably interfered with this relationship by seeking appointment of a receiver knowing full well the Ruben was not a member of YRY. [Counterclaim at ¶ 145]. The improper and malicious refusal to remove a freeze on a banking account is interference with the banking contract and prospective economic advantage. The Counterclaim specifically alleges: "The actions of Counter-Defendants caused damage to BHA and YRY by freezing its bank accounts, causing it to lose liquidity and profits, and loss of business opportunities. [Counterclaim at ¶ 150].

The above facts seem more than sufficient to plead the counts. If the Court disagrees, Counter-Plaintiffs request leave to plead in more detail.

**VI.      The Breach of Contract claim is sufficient, or can be repled in more detail.**

The counterclaim does not state what provisions of the Shayarin Settlement were breached, how they were breached or what damages (p. 12) The complaint does not need to plead in this level of factual detail. When people settle, they think they buy peace. YRY, BHA and Ybarra did not get the peace they thought they'd bought when they settled Shayarin. This was not lost on Judge McGing, whose comments are pled in the Counterclaim. Counter-Plaintiffs feel they have sufficiently plead the contract count. But, again, if the Court disagrees, they seek leave to replead.

14

**VII.    Counter-Plaintiffs seek leave to file Counterclaims attached to the answer.**

Counter-Defendants seem somewhat caught up in this defect. Counter-Plaintiffs' seek leave to file a document with the Counterclaim attached to the answer, in the same PDF, because to Counter-Defendants this seems to them to be a big deal.


WHEREFORE, RUBEN YBARRA, YRY HOLDINGS, LLC and BOULDER HILL APARTMENTS, LLC, request Counter-Defendants' Motion to Dismiss the Counterclaims be denied, or Counter-Plaintiffs be given to leave replead, as requested herein.

Respectfully Submitted,

/s/ Christopher V. Langone

Christopher V. Langone
205 North Michigan Ave.
Suite 810
Chicago, IL 60601
(312) 720-9191
Chris@LangoneLaw.com