UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CNTRUST DEBT RECOVERY and BRUCE TEITELBAUM, <br><br> Plaintiffs/Counter-Defendants, <br><br> v. <br><br> RUBEN YBARRA, YRY HOLDINGS, LLC, and BOULDER HILL APARTMENTS, LLC, <br><br> Defendants/Counter-Plaintiffs. | No. 21 C 2702 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

In the latest installment of this longstanding commercial dispute, Counter-Plaintiffs Ruben Ybarra, YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA") filed a counterclaim against Counter-Defendants CNTRST Debt Recovery, LLC ("CDR") and Bruce Teitelbaum.[1] In their counterclaim, Counter-Plaintiffs bring claims for champerty, abuse of process, tortious interference with contract, and tortious interference with prospective economic advantage against CDR and Teitelbaum. They also bring a claim for breach of contract against Teitelbaum. Counter-Defendants have moved to dismiss the counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Counter-Plaintiffs have failed to sufficiently allege their claims, the Court dismisses the counterclaim, with the champerty claim dismissed with prejudice and the remaining claims without prejudice.

---

[1] Counter-Defendants have a pending abuse of process claim against Counter-Plaintiffs, claiming that Counter-Plaintiffs engaged in abuse of process by serving abusive discovery in connection with post-judgment proceedings in state court. Some of the facts relevant to that claim overlap with those in the counterclaims, but the Court's focus in this Opinion is on the viability of the counterclaim only.

1

## BACKGROUND[2]

### I. Counter-Plaintiffs

Between 2006 and 2008, Ybarra served as a vice president and loan officer at Centrust Bank. Ybarra also obtained loans from Centrust to establish a real estate portfolio. After Ybarra and his companies defaulted on their Centrust loans, Centrust filed several collection suits against Ybarra in the Circuit Court of Cook County, Illinois in 2010. The state court awarded judgments to Centrust, totaling over $2.6 million, against Ybarra.

In June 2010, Teitelbaum approached Ybarra's wife, Yolanda, to solicit her participation in real estate transactions. In 2011, the Yolanda Ybarra Revocable Trust, Ybarra Children Investment Trust, and Ruben Ybarra Family Insurance Trust formed YRY, a Delaware manager-managed limited liability company. Ybarra served as YRY's manager, although he was not a YRY member. Teitelbaum knew that Ybarra did not hold a membership interest in YRY.

In May 2015, YRY created BHA, a limited liability company based in Illinois, with YRY as its only member. It appears that YRY created BHA to hold certain apartments in Montgomery, Illinois (the "BHA Apartments").

### II. Teitelbaum and the *Shayarin* Settlement

In October 2011, Teitelbaum helped incorporate Boulder 2011 LLC in Illinois. Boulder 2011 had as its members YRY, Shayarin LLC (with Teitelbaum as its manager), and Susan Goldner. Teitelbaum and Ybarra served as managers of Boulder 2011.

---

[2] The Court takes the facts in the background section from Counter-Plaintiffs' counterclaim and presumes them to be true for the purpose of resolving Counter-Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

In August 2014, seeking to dissolve Boulder 2011 and compel the sale of the BHA Apartments, Teitelbaum and Shayarin filed suit in state court against YRY, Ybarra, and Boulder 2011. The parties settled the *Shayarin* case in April 2015. Pursuant to the *Shayarin* settlement, YRY purchased Teitelbaum's and Shayarin's membership interest in Boulder 2011 for $1.16 million. The state court then dismissed the *Shayarin* case.

Despite settling the *Shayarin* case, Teitelbaum continued to antagonize Counter-Plaintiffs. On June 10, 2015, Teitelbaum sent an email to YRY's lenders, T2 and Union Bank, about Ybarra. Teitelbaum attached a consent decree between Ybarra and the Office of the Comptroller of Currency, which barred Ybarra from the banking industry and required him to make restitution to Centrust. He also provided T2 and Union Bank with a listing of Ybarra's former Park Ridge home with the handwritten note "Lost his House." Doc. 44 ¶ 30. Finally, Teitelbaum attached Select Funding LLC's *lis pendens* against Ybarra on one of his properties.

### III. Creation of CDR and its Agreement with Centrust to Pursue Centrust's Judgments Against Ybarra

By the summer of 2015, Ybarra owed more than $3.3 million on the Centrust judgments. Centrust had not actively pursued collection of the judgments, however, until Teitelbaum contacted Centrust around that time. Teitelbaum expressed interest in hiring a lawyer to represent himself and Centrust in legal proceedings against Ybarra, with the understanding that Centrust and Teitelbaum would share in any recovered funds. Teitelbaum then formed CDR on August 8, 2015 and assumed the role of CDR's president. Ten days later, CDR and Centrust executed a confidential "Agreement of Creditors" that gave CDR the authority to collect the Centrust judgments on Centrust's behalf. The parties agreed that CDR would receive 70% of any recovered funds after the reimbursement of legal expenses, with Centrust receiving the remaining 30%.

On September 2, 2015, CDR also obtained the right to pursue litigation against Ybarra with respect to property owned by 7550 Kingston LLC (the "Kingston Property"). Select Funding held certain mortgage loans against the Kingston Property and assigned the Kingston Property's underlying mortgage and the right to pursue litigation to CDR on that date. Select Funding's Office Manager Eric Ferleger, a disbarred attorney and friend of Teitelbaum, organized the assignment. In December 2015, CDR formally substituted in for Select Funding as the plaintiff in the ongoing Kingston Property litigation.

### IV. Motions for Charging Order Against Ybarra

In January 2016, Centrust filed motions for charging orders[3] against Ybarra's alleged interest in YRY in several of the cases in which Centrust had obtained judgments against Ybarra, including Case No. 2010 L 50077 (the "50077 case"). However, Centrust withdrew its motion in the 50077 case after Ybarra and YRY's counsel advised Centrust's counsel that Centrust had not yet served citations on Ybarra or YRY and that Ybarra was the manager—not a member—of YRY.[4] In July 2016, Centrust filed motions for charging orders in all of the cases except the 50077 case, again seeking the imposition of a lien on Ybarra's supposed membership interest in YRY. The day before the state court was to hear these motions in August 2016, Centrust filed "corrected" motions that changed the amount owed on the judgments. Doc. 44 ¶ 47. Counsel for Centrust sent notices of these motions via regular mail to Ybarra at an address in Boca Raton, Florida, where he did not reside. The motions falsely claimed that YRY was an Illinois limited liability company and that Ybarra was the managing member of YRY. The motions also invoked

---

[3] "A charging order constitutes a lien on a judgment debtor's distributional interest and requires the limited liability company to pay over to the person to which the charging order was issued any distribution that would otherwise be paid to the judgment debtor." 805 Ill. Comp. Stat. 180/30-20.

[4] The counterclaim does not indicate what happened with the remaining charging orders filed in the other cases.

4

the wrong charging order section of the relevant state statute. On August 2, 2016, the state court granted the corrected motions for charging orders in all but the 50077 case. YRY and Ybarra did not have representation at the hearing.

On September 9, 2016, Centrust filed motions to appoint Ferleger as the receiver to enforce these charging orders—motions that referenced Ybarra as a YRY member-manager and did not reveal Ferleger's previous involvement with CDR. Despite the fact that YRY and Ybarra continued not to have representation, the state court granted the motions on September 14, requiring Ybarra and YRY to turn over records and cooperate with Ferleger. The court also barred YRY from making distributions without prior notice to Ferleger. On September 16, Ferleger emailed T2, YRY's junior lender, that he had been appointed receiver of YRY and its members. Ferleger also claimed that his appointment as a receiver would likely default the senior mortgage in favor of Union Bank. Finally, he claimed to have an unidentified investor interested in purchasing T2's junior mortgage interest in the BHA Apartments.

V.      **Conditional Judgments and Petitions to Revive**

On November 16, 2016, the state court entered a conditional judgment against YRY for $1,142,414.88 in the 50077 case for its alleged failure to comply with a third party citation. The order also authorized Centrust to serve YRY by sending the order via certified mail to Ybarra. On December 29, 2016, Centrust filed notices of motion certifying that it simultaneously filed motions to compel and for conditional judgment against YRY in the various 2010 cases in which it had obtained judgments against Ybarra. The motions sought to revive the 2010 judgments, but Centrust did not properly file the motions in all of the cases. Centrust continued to send copies of the filings to YRY through Ybarra at the same Boca Raton address where Ybarra did not reside, a fact that Counter-Defendants knew at the time. When Centrust amended these notices

5

less than two weeks later, with the notices again failing to attach the referenced petitions to revive the judgment, Centrust similarly sent the copies only to Ybarra at the Boca Raton address.

On January 28, 2017, Centrust's judgment in the 50077 case lapsed, as did Centrust's judgment lien on certain of Ybarra's property. On February 23, 2017, the state court allowed Centrust to serve its petition for revival of the judgment by mailing to Ybarra's new lawyer. On April 4, 2017, Centrust attempted to revive the $1,853,685.51 judgment in the 50077 case.[5]

## VI. Subsequent Proceedings

On April 21, 2017, Ybarra traveled from Texas to Illinois to sit for a preliminary citation examination at Centrust's counsel's office. There, the Cook County Sheriff arrested Ybarra pursuant to a rule to show cause and body attachment issued by the state court. Teitelbaum "took a photograph [of the arrest] as a sort of trophy to document the occasion." Doc. 44 ¶ 77. Centrust did not seek to redepose Ybarra following the execution of the body attachment.

In May 2018, BHA entered into a property management agreement for the BHA Apartments with Real Realty LLC. On June 11, 2018, BHA executed a note and mortgage with T2, secured by the BHA Apartments. In September of that year, Centrust filed an emergency motion in the 50077 case to appoint a receiver for the BHA Apartments. BHA agreed to a freeze of its operating account while the parties briefed the motion and before its presentment date on October 16, 2018. Centrust did not proceed with the motion in the 50077 case, however, and ultimately withdrew it on June 4, 2019. In withdrawing the motion, Centrust did not agree to withdraw or vacate the portion of the briefing schedule that froze BHA's operating account. Centrust's decision not to proceed on the motion likely had to do with the fact that another judge denied a virtually identical motion filed by CDR on October 2, 2018. In doing so, the judge

---

[5] The counterclaim does not clarify whether this attempt succeeded.

6

remarked that, in accord with the *Shayarin* settlement, "the [*Shayarin*] case was dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Defendants [YRY] now control." Doc. 44 ¶ 143 (alterations in original).

In January 2019, Ybarra's wife sat for a citation examination in the 50077 case, explaining that Ybarra had no interest in YRY. Afterwards, Teitelbaum and Jim McMahon, Centrust's president, discussed their strategy of using Ybarra's wife to obtain concessions from Ybarra as well as the BHA Apartments.

In April 2019, through new counsel, Centrust filed a motion for judicial determination in the 50077 case to sell the BHA Apartments pursuant to 735 Ill. Comp. Stat. 5/2-1402. That motion again represented that Ybarra was a member of YRY. The motion froze YRY's ability to sell or transfer the BHA Apartments and Ybarra's ability to receive income. YRY and BHA then sought to intervene in the 50077 case in July 2019 to challenge the freeze orders. Subsequent litigation ensued over YRY and BHA's attempts to obtain a copy of the Agreement of Creditors between Centrust and CDR. Ultimately, in July 2020, Teitelbaum informed the state court that CDR and Centrust had terminated their agreement.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to

the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.   Champerty (Count I)

Counter-Plaintiffs claim that the Agreement of Creditors between CDR and Teitelbaum amounts to a maintenance and champerty scheme that violates Illinois law. "[M]aintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus*, 436 U.S. 412, 424 n.15 (1978). Indeed, champerty is "a special form of maintenance, which is essentially officious intermeddling in a suit in which one has no interest by assisting a party in its prosecution." *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 603 (5th Cir. 1982) ("Champerty is maintenance with compensation derived from the proceeds of the suit.").

Counter-Defendants argue that Illinois law does not recognize a cause of action for champerty, maintenance, or barratry. "In Illinois, the common-law offense of maintenance was abolished long ago by statute, which has remained virtually unchanged for over a century."[6] *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 725 (N.D. Ill. 2014) (citing *Brush v. City of Carbondale,* 229 Ill. 144, 151 (1907)). Indeed, maintenance and champerty "ha[ve] been so

---

[6] Under the Illinois maintenance statute, "[i]f a person *officiously intermeddles* in an action that in no way belongs to or concerns that person, by maintaining or assisting either party, with money or otherwise, to prosecute or defend the action, with a view to promote litigation, he or she is guilty of maintenance and upon conviction shall be fined and punished as in cases of common barratry. It is not maintenance for a person to maintain the action of his or her relative or servant, or a poor person out of charity. 720 Ill. Comp. Stat. 5/32-12 (emphasis added).

8

pruned away and exceptions so grafted upon [them], that there is nothing of substance left of [them] in this State." *Id.* at 727 (alterations in original) (quoting *Dunne v. Herrick*, 37 Ill. App. 180 (1890)). Acknowledging that *Brush* abolished the maintenance *offense*, Counter-Plaintiffs still contend that the maintenance *tort* remains. *See Weigel Broad. Co. v. Topel*, No. 83 C 7921, 1985 WL 2360, at *6 (N.D. Ill. Aug. 21, 1985) (distinguishing between the "common law offense (meaning crime) of maintenance, [which] was abolished" and a "common law action for the tort of maintenance, [which] remains").

The Court need not wade into this question, however, because even if Illinois continues to recognize champerty as a viable tort, only the parties to the legal financing agreement can raise the claim. *See Miller UK Ltd.*, 17 F. Supp. 3d at 726 (citing *Oil, Inc. v. Martin*, 381 Ill. 11, 19 (1942) (champerty "may only be invoked by the parties to the agreement [and] . . . the defense of champerty can only be interposed in an action between the parties to the champertous contract, and does not furnish any reason for refusing relief in the proceeding to which the champertous agreement relates")); *Acorn Bankshares, Inc. v. Suburban Bancorp, Inc.*, No. 85 C 329, 1985 WL 2671, at *7 (N.D. Ill. Sept. 18, 1985) (a defendant cannot use the plaintiff's allegedly champertous agreement with a third party as a defense to prevent the plaintiff from seeking relief against the defendant).[7] In other words, as strangers to the Agreement of Creditors, Counter-Plaintiffs cannot use champerty to pursue an independent claim against the

---

[7] Counter-Plaintiffs point to out-of-state caselaw allowing a non-party to the allegedly champertous agreement to bring a champerty claim. *See, e.g.*, *Smart Commc'ns. Holding, Inc. v. Global Tel-Link Corp.*, No. 1:21-CV-01708, 2022 WL 1049319, at *4 (M.D. Pa. Apr. 7, 2022) (finding "sufficient evidence that maintenance exists as an affirmative cause of action under Pennsylvania law"); *Kelley v. Blanchard*, 82 A. 728 (R.I. 1912) (refusing to allow a complainant to pursue a request to set aside a foreclosure sale where the complainant obtained an interest in the property pursuant to a champertous agreement). Although the Court does not find the analysis in either case on point, even if these cases indicated that a third party could maintain an independent claim for champerty, the Court is bound by Illinois law.

9

parties to that agreement. *See Prospect Funding Holdings, LLC v. Saulter*, 2018 IL App (1st) 171277, ¶¶ 30–32 (distinguishing between a third party seeking to raise champerty as a defense to an underlying lawsuit or as a separate cause of action and a third-party beneficiary of the agreement seeking to use champerty as a defense to performing its obligations under the allegedly champertous agreement).[8] Thus, the Court must dismiss Counter-Plaintiffs' champerty claim. And because the Court cannot conceive of a basis for allowing such a claim to proceed in this case, the Court dismisses the claim with prejudice.

## II.    Abuse of Process (Count II)

In Illinois, "[a]buse of process is defined as the misuse of the legal process to accomplish some purpose outside the scope of the process itself." *Farwell v. Senior Servs. Assocs., Inc.*, 2012 IL App (2d) 110669, ¶ 21 (citation omitted). "[A]n abuse of process claim requires proof of two elements: (1) the existence of an ulterior motive or purpose; and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings." *McDuffie v. Loney*, No. 16 C 8860, 2017 WL 6039949, at *3 (N.D. Ill. Dec. 6, 2017) (quoting *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 372 (7th Cir. 1998)). The first element requires allegations "that show that the defendant instituted proceedings against him for an improper purpose, such as extortion, intimidation, or embarrassment." *Kumar v. Bornstein*, 354 Ill. App. 3d 159, 165 (2004). To satisfy the second element, Counter-Plaintiffs must allege that Counter-Defendants "used the court's process 'to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing that [it] could not legally be compelled

---

[8] The *Prospect Holdings* court based its analysis in part on the understanding that Minnesota outlaws champertous agreements. 2018 IL App (1st) 171277, ¶ 28. But subsequently, the Minnesota Supreme Court concluded that changes in the legal profession and societal attitudes toward litigation funding warranted the abolition of the prohibition against champerty. *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 238–41 (Minn. 2020).

10

to do.'" *Slep-Tone Ent. Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 909 (N.D. Ill. 2014) (alteration in original) (quoting *Kumar*, 354 Ill. App. 3d at 165). Critically, "[c]laims for 'abuse of process [are] not favored under Illinois law.'" *Harvey v. City of Chicago*, No. 19-CV-05450, 2021 WL 4401328, at *4 (N.D. Ill. Sept. 27, 2021) (second alteration in original) (quoting *Kumar*, 354 Ill. App. 3d at 166).

With respect to their abuse of process claim, Counter-Plaintiffs contend that Counter-Defendants "(a) willfully sen[t] notices to the wrong address in Boca Raton (b) ma[de] misrepresentations to the state court; (c) conceal[ed] the Champertous Agreement from the State Court and opposing litigants; (d) ma[de] and abandon[ed] frivolous motions for a receiver; (e) interfer[ed] with the junior lender . . . ; (f) deceiv[ed] [Ybarra] into coming to a citation, which was set as a trap to seize him pursuant to a body attachment in order to intimidate him, and (g) us[ed] the services of a disbarred lawyer to facilitate the unauthorized practice of law." Doc. 44 ¶ 133.

Initially, Counter-Defendants argue that Counter-Plaintiffs have not included any allegations suggesting Counter-Defendants' use, let alone abuse, of process, as the term "process" is understood by Illinois courts. Under Illinois law, "[p]rocess is issued by the court[ ] under its official seal and must be distinguished from pleadings, which are created and filed by the litigants." *Slep-Tone Ent. Corp. v. Coyne*, No. 13 C 2298, 2015 WL 127836, at *7 (N.D. Ill. Jan. 8, 2015) (alterations in original) (quoting *Com. Bank, N.A. v. Plotkin*, 255 Ill. App. 3d 870, 872 (1994)). The Court agrees with Counter-Defendants that the majority of the actions Counter-Plaintiffs allege do not suggest the use of process. For example, the mailing of filings, as well as the actual filings themselves, are actions taken by a party, not a court, and none of these filings or notices were issued by the state court under its official seal. *See Kalamata, Inc.*,

11

75 F. Supp. 3d at 908–09 (Illinois courts use "process" "in the literal, legal sense of something issued by the court . . . under its official seal," not "in the general sense—as in 'the legal process' of suing someone, prosecuting the case, [or] receiving judgment, etc." (alterations in original) (citation omitted)); *Cartwright v. Wexler, Wexler & Heller, Ltd.*, 53 Ill. App. 3d 983, 986 (1977) ("[P]laintiffs have not alleged facts which would indicate that defendants did anything more than institute a lawsuit and, after a default judgment was entered, obtain satisfaction of their judgment through the regular procedures for garnishment. The complaint fails to allege an act by defendants in the use of legal process which was not proper in the prosecution of their action."). Similarly, the Court fails to understand how concealing the Agreement of Creditors, making misrepresentations to the state court, interfering with a junior lender by providing notice to that lender of court proceedings, or using a disbarred lawyer amounts to process. Indeed, Counter-Plaintiffs appear to recognize as much, failing to make any argument in their response as to why all but the issuance of a rule to show cause and body attachment constitutes process. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

As for the issuance of the rule to show cause and body attachment, the Court agrees with Counter-Plaintiffs that this qualifies as process under Illinois law. *See, e.g.*, *Harvey*, 2021 WL 4401328, at *4 (rule to show cause qualified as use of court process). But this does not end the inquiry. To satisfy the first element, Counter-Plaintiffs must also allege that Counter-Defendants used the process improperly. *See Kumar*, 354 Ill. App. 3d at 165 (listing "extortion, intimidation, or embarrassment" as examples of "improper purpose"). And to satisfy the second element, Illinois requires allegations that process "has been used to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing

12

that he or she could not legally be compelled to do." *Kumar*, 354 Ill. App. 3d at 168; *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 969 (1972) ("To constitute an abuse of the process in the legal sense, there must be some act in use of the process which is not proper in the regular course of the proceedings.").

The circumstances surrounding the issuance of the show cause order and body attachment are not clearly set forth in the counterclaim, nor does the counterclaim address the resolution of Ybarra's arrest pursuant to the orders. As such, the counterclaim does not suggest that Counter-Defendants used the show cause order or body attachment to compel Counter-Plaintiffs "to do something [they] [were] not legally required to do." *Slep-Tone Ent. Corp. v. Elwood Enters., Inc.*, 165 F. Supp. 3d 705, 714 (N.D. Ill. 2015). This is particularly the case given that "abuse of process lies for the improper use of process *after* it has been issued, not for maliciously causing process to be issued." *Kumar*, 354 Ill. App. 3d at 168. And here, the counterclaim focuses on the allegedly malicious intentions of getting the state court to issue the show cause order and body attachment, not on the subsequent improper use of those orders. *See Erlich v. Lopin-Erlich*, 195 Ill. App. 3d 537, 539 (1990) (no abuse of process claim where the plaintiff alleged that the defendant obtained a TRO on false pretenses with the subjective intention of causing the plaintiff financial harm but did so in the regular prosecution of the proceeding); *cf. Weifang Tengyi Jewelry Trading Co. v. Intuii LLC*, No. 18 C 4651, 2019 WL 3889626, at *4–5 (N.D. Ill. Aug. 19, 2019) (abuse of process claim could proceed based on allegations that the plaintiff used the leverage of a TRO "to force [the defendant] to choose between having its business shut down and paying an exorbitant settlement" despite learning that the premise for the issuance of the TRO was incorrect); *Shatz v. Paul*, 7 Ill. App. 2d 223, 239 (1955) (the plaintiff sufficiently alleged an abuse of process claim based on the defendant's intent to use process to "compel[ ] the

plaintiff to borrow funds from friends or relatives and seek to pledge their personal credit toward the payment of the debts," a "collateral end going far beyond what the plaintiff could legally and regularly be compelled to do"). Without more to suggest that Counter-Defendants used the show cause order and body attachment to force Counter-Plaintiffs to do something they were not required to do in the post-judgment proceedings, Counter-Plaintiffs have not sufficiently stated an abuse of process claim.

### III. Tortious Interference with Contract (Count III)

To state a claim for tortious interference with contract, Counter-Plaintiffs must allege "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages." *Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 967–68 (7th Cir. 2011) (citing *Purmal v. Robert W. Wadington & Assocs.*, 354 Ill. App. 3d 715, 727 (2004)). Counter-Plaintiffs allege that in filing their September 2018 emergency motion to appoint a receiver for the BHA Apartments, Counter-Defendants interfered in YRY and BHA's contractual relationship with their lender T2. Specifically, they contend that, by moving for a receiver, Counter-Defendants sought to freeze BHA's operating account and therefore cause BHA to breach its contract with T2.

This claim fails for the fundamental reason that Counter-Plaintiffs have not alleged that YRY or BHA breached any contract it had with T2. *See Cartwright v. Cooney*, 788 F. Supp. 2d 744, 754 (N.D. Ill. 2011) (a plaintiff cannot maintain a tortious interference with contract claim absent allegations of a breach of contract). While Counter-Plaintiffs' response indicates that the appointment of a receiver would have constituted a breach, no such receiver was appointed, nor

14

does the counterclaim indicate that T2 treated the filing of the motion or anything else as a breach of the contract. Further, to the extent that Counter-Plaintiffs attempt to base their claim on a freezing of their bank accounts, the counterclaim does not suggest that the freezing of their accounts amounted to a breach of the contract they had with their unnamed bank. Therefore, Counter-Plaintiffs have not sufficiently stated a tortious interference with contract claim.

### IV. Tortious Interference with Prospective Economic Advantage (Count IV)

Next, to state a tortious interference with prospective economic advantage claim, Counter-Plaintiffs must allege "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill.2d 288, 300–01 (2001)). "A reasonable expectancy requires more than the hope or the opportunity of a future business relationship." *Kiebala v. Boris*, No. 1:16 CV 7478, 2017 WL 4339947, at *4 (N.D. Ill. Sept. 29, 2017) (citation omitted) (internal quotation marks omitted), *aff'd*, 928 F.3d 680 (7th Cir. 2019).

Counter-Plaintiffs allege that, by pursuing various post-judgment proceedings that held up Counter-Plaintiffs' ability to alienate or sell the BHA Apartments, Counter-Defendants caused Counter-Plaintiffs damage. But such vague allegations do not suffice to state a tortious interference with prospective economic advantage claim, where the counterclaim only refers to a generalized "loss of business opportunities." Doc. 44 ¶ 150. Without allegations of more than the hope of a sale of the BHA Apartments, Counter-Plaintiffs cannot pursue their tortious interference with prospective economic advantage claim. *See Ammons v. Dart*, No. 13 C 8817,

15

2015 WL 1740086, at *4 (N.D. Ill. Apr. 13, 2015) ("[A] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party." (citation omitted)); *Frain Grp., Inc. v. Steve's Frozen Chillers*, No. 14 C 7097, 2015 WL 1186131, at *4 (N.D. Ill. Mar. 10, 2015) (dismissing tortious interference claim where plaintiff failed to identify current or prospective customers, or offer any other allegations supporting his reasonable expectation of new business).

V.      **Breach of Contract (Count V)**

Finally, Teitelbaum seeks dismissal of Counter-Plaintiffs' breach of contract claim against him related to the *Shayarin* settlement. "Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) a breach by the defendant, and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (2004)). "Only a duty imposed by the terms of a contract can give rise to a breach." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (quoting *W.W. Vincent & Co.*, 351 Ill. App. 3d at 752).

Counter-Plaintiffs allege that Teitelbaum breached the *Shayarin* settlement because he relinquished any claim to the BHA Apartments in that settlement but then took actions to obtain an interest in those apartments. Teitelbaum argues that Counter-Plaintiffs have not alleged a specific provision of the settlement agreement that Teitelbaum breached. This district is split regarding whether a plaintiff must identify the specific provisions of the contract that it alleges the defendant breached. *See Peerless Network, Inc. v. MCI Commc'n Servs., Inc.*, No. 14 C 7417, 2015 WL 2455128, at *5 (N.D. Ill. May 21, 2015) (collecting cases). A majority favor

16

allowing the case to move forward if the plaintiff has alleged sufficient facts to establish a breach. *Id.* "What matters is whether [Counter-Plaintiffs] 'alleged enough facts to put [Teitelbaum] on fair notice of the contractual duty [he] breached.'" *Bortz v. Bank of Am., N.A.*, No. 16-cv-5338, 2016 WL 7104288, at *4 (N.D. Ill. Dec. 6, 2016) (quoting *Peerless*, 2015 WL 2455128, at *7).

In response to the motion to dismiss, Counter-Plaintiffs indicate that they "did not get the peace they thought they'd bought when they settled Shayarin." Doc. 74 at 14. This may refer to a breach of the implied covenant of fair dealing or to the release to which Teitelbaum agreed in the *Shayarin* settlement. But given the conclusory nature of the allegations and Counter-Plaintiffs' offer to replead the claim in more detail, the Court finds it appropriate to dismiss the breach of contract claim and allow Counter-Plaintiffs the opportunity to replead. In doing so, Counter-Plaintiffs should clarify the terms of the *Shayarin* settlement that they claim Teitelbaum breached, as well as the ways in which Teitelbaum allegedly did so. Counter-Plaintiffs also should consider whether, as Teitelbaum alleges, claim or issue preclusion bars them from pursuing their breach of contract claim against Teitelbaum in this litigation.[9]

---

[9] Similarly, in considering whether and how to amend their counterclaims, Counter-Plaintiffs should also take into account the arguments that Counter-Defendants raised for dismissal that the Court did not address, including whether Teitelbaum is a proper party to the abuse of process and tortious interference claims, and whether claim and issue preclusion bar any of these claims as well. Finally, if Counter-Plaintiffs do choose to file an amended counterclaim, they should file it not as a standalone document but rather as part of an amended answer.

## CONCLUSION

For the foregoing reasons, the Court grants Counter-Defendants' motion to dismiss [52]. The Court dismisses the champerty claim (Count I) with prejudice and the abuse of process, tortious interference with contract, tortious interference with prospective business advantage, and breach of contract claims (Counts II–V) without prejudice.

Dated: August 14, 2023

_____
SARA L. ELLIS
United States District Judge