IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CNTRST DEBT RECOVERY and | ) | |
| BRUCE TEITELBAUM, | ) | Case No. 21-cv-02702 |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Honorable Judge Sara E. Ellis |
| | ) | |
| v. | ) | Hon. Magistrate Judge Maria Valdez |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, | ) | |
| LLC, and BOULDER HILL | ) | |
| APARTMENTS, LLC, | ) | |
| | ) | |
| Defendants / Counter-Plaintiffs. | ) | |

## ANSWER TO COMPLAINT
## AND AMENDED COUNTERLCLAIM

NOW COME Defendants and Counter-Plaintiffs, Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY") and Boulder Hill Apartments, LLC ("Boulder Hill") (collectively, "Defendants" or "Counter-Plaintiffs"), by their attorneys, and as their *Answer to Complaint and Amended Counterclaim* state as follows:

### NATURE OF THE CASE

1.      Ybarra is an individual with a long history of using straw companies to fraudulently obtain loans from Centrust Bank ("Centrust"), to disguise his ownership interest in such companies as part of a scheme to avoid paying his debts, to harass and threaten Plaintiffs and other with baseless litigation, and to defraud at least one court.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

2.      Plaintiffs commenced this case to (a) protect themselves from further harassment by Defendants and (b) recover damages from Defendants for their past litigation abuses directed to Plaintiffs.

1

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

3.      From 2006 to 2008, Ybarra was employed by Centrust Bank as a Vice President and loan officer. During his tenure, Ybarra repeatedly used straw entities to conceal his ownership and control over Centrust borrowers. Ybarra even acted as Centrust's loan officer for such loans without revealing his control over the borrowers. In addition, Ybarra received bribes, made undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent.

**ANSWER:** **Defendants admit that Ybarra was employed by Centrust and entered a consent decree relating to alleged misconduct related to loans, but Defendants deny the balance of the allegations in this paragraph.**

4.   Eventually, the Office of the Comptroller of Currency (the "OCC") discovered Ybarra's illegal activities and commenced enforcement proceedings against him pursuant to 12 U.S.C. § 1818. To avoid prosecution by the OCC, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust.

**ANSWER:** **Defendants admit that the OCC commenced enforcement proceedings, Ybarra agreed to a consent order, and judgments were entered against him but Defendants deny the balance of the allegations in this paragraph.**

5.      Predictably, Ybarra and his companies also defaulted on the loans Centrust made to them. In 2010, Centrust sued Ybarra to collect the debts. In that litigation, Centrust was awarded judgments totaling more than $2.6 million. Ybarra has never satisfied the judgments.

**ANSWER: Defendants admit that the OCC commenced enforcement proceedings, Ybarra agreed to a consent order, and judgments were entered against him but Defendants deny the balance of the allegations in this paragraph.**

6.     Instead, shortly after Centrust's judgments were entered against him, Ybarra implemented an asset protection plan designed to shield his assets from Centrust and potentially other creditors. Pursuant to his asset protection plan, Ybarra used straw companies to retain de facto ownership and control over a wide range of assets, including apartments located in Montgomery, Illinois. With respect to the Montgomery apartments, Plaintiffs believe that:

i)     BHA was organized on May 20, 2015, and in exchange for $100, it received its interest in the Montgomery apartments;

ii)    BHA is 100% owned and controlled by YRY;

iii)   Ybarra manages YRY;

iv)    Ybarra's wife and kids or their trusts are the nominal owners of YRY;

v)     Ybarra exercises many of the indicia of ownership for YRY and derives benefits from such entities by, on information and belief, using the funds of YRY to pay the attorneys that represent him;

vi)    In supplemental proceedings, the attorney for YRY and BHA has acted as if they represent Ybarra, instead of YRY and BHA;

vii)   Ybarra represented in a 2018 wire transfer authorization form that he was the "Owner" of YRY;

viii)  Ybarra, as the manager of YRY, entered into a loan with T2 Boulder Hill Montgomery, LLC for approximately $9 million and he guaranteed the loan, although his wife denied that fact under oath;

ix)    Ybarra is the president and secretary of the Boulder Hills Condominium Association; and

x)     Ybarra has a direct or indirect interest in the profits, losses, or cash flow of YRY and has asserted that he has no income himself.

3

**ANSWER:** **Defendants deny the allegations contained in this paragraph**

8. Based on this information or similar information, and based upon Ybarra's well-established strategy of using others to shield his ownership interests in assets, Plaintiffs reasonably concluded that the equity in YRY and BHA could be accessed to recover the amount that Ybarra owed to Centrust.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

9. As a result, Plaintiffs assisted Centrust in its efforts to collect its judgment from the Montgomery apartments pursuant to post-judgment proceedings before the state court. Plaintiffs believed the post-judgment proceedings would have been successful if they had been completed, but Centrust never completed the proceedings. Before Centrust could complete the post-judgment proceedings. Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV").

**ANSWER:** **Defendants admit attachment proceedings were initiated, but deny Plaintiff's speculation about whether they "would have been successful," or what Centrust otherwise believes. Defendants admit Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV") and PTCV eventually withdrew the attachment proceedings.**

10. Plaintiffs believe PTCV is another of Ybarra's straw companies. Once PTCV acquired the judgments against Ybarra, those judgments were no longer held by an adverse entity or a creditor seeking to recover from Ybarra. Instead, those judgments were held by a friendly creditor with no intention of pursuing collection from Ybarra. Rather than deeming the

judgments satisfied, however, Defendants opted to use the judgments offensively. They pretended in a state court proceeding that PTCV was a third party whose sole interest was to collect on the judgments against Ybarra.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to who Centrust notified, or why, or the amount of any fees incurred, and on that basis denies same. Defendants deny the remaining allegations contained in this paragraph.**

11. Defendants thus positioned PTCV as the putative judgment creditor that was pursuing Ybarra in state court to collect judgment of more than $5 million. They did this for no legitimate purpose. Instead, Defendants opted to use the judgments to launch an offensive action against Plaintiffs and other (a) to prolong the state court proceedings and increase the burden upon Plaintiffs and Centrust; (b) so that the state court would be fooled into believing (which it was) that YRY and BHA needed extensive discovery from Plaintiffs, Centrust and others to protect YRY and BHA from PTCV's judgment collection efforts, and (c) to engineer a resolution of the state-court proceedings that would bolster Defendants anticipated malicious-prosecution suit. This was all a ruse, however, because parties that Defendants controlled owned PTCV.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

12. PTCV thus had no intention of ever collecting from Ybarra or YRY or BHA. In the end, Defendants' fraud upon the state court was partially successful. They did manage to prolong the state-court proceedings long enough to issue several abusive discovery requests to Plaintiffs and others, but the bizarre, non-adversarial conduct of Ybarra's straw companies eventually aroused the state court's suspicions. The state court authorized Plaintiffs to investigate the collusion between PTCV, Defendants and others. The prospect of an investigation promptly ended the scheme to defraud the state court and to abuse the state court

proceedings. To avoid being unmasked, Defendants caused the attachment proceedings to end and retreated from the state court.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

13.    In this case, the Plaintiffs are seeking to end Defendants' abuse of legal proceedings once and for all. Plaintiffs are seeking a declaration that Defendants do not have any legitimate claim against Plaintiffs for malicious prosecution or abuse of process. Plaintiffs are also seeking to recover damages from Defendants for Defendants abuse of process in connection with the state-court proceedings.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

### Parties

14.    CDR is an Illinois corporation. Its office is located in Northbrook, Illinois.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

15.    Teitelbaum is a resident of Highland Park, Illinois and is a citizen of Illinois.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

16.    Ybarra is an individual that, upon information and belief, is domiciled in Texas and is a citizen of Texas.  Upon information and belief, Ybarra intends to remain in Texas.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

17.    YRY is a Delaware limited liability company. Upon information and belief, YRY's members are all citizens of Texas either because they are individuals that reside in Texas with the intent to remain, or because they are trusts with trustees that reside in Texas with the intent to remain.

**ANSWER:** **Admit that YRY is a Delaware limited liability company; deny the balance of the allegations.**

18.    BHA is an Illinois limited liability company with only one member: YRY.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

### Jurisdiction

19.     The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

20.     This Court has personal jurisdiction over Defendants because they have each regularly conducted business in Illinois, they have each owned property in Illinois (either directly or indirectly), and they were each involved in the transactions and events described below (which occurred in Illinois).

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

### Factual Background

B.      <u>Ybarra's Misconduct as a Centrust Loan Officer</u>

21.     From 2006 to 2008, Ybarra was employed as a loan officer and Vice President by Centrust.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

22.     In his capacity as a loan officer, Ybarra was required to evaluate, authorize, and/or recommend the approval of loans that would be in Centrust's best interests to make.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

23.     As a loan officer, Ybarra was also responsible for monitoring a portfolio of existing Centrust loans for the purpose of making, authorizing, and/or recommending any necessary actions or adjustments by the bank, such as loan extensions, modifications, or collection activities.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

24. As a loan officer, Ybarra was prohibited from receiving any undisclosed personal benefits from Centrust customers, such as bribes or kickbacks. He was also prohibited from having any undisclosed personal business dealings with Centrust customers.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

25. As a loan officer, Ybarra was required to disclose any material ownership interest he held in Centrust's customers or prospective customers.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

26. As a loan officer, Ybarra was required to place Centrust's interests ahead of his own when dealing with Centrust's customers. He was undoubtedly prohibited from releasing Centrust's collateral without its knowledge or consent.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

27. Ybarra did not faithfully discharge his duties as a Centrust loan officer. According to the OCC, Ybarra engaged in a pattern and practice of misconduct during his tenure at Centrust which included personal dishonesty, breaches of fiduciary duties, unjust enrichment, and flagrant disregard for banking laws. Ybarra's misconduct caused Centrust to suffer substantial losses.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

28. In 2012, the OCC initiated an enforcement proceeding against Ybarra based on his fraudulent activities (the "OCC Case"). The OCC Case culminated in the entry of a consent order against Ybarra (the "Consent Order") on January 22, 2013 which barred him from any future involvement with an insured depository institution and required him to reimburse Centrust for some of its losses. A true and correct copy of the Consent Order is attached hereto as **Exhibit A**.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

29. According to the Consent Order, Ybarra's misconduct as a Centrust loan officer included:

> i) Employing a straw borrower to conceal from Centrust that he owned a controlling interest in an entity that received a $1.4 million loan from the bank;
>
> ii) Purchasing an undisclosed controlling interest in a company that had received several loans from Centrust and acting as the loan officer for the company both before and after his acquisition of the undisclosed controlling interest;
>
> iii) Purchasing an undisclosed controlling interest in a Centrust borrower and thereafter acting as the bank's loan officer with respect to several additional loans the bank made to the borrower;
>
> iv) Receiving a bribe from a Centrust borrower in exchange for inducing the bank to make an uncollectable loan to the borrower;
>
> v) Receiving a bribe from a property seller in exchange for inducing Centrust to finance the purchase of the seller's property with an uncollectable loan;
>
> vi) Making several undisclosed high-interest, short-term loans to a Centrust borrower with his own personal funds;
>
> vii) Purchasing an undisclosed controlling interest in a company that had received several loans from Centrust and acting as the loan officer for the company both before and after his acquisition of the undisclosed controlling interest;
>
> viii) Purchasing an undisclosed controlling interest in a Centrust borrower

and thereafter acting as the bank's loan officer with respect to several additional loans the bank made to the borrower;

ix) Recording a personal mortgage against a property that was already security for a Centrust loan; and

x) Releasing Centrust's mortgage in a property without its knowledge or consent.

**ANSWER:** **The Consent Order speaks for itself, and thus no response is required.**

**B.    CENTRUST'S JUDGMENTS AGAINST YBARRA**

30.    During his tenure at Centrust, Ybarra also obtained loans (collectively, the "Loans") totaling more than $2.5 million from the bank for entities that he owned and controlled, including:

i) <u>Loan 427</u>. Loan number *****427 ("Loan 427") was made to Fox Valley II, a Series of Develco Investments, L.L.C., an Illinois limited liability company ("Fox Valley II"). The loan was memorialized by a promissory note dated August 31, 2009 for the principal amount of $659,652.63. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

ii) <u>Loan 763</u>. Loan number *****763 ("Loan 763") was made to Higgins-G&W, a Series of Develco Investments, L.L.C., an Illinois limited liability company ("Higgins-G&W"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $380,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-G&W.

iii) <u>Loan 766</u>. Loan number *****766 ("Loan 766") was made to

Higgins-AW, a Series of Develco Investments, L.L.C., an Illinois

limited liability company ("Higgins-AW"). The loan was

memorialized by a promissory note dated October 25, 2007 for the

principal amount of $1,130,000. Ybarra personally guaranteed the

loan. Ybarra was the sole member and manager of Higgins-AW.

iv)  Loan 769. Loan number *****769 ("Loan 769") was made to

Higgins-NP, a Series of Develco Investments, L.L.C., an Illinois

limited liability company ("Higgins-NP"). The loan was

memorialized by a promissory note dated October 25, 2007 for the

principal amount of $152,000. Ybarra personally guaranteed the loan.

Ybarra was the sole member and manager of Higgins-NP.

v)  Loan 826. Loan number *****826 ("Loan 826") was made to Fox

Valley II. The loan was memorialized by a promissory note dated

August 31, 2009 for the principal amount of $199,998.97. Ybarra

personally guaranteed the loan. Ybarra was the sole member and

manager of Fox Valley II.

**ANSWER:   Defendants admit the allegations contained in this paragraph.**

31.    Ybarra and his companies eventually defaulted on the Loans. As a result,

Centrust initiated several lawsuits (collectively, the "Collection Lawsuits") against Ybarra in the

Circuit Court of Cook County, Illinois (the "Circuit Court"). In the Collection Lawsuits, the

Circuit Court entered judgements in favor of Centrust against Ybarra for more than $2.6 million

(collectively, the "Judgments") as follows:

i)  Case No. 50077. In Circuit Court case number 10-L-50077 ("Case

Number 50077"), Centrust obtained a money judgment concerning

11

Loan 766 against Ybarra on January 28, 2010 for $1,142,414.88, plus costs.

ii)    Case No. 50078. In Circuit Court case number 10-L-50078 ("Case Number 50078"), Centrust obtained a money judgment concerning Loan 763 against Ybarra on January 28, 2010 for $384,565.22, plus costs.

iii)    Case No. 50079. In Circuit Court case number 10-L-50079 ("Case Number 50079"), Centrust obtained a money judgment concerning Loan 769 against Ybarra on January 28, 2010 for $154,275.77, plus costs.

iv)    Case No. 50286. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 427 against Ybarra on February 26, 2010 for $710,583.95, plus costs.

v)    Case No. 50287. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 826 against Ybarra on February 26, 2010 for $216,135.04, plus costs.

**ANSWER:**    **Defendants admit the allegations contained in this paragraph.**

C.    <u>Centrust's Agreement with CDR</u>.

32.    In February 2012, Commercial Bancshares Corp. acquired a controlling interest in Centrust's parent company. In connection with the acquisition, Centrust's management team also changed.

**ANSWER:**    **Defendants lack knowledge or information sufficient to form a belief as to**

who as retained by Centrust and when, and on that basis, Defendants deny the allegations in this paragraph.

33.     After Centrust's new management team assumed control of the bank, they discovered the Judgements remained unsatisfied and began making efforts to collect them.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to who what was known or unknown to Centrust and when, and on that basis denies the allegation.**

34.     Nevertheless, despite its best efforts, Centrust was unable to collect the Judgements. By the summer of 2015, the amount Ybarra owed to Centrust based on the Judgments had increased to more than $3.3 million.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

35.     Given Ybarra's prior history of employing straw entities and concealing his assets, Centrust reasonably suspected Ybarra might be employing similar tactics to protect his assets from Centrust. However, Centrust was unable to figure out exactly where Ybarra may have hidden his assets.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

36.     Centrust had all but given up trying to locate Ybarra's assets when Bruce contacted them in 2015 and informed Centrust that Ybarra (a) was his former business associate and (b) was concealing his assets from his creditors. Bruce also indicated he was willing to retain an attorney to represent Centrust in collection proceedings against Ybarra if Centrust would agree to share the recovery with him.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to who if and when Teitelbaum met with Centrust or what was discussed, and on that basis,**

**Defendants deny the allegations in this paragraph.**

37.     Eventually, on or about August 18, 2015, Centrust and CDR entered into an Agreement of Creditors (the "Agreement") that gave CDR the authority to collect the Judgments on behalf of Centrust. A true and correct copy of the Agreement is attached hereto as **Exhibit B**.

**ANSWER:     Defendants admit the allegations contained in this paragraph.**

38.     Under the terms of the Agreement, CDR promised to openly share with Centrust whatever information CDR possessed or acquired regarding the location of Ybarra's assets. CDR also agreed to retain and pay for lead counsel to jointly represent Centrust and CDR in all post judgment collection actions.

**ANSWER:     Defendants do not dispute the terms are set forth in the agreement.**

39.     In exchange for CDR's engagement of joint counsel for the parties, as well as CDR's agreement to openly share information with Centrust regarding Ybarra's assets, Centrust granted CDR the right to receive 70% of any amount recovered with respect to the Judgments.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

D.     Ybarra's Asset Protection Plan

40.     In or about 2011, Ybarra created an elaborate asset protection plan designed to conceal and shield his assets from creditors.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

41.     In connection with his plan, Ybarra created YRY to act as a holding company for many (probably most) of his assets. YRY operated as a central vehicle in Ybarra's asset protection scheme. It was apparently designed to own and control most (perhaps all) of Ybarra's business ventures and investments.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

14

42. Ybarra made himself manager of YRY, thereby vesting himself with complete control over the management of YRY's affairs. Ybarra also gave himself and his wife 100% beneficial ownership of YRY. Thus, YRY was 100% owned (directly or indirectly) and controlled by Ybarra.

**ANSWER: Defendants admit Ybarra was manager, Defendants deny the allegations in this paragraph**

43. Ybarra also briefly owned 2.5% of YRY—taking an assignment of the interest from his wife before quickly turning around and assigning his 2.5% interest to an insurance trust created as part of his asset protection scheme.

**ANSWER: Defendants deny the allegations contained in this paragraph.**

44. To further shield his assets, Ybarra also created several subsidiary entities that were owned and controlled by him (indirectly through YRY).

**ANSWER: Defendants deny the allegations contained in this paragraph.**

E. BHA and the Boulder Hill Apartments

45. BHA is one of YRY's subsidiaries that Ybarra created to shield his assets from his creditors. BHA is the record owner of most of the units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments (the "Apartments"). Through YRY and BHA, Ybarra indirectly owns and controls the Apartments. On information and belief, Ybarra also is attempting to gain control of the remaining units in the complex through his role as president of the Boulder Hill Condominium Association.

**ANSWER: Defendants admit that "BHA is one of YRY's subsidiaries," and "BHA is the record owner of several units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments," Defendants deny the allegations in this paragraph.**

46.     YRY is the sole manager of BHA, thereby vesting Ybarra with complete de facto control over the management of BHA's affairs. YRY is also the sole member of BHA, which means Ybarra and his wife beneficially own 100% of BHA.

**ANSWER:    Defendants admit that "YRY is the sole manager of BHA" and "YRY is also the sole member of BHA." Defendants deny the remaining allegations in this paragraph.**

47.     Bruce also owned (directly or indirectly) some membership interest in BHA. He transferred that to YRY prior to entering into the Agreement with Centrust. Bruce's former affiliation with BHA afforded him insight regarding how Ybarra uses BHA and YRY to conceal his assets.

**ANSWER:    Defendants admit that. Teitelbaum also owned (directly or indirectly) some membership interest in BHA which he transferred to YRY prior to entering into the Agreement with Centrust but lack knowledge or information sufficient to form a belief as to the remaining allegations, and on that basis deny same.**

F.     Post-Judgment Pursuit of the Apartments

48.     Following Centrust's execution of the Agreement, CDR engaged the firm of Kluever and Platt ("K.P.") and then Markoff Law, L.L.C. ("Markoff") to collect the Judgments and generally pursue collection activities against Ybarra. In connection with its engagement, K.W. and Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments.

**ANSWER:    Defendants admit that Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments yet deny the Defendants deny the remaining allegations in this paragraph.**

49.     Among other things, counsel instituted post-judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and

16

others. Eventually, Markoff was able to confirm that Ybarra is the beneficial owner of the Apartments through YRY and BHA.

**ANSWER:** **Admit Markoff initiated post judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and others, deny what Markoff was (or was not) able to confirm.**

50. For example, Markoff discovered YRY filed a tax return in which it indicated Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital. A true and correct copy of the tax return Markoff discovered is attached hereto as **Exhibit C**.

**ANSWER:** **Defendants admit Exhibit C is an excerpt from a tax return filed by YRY, Defendants deny the characterizations and legal conclusions in this paragraph and lacks knowledge or information sufficient to form a belief as to what Markoff discovered, and on that basis denies same.**

51. Markoff also discovered BHA's Operating Agreement, which indicates YRY is BHA's sole member and manager. A true and correct copy of BHA's Operating Agreement is attached hereto as **Exhibit D**.

**ANSWER:** **Defendants admit Exhibit D is a genuine copy of BHA's Operating Agreement. Defendants deny the characterizations and legal conclusions in this paragraph.**

52. Markoff also discovered BHA received a quitclaim deed (the "Deed") for most of the Apartments from an Illinois limited liability company named Boulder Hill Condominiums, L.L.C. ("BHC") in or about 2018. A true and correct copy of the Deed is attached hereto as **Exhibit E**. According to the Deed, BHC's manager was YRY, YRY's manager was Ybarra, and BHC received less than $100 from BHA in exchange for the Deed.

17

**ANSWER:    Defendants admit Exhibit E is a genuine copy of the Deed. Defendants deny the characterizations and legal conclusions in this paragraph.**

53.    In discovery, Markoff was also able to obtain a copy of BHC's Operating Agreement. Predictably, BHC's Operating Agreement indicated that YRY was BHC's sole member and manager. A true and correct copy of BHC's Operating Agreement is attached hereto as **Exhibit F**.

**ANSWER:    Defendants admit Exhibit F is a genuine copy of the Deed. Defendants deny the characterizations and legal conclusions in this paragraph.**

54.    Based on the information Markoff was able to develop through discovery, as well as Ybarra's history of employing straw companies to conceal his assets, Markoff reasonably concluded Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield the Apartments from his creditors. Markoff also reasonably believed it could develop facts establishing the Apartments were transferred to BHA to hinder, delay, or defraud Ybarra's creditors. As a result, Markoff ultimately recommended to Centrust that it institute proceedings in the Collection Lawsuits to attach the Apartments.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

55.    Centrust accepted Markoff's recommendation. As a result, Centrust authorized Markoff to file a Motion for Judicial Determination and Other Relief Pursuant to 735 ILCS 5/2-1401 (the "Motion for Judicial Determination") on its behalf in Case 50077. A true and correct coy of the Motion for Judicial Determination – which was filed on May 30, 2019 – is attached hereto as **Exhibit G**. In the Motion for Judicial Determination, Centrust sought to attach the Apartments and have them sold to satisfy its judgments.

**ANSWER:    Admit a Motion for Judicial Determination was filed, a genuine copy of**

**which is attached as Exhibit G, Defendants lack information to form a belief as to what, if anything, this was a "result" of.**

56.    In December of 2019, YRY and BHA filed adverse claims with respect to the Motion for Judicial Determination. They asserted that their rights are superior to any rights that Centrust or Plaintiffs can claim in BHA, YRY and the Boulder Hill Apartments.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

57.    As adverse claimants, YRY and BHA sought and were granted the right to an evidentiary hearing and to conduct extensive discovery regarding the claim that the equity in YRY and/or BHA could be attached by Centrust to satisfy the judgments Ybarra owed to Centrust.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

58.    The parties never completed discovery regarding the Motion for Judicial Determination, nor did the Circuit Court ever conduct a final evidentiary hearing regarding the motion, or rule on the motion.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

59.    Before any of that could happen, Centrust assigned the Judgments to ABS. ABS. was then approached by an entity controlled by Defendants known as PTCV and then assigned the Judgments to PTCV. PTCV then substituted into the Collection Actions as the judgment creditor and was granted the right to conduct discovery in support of the Motion for Judicial Determination. As Plaintiffs allege below, PTCV eventually withdrew the Motion for Judicial Determination rather than have its involvement in a fraudulent scheme exposed.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

G.      Ybarra's Continued Use of Straw Entities

60.      Although the parties never completed discovery regarding the Motion for Judicial determination, further evidence did emerge in the Collection Actions of Ybarra's use of straw entities to conceal his assets and implement his hidden agendas.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

61.      Specifically, it appears one or more of the Defendants were involved in establishing PTCV to acquire the Judgements from ABS. One or more of the Defendants then had PTCV, YRY, and BHA pose in the Collection Actions as adverse parties to keep the post judgment proceedings in Case 50077 alive, not for the purpose of satisfying the Judgments, but rather for the surreptitious purpose of conducting discovery regarding a potential malicious prosecution or abuse of process suit Defendants planned to bring against Centrust for having attempted to attach the equity in the Apartments to satisfy the Judgements. Counsel for YRY and BHA made their true purpose clear by sending to Centrust a letter threatening such litigation against Plaintiffs, Centrust, Markoff Law and KP.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

62.      In connection with this scheme, upon information and belief, Ybarra had YRY and BHA issue burdensome discovery requests to Centrust, CDR, Bruce, KP, and Markoff that primarily focused on their past efforts to collect the Judgments, rather than the merits of the pending Motion for Judicial Determination. Meanwhile, Ybarra had PTCV keep the Motion for Judicial Determination alive for the sole purpose of giving the Circuit Court the false impression that there was a pending adverse claim among YRY, BHA, and PTCV regarding the Apartments that would require adjudication.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

20

63.     Eventually, the Circuit Court grew suspicious that Ybarra, YRY, BHA, and PTCV were colluding and might not truly be adverse parties. This happened when Plaintiffs pointed out in the context of their motion for discovery sanctions and their motion to quash the discovery served upon them that:

    i)    PTCV never took any concrete steps to prosecute the Motion for Judicial Determination;

    ii)    PTCV never conducted any discovery to support the pending Motion for Judicial Determination or defend against the adverse claims of YRY and BHA concerning the Apartments;

    iii)    PTCV relied on the discovery of YRY and BHA, which were supposedly PTCV's adversaries;

    iv)    PTCV exhibited tremendous passivity, if not indifference, towards YRY, BHA, and the outcome of proceedings concerning the Motion for Judicial Determination;

    v)    Ybarra's former counsel appeared to have some continuing, behind the-scenes role in orchestrating the litigation strategies of YRY, BHA, and PTCV;

    vi)    PTCV's lead attorney in Case 50077 had a long-time, close working relationship with Ybarra's former counsel;

    vii)    PTCV's principal office is located at the law firm that represented PTCV in Case 50077;

    viii)    The individuals behind the ownership and management of PTCV could not be determined from its filings with the Illinois Secretary of State.

21

ix)   PTCV was formed in the fall of 2020 by the law firm that represented it in Case 50077;

x)   CDR and Teitelbaum tried to determine who owned PTCV from ABS., but ABS. refused to disclose that information;

xi)   One of PTCV's attorneys never appeared in Case 50077 after CDR and Teitelbaum filed a motion for sanction against her; and

xii)   Ybarra, PTCV, YRY, and BHA never denied they have a friendly relationship.

**ANSWER:   Defendants deny the allegations contained in this paragraph.**

64.    Due to its suspicions, the Circuit Court entered an order on May 3, 2021 granting Centrust, CDR, Teitelbaum, and Markoff leave to conduct discovery in connection with the motion for sanctions to ferret out the potential collusion among Ybarra, PTCV, YRY, and BHA that Plaintiffs had identified. A true and correct copy of the Circuit Court's May 3, 2021 order is attached hereto as **Exhibit H**.

**ANSWER:   Admit that Exhibit H is a genuine copy of the Court's order dated May 3, 2021, Defendants deny the characterizations and legal conclusions in this paragraph.**

65.    Almost immediately after the Circuit Court entered its May 3, 2021 order authorizing discovery into the relationship between PTCV and Defendants, these entities submitted a joint proposed agreed order to the Circuit Court that would withdraw the Motion for Judicial Determination and withdraw the adverse claims of YRY and BHA. On information and belief, Defendants submitted the joint order to effectively terminate the Collection Actions because they did not want to have their fraud upon the Circuit Court exposed by Plaintiffs, Centrust and Markoff.

**ANSWER:   Defendants deny the allegations contained in this paragraph.**

H.     YRY and BHA's Threats Against Plaintiffs

66.     YRY and BHA have also repeatedly threatened Plaintiffs with legal action.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

67.     According to YRY and BHA, they intend to sue Plaintiffs for "abusive" and "frivolous" prosecution of the Motion for Judicial Determination and certain related matters. A true and correct copy of a notice of claim (the "Notice of Claim") that YRY and BHA's attorneys sent to Centrust regarding their alleged claims is attached hereto as **Exhibit I**.

**ANSWER:     Defendants deny that Exhibit I is genuine and was delivered to Centrust through an attorney.**

68.     YRY and BHA served the Notice of Claim more than seven months ago. In the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their claims and they expressly stated that claims would be filed against Plaintiffs. YRY and BHA have repeated their threats of litigation, but they have never actually filed a lawsuit.

**ANSWER:     Defendants admit that YRY and BHA served the Notice of Claim on Centrust more than seven months ago, and in the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their claims. Defendants deny that "threats" were repeated on "numerous occasions." Admit no lawsuit has been filed.**

69.     Ybarra is the party responsible for causing YRY and BHA to threaten Plaintiffs with litigation.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

70.     YRY and BHA also have conceded in pleadings they intend to pursue claims against Plaintiffs. Plaintiffs objected to a broad subpoena YRY and BHA served upon Plaintiffs ostensibly in connection with the Motion for Judicial Determination by pointing out that PTCV had no intention of ever pursuing the Motion for Judicial Determination and that the subject

discovery was solely in aid of the litigation that Defendants intended to bring once they had completed their discovery. Rather than denying this was their ulterior motive, YRY and BHA tried to have their cake and eat it too. They apprised the Circuit Court that CDR's "binary distinction between evidence for … defending against the motion to forcibly sell the Boulder Hill Apartments on the one hand, and on the other hand, evidence to support a claim for Adverse Claimants' damages—is too simplistic."

**ANSWER:     Denied.**

### Count I – Declaratory Judgment (No Malicious Prosecution)

71.     Plaintiffs incorporate by reference Paragraphs 1 through 70 of their Complaint.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

72.     As alleged above, there is a substantial controversy between Plaintiffs and Defendants regarding the issue of whether Plaintiffs maliciously prosecuted claims in the Circuit Court concerning the Apartments. Defendants assert Plaintiffs maliciously prosecuted the Motion for Judicial Determination and certain related matters in the Circuit Court, whereas Plaintiffs deny they maliciously prosecuted the Motion for Judicial Determination or any other matter in the Circuit Court.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required**.

73.     As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Plaintiffs, whereas Plaintiffs are seeking to avoid paying any damages to Defendants.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

74.     As alleged above, the controversy between Plaintiffs and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim and repeatedly indicated they would be filing a lawsuit against Plaintiffs.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

75.     Under the Declaratory Judgment Act, this Court may resolve the controversy between Plaintiffs and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of malicious prosecution.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

76.     In this regard, Plaintiffs respectfully submits that they did not maliciously prosecute any claims against Defendants in the Collection Lawsuits.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

77.     As alleged above, Plaintiffs did not commence or continue any cause of action against Defendants in the Collection Lawsuits that was terminated in Defendants' favor.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

78.     Nor did Plaintiffs commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

79.     Instead, Plaintiffs merely attempted to attach the Apartments because they

reasonably suspected Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield his assets from his creditors. As alleged above, there is an abundance of documentary proof that readily reveals Ybarra directly or indirectly owns and controls YRY and BHA. Moreover, Ybarra has a long history of employing straw companies to shield his assets and implement his hidden agendas.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

80. In addition, as alleged above, BHA received the Apartments for less than $100 from another company (BHC) directly or indirectly owned and controlled by Ybarra. As a result, Plaintiffs also reasonably suspected the Apartments were transferred to BHA with the intent to hinder, delay, or defraud Ybarra's creditors.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

81. Given these facts and circumstances, Defendants do not have any valid claim against Ybarra for malicious prosecution.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

### Count II – Declaratory Judgment (No Abuse of Process)

82. Plaintiffs incorporate by reference Paragraphs 1 through 81 of their Complaint.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

26

83.     As alleged above, there is a substantial controversy between Plaintiffs and Defendants regarding the issue of whether Plaintiffs committed an abuse of process in connection with the Collection Lawsuits. Defendants assert the Motion for Judicial Determination and certain related matters pursued by Plaintiffs in the Circuit Court were an abuse of process, whereas Plaintiffs deny any such abuse of process ever occurred. As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Plaintiffs, whereas Plaintiffs are seeking to avoid paying any damages to Defendants.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

84.     As alleged above, the controversy between Plaintiffs and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim on Plaintiffs and repeatedly threatened to file a lawsuit against Plaintiffs.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

85.     Under the Declaratory Judgment Act, this Court may resolve the controversy between Plaintiffs and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of abuse of process.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

86.     In this regard, Plaintiffs respectfully submit they did not commit any abuse of process in the Collection Lawsuits.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

87.    Plaintiffs had no ulterior purpose or motive for pursuing the Motion for Judicial Determination, seeking attachment of the Apartments, or attempting to collect the Judgments.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

88.    Plaintiffs' sole objective was the satisfaction of the Judgments by proper legal means.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

89.    Furthermore, Plaintiffs did not employ any legal process in the Collection Lawsuits that was not proper in the regular prosecution of those proceedings.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

90.    As a result, Defendants have no valid claim for abuse of process against Plaintiffs.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

**Count III – Abuse of Process (Against Defendants)**

91.    Plaintiffs incorporate by reference Paragraphs 1 through 90 of their Complaint.

28

**ANSWER:** **Defendants restate their answers to paragraph 1 through 90 of the Complaint as their response to paragraph 91 of Count III of the Complaint as if fully stated herein.**

92.     As alleged above, Defendants caused YRY and BHA's counsel to serve discovery requests on Plaintiffs in connection with the Collection Lawsuits.

**ANSWER:** **Defendants admit that YRY and BHA's served discovery requests on Centrust in connection with the Collection Lawsuits, Defendants deny the remaining allegations in this paragraph.**

93.     Defendants pretended the discovery requests were served for the purpose of developing evidence to defeat the Motion for Judicial Determination and prevent PTCV from attaching the Apartments. However, Defendants' true purpose and motive for serving the discovery on Plaintiffs was to develop evidence for a subsequent lawsuit against Plaintiffs and others.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

94.     As alleged above, Defendants also conspired to perpetuate the post-judgment proceedings in Case 50077 even though there was no legitimate adverse claim among PTCV, YRY, and BHA regarding the Motion for Judicial Determination or Apartments.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

95.     The post-judgment proceedings should have ended in August or September of 2020, after PTCV acquired the Judgements. At that time there was no longer jurisdiction over the post-judgment proceedings because there was no longer a case or controversy between adverse parties.

**ANSWER:** **Denied.**

29

96. Defendants litigated the proceedings in the Circuit Court after PTCV acquired the Judgments for the sole purpose of keeping those proceedings alive so they could pursue unrelated discovery designed to develop evidence for subsequent litigation against Plaintiffs and others.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

97. It was not proper for Defendants to serve abusive discovery on Plaintiffs in the Collection Lawsuits for information that was unrelated to the claims pending in those cases, nor was it proper for Defendants to prolong the post-judgment proceedings when there was no legitimate controversy among them regarding the Motion for Judicial Determination or Apartments.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

98. Plaintiffs have suffered significant damage because of Defendants' abuse of process in the Collection Lawsuits, including, without limitation, attorneys' fees and costs related to the Collection Lawsuits and above-referenced abusive discovery.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

99. Plaintiffs' damages exceed $75,000.

**ANSWER:  Denied.**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

## FIRST AMENDED COUNTERCLAIM

Counter-Plaintiffs, Ruben Ybarra, YRY Holdings, LLC, and Boulder Hill Apartments, LLC (collectively "Counter-Plaintiffs"), by their attorneys, and as their *First Amended Counterclaim*, state as follows:

### Parties and Relevant Entities

1.      Counter-Plaintiff RUBEN YBARRA ("Ruben") is an individual and citizen of the State of Texas. Yolanda Ybarra ("Yolanda") is Ruben's wife and is a citizen of the State of Texas.

2.      Counter-Plaintiff YRY HOLDINGS, LLC ("YRY") is a limited-liability company organized and existing under the laws of the State of Delaware. YRY was formed as a limited liability company organized and existing under the laws of the State of Delaware on August 1, 2011. At all relevant times, the three members of YRY were: (a) the Yolanda Ybarra Revocable Trust, (b) the Ybarra Children Investment Trust, and (c) the Ruben Ybarra Family Insurance Trust. All Counter-Defendants actually knew or reasonably should have known this at all times relevant to this Amended Complaint. Ruben was *not a member* of YRY, and at all relevant times, Counter-Defendants (and each of them) knew that, indeed Counter-Defendants specifically and falsely represented to the Court that Ruben was a member of YRY for no other purpose other than to tie up and interfere with Ruben's assets and income stream, by preventing any distributions from YRY. As more fully alleged herein, at various times throughout the state court proceedings, Counter-Defendants knowingly and falsely represented to the Court that Ruben was a member of YRY.

3.      Counter-Plaintiff BOULDER HILL APARTMENTS, LLC ("BHA") is a limited liability company organized and existing under the laws of the State of Illinois, with one member: YRY. All Counter-Defendants actually knew or reasonably should have known this at all times relevant to this Amended Complaint.

31

4.      Counter-Defendant CNTRST Debt Recovery ("CNTRST") is an Illinois corporation with its principal place of business in Illinois.

5.      Counter-Defendant Bruce Teitelbaum ("Teitelbaum") was, at all relevant times, the President of CNTRST.

6.      Shortly after he filed for bankruptcy (filed April 30, 2010), in approximately June of 2010, Teitelbaum approached Yolanda, Ruben's wife, and solicited her participation in certain business ventures.

7.      As their business ventures developed, Teitelbaum introduced Ruben and Yolanda to his attorney, Michael Tuchman.

8.      With Tuchman's assistance, Yolanda created various entities that would enable Teitelbaum and Yolanda to participate in real estate transactions despite the Judgments against Ruben and his substantial unrelated debt. One of these entities was YRY.

### The *Shayarin* Case and *Shayarin* Settlement

9.      On October 6, 2011, Boulder 2011 LLC ("Boulder 2011") was incorporated with the Illinois Secretary of State. YRY, Shayarin LLC (of which Teitelbaum was manager), and Susan Goldner were the original members of Boulder 2011. Teitelbaum and Ruben were managers of Boulder 2011.

10.      On August 18, 2014, Teitelbaum and his limited liability company Shayarin LLC filed suit against YRY, Boulder 2011, and Ruben (the "*Shayarin* Case."). In the *Shayarin* Case, Teitelbaum sought to dissolve Boulder 2011 and to compel a sale of the Boulder Hill Apartments.

11.      In the *Shayarin* Case, Teitelbaum intentionally and falsely alleged that Ruben was a 100% member of YRY. This false allegation is important because it shows that Counter-Defendants, were (or should have been) fully aware that Ruben was not a member of YRY –

nonetheless, Counter-Defendants falsely, fraudulently, and repeatedly represented that he was. This was done in order to interfere with the contracts of Counter-Plaintiffs, as alleged herein (hereinafter the "Interference Scheme").

12. On April 24, 2015, Shayarin, Teitelbaum, Ruben, and YRY settled the *Shayarin* Case (the "*Shayarin* Settlement"). Pursuant to the *Shayarin* Settlement, YRY agreed to purchase, and did in fact purchase, Teitelbaum & Shayarin's membership interest in Boulder 2011 – and, thus, all interest in the Boulder Hill Apartments – for 1.16 million dollars. After performance by YRY, the *Shayarin* case was dismissed in accordance with the *Shayarin* Settlement.

13. Teitelbaum, however, had no intention of honoring the *Shayarin* Settlement. He had almost immediate buyer's remorse about the *Shayarin* Settlement, or maybe even hatched the scheme alleged herein prior to the *Shayarin* Settlement. But one thing was for sure, Teitelbaum's eyes were fixed on obtaining more, if not all, of the Boulder Hill Apartments for himself, and he was going to interlope into the then-dormant Centrust collection action and foment and maintain litigation for improper and extortionate purposes, including intentionally running up attorney's fees and interfering with and tying up Counter-Plaintiffs' assets and interfering with their liquidity, lending contracts, and prospective economic advantage.

**Select Funding, Eric Ferleger and the**
***Kingston* Case (a/k/a "the Small Case")**

14. Select Funding LLC ("Select Funding") holds itself out as making "hard money loans" for non-traditional investment properties.

15. Ferleger is a disbarred attorney, with a long history of discipline with the ARDC, including, but not limited to:

      (a)     In 1991, Ferleger was censured for giving gifts to clerks in collection courtrooms;

      (b)     In 2004, Ferleger was suspended for among other things (such as

lying to a court and the ARDC and for drug abuse), abuse in collection proceedings, including personally serving a citation to discover assets when not authorized to do so (by pushing it into the respondent's chest saying "you're served asshole"), threatening to "get" the debtor, and attempting to force his way into the debtor's home;

(c)  In 2006, further discipline was imposed on Ferleger for, among other things (such as driving under the influence while under and order from the ARDC to not drink, as part of his prior discipline): improperly practicing law during his suspension, failing to account for client funds, improperly threatening criminal prosecution to gain an advantage in a civil case, driving on a suspended license, and failing to follow client's directives; and

(d)  In 2008, Ferleger was disbarred on consent.

16.  At all relevant times, Ferleger claimed to be the "Office Manager" for Select Funding.

17.  Ferleger was also a friend of Teitelbaum and a part of the "mastermind" group behind the Interference Scheme alleged herein. It is believed that he improperly performed much of the legal work behind the scenes, in order to keep costs down for Counter-Defendants (and increase cost on Counter-Plaintiffs), who were forced to employ legitimate, legally-admitted, attorneys.

18.  Select Funding held certain mortgage loans against a property owned by 7550 Kingston LLC (the "Kingston Property"), a company in which some of the Plaintiffs held membership interests. Litigation was filed against Ruben and others in the Circuit Court of Cook County regarding this Kingston Property (the "*Kingston* Case").

19.  The complete circumstances of the *Kingston* Case are not fully relevant to Counter-Defendants' liability as alleged herein, other than to note that the *Kingston* Case involved a unique issue regarding insurance and non-occupied buildings. More importantly, the *Kingston* Case formed a template for the larger scheme, relating to Boulder Hill Apartments, as more fully alleged

herein.

20.     This so-called "small case" (as it was called in emails eventually unearthed by Counter-Plaintiffs) became a model for what Counter-Defendants sought to replicate with respect to the Boulder Hill Apartments

21.     Teitelbaum reported to the Bank in an email dated January 24, 2019: "Was paid $245,000 from the thief [referring to Ruben] in the small case. With legal fees and additional interest, it cost the "a-hole" (i.e., Ruben) somewhere around $440,000 to settle what was a $180,000 debt." In other emails Teitelbaum and the Bank's President noted that their efforts were just "like the small case" only on a larger scale. As noted in an email dated September 21, 2018, "Following same pattern as small case."

**The Formation of CNTRST**
**& Taking Control of the *Kingston* Case, a/k/a "The Small Case"**

22.     As a result of the great real estate crash of 2008 and 2009, Ruben lost millions of dollars; as a result, various judgments totaling over $2.6 million (collectively the "Judgments") were entered against him.  One of these Judgments was obtained on January 28, 2010, Case Number 50077 in the amount of $1,142,414.88. The Bank was not diligent in collecting the Judgments prior to being approached by Teitelbaum, who proposed the Interference Scheme more fully described and alleged herein.

23.     On August 18, 2015, the Bank and CNTRST executed a document entitled "Agreement of Creditors," (hereinafter the "Agreement").  As to the Agreement: (i) CNTRST's alleged respective claims were not identified; (ii) the Bank identified its "respective claims," (and all of them were against Ruben and companies owned by Ruben); (iii) YRY, BHA, and Yolanda were not identified as "Debtors;"; (iv) the word "assignment" did not appear anywhere; (v) the agreement was drafted by Defendant Markoff Law; (vi) McMahon, the Bank's president, signed

the agreement; (vii) CNTRST was responsible for hiring, paying, and directing so-called "Lead Counsel;" (viii) the Bank was to get 30% of recovered money and CNTRST was to get the remaining 70%; and (ix) the Agreement was to be kept confidential.

24.     On September 2, 2015, Select Funding, presumably at the direction of Ferleger, assigned the underlying mortgage in the *Kingston* Case and the rights to pursue that litigation to CNTRST (the "*Kingston* Assignments"). The *Kingston* Assignments were recorded with the Cook County Recorder of Deeds on September 15, 2015. The *Kingston* Assignments were executed by Select Funding's "manager," disbarred-attorney Eric Ferleger. Indeed, it is believed, and thus alleged, Ferleger was unethically preparing, or providing legal input into, many of the legal documents in the background, including the *Kingston* Assignments. Ferleger notarized the "manager's" (i.e., his own) signature.

25.     After recording, the *Kingston* Assignments were sent to attorney Richard Jones. Jones was the Bank's lawyer in Case No. 10 L 50077 from its initial filing in January 2010 through at least January 2016. CNTRST acquired its interest in the *Kingston* Case <u>after</u> the Agreement was executed in August 2015. The *Kingston* Case was not identified as a "Respective Claim" of CNTRST when the Agreement was executed.

26.     In December 2015, CNTRST formally substituted in as plaintiff in the *Kingston* Case for Select Funding.

### The 2016 Motion(s) for Charging Order(s) and False Allegations that Ruben was A Member of YRY

27.     On January 7, 2016, Plaintiff in Case Nos. 2010 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287 filed motions for charging orders ("Motion[s] for Charging Order[s]") against Ruben's alleged interest in YRY (of which, in truth, as Counter-Defendants knew full well, there was none). The Motions for Charging Orders were noticed to proceed on January 26, 2017.

36

The Motions for Charging Orders falsely alleged that Ruben was the manager of YRY, and according to the LLC Act, a charging order would be appropriate.

28.     The Motion for Charging Order in Case Number 50077 was withdrawn after counsel for Ruben and YRY advised the Bank's then counsel, Richard Jones: (a) that the Bank had not yet served citations on Ruben, Yolanda, or YRY; and (b) more importantly, Ruben was a manager but not a member of YRY. This latter fact, and the Counter-Defendants' knowledge of it, assumes particular importance in light of Counter-Defendants' subsequent conduct, where they repeatedly, and knowingly, made false representations to the state courts that Ruben was a member of YRY when they knew he was not, and did so for the sole purpose of interfering with Ruben's contracts and prospective economic advantage, as alleged below.

29.     On July 28, 2016, in all of the cases *except* Case Number 50077, the Bank, through its counsel, filed motions for charging orders to impose a lien on Ruben's non-existent membership interest in YRY. The motions were scheduled to proceed on August 2, 2016.

30.     In the late afternoon of August 1, 2016, the Bank filed so-called "corrected" motions for charging orders that changed the amount due and owing on the judgments. Notice of these motions was sent to Ruben via regular mail, in his individual capacity, to an address in Boca Raton, Florida. Ruben did not reside at this address and the Bank knew this.

31.     In all cases other than Case Number 50077, on September 9, 2016, the Bank filed motions under the Illinois LLC Act to appoint disbarred-attorney Ferleger as a receiver to enforce the charging orders over Ruben's alleged but – as the Bank knew – non-existent distributional membership interest in YRY. The notices of motion stated that they were served via regular mail to Ruben in his individual capacity and as the manager of YRY.

32.     The motions for a receiver did not reveal Ferleger's role in assigning the *Kingston* Case to CNTRST, or other information showing he was in on the scheme. A receiver is supposed

37

to be an honest, ethical, and disinterested officer that reports to the Court, not a co-participant and co-mastermind behind the Interference Scheme.

33.     The Bank falsely alleged that Ruben was the managing member of YRY. The motion also falsely alleged that YRY generates income that is ultimately distributed to Ruben.

34.     The motions (falsely) chronicled Ruben's supposed failure to comply with citations, charging orders, and the entry of body attachment orders – thus continuing to try to "set up" a contempt.

35.     As with the prior filings, the motions to appoint a receiver were not verified.

36.     The motions to appoint receiver were silent about Ferleger's qualifications to act as a receiver and did not allege that Ferleger is disinterested, which he clearly was not.

37.     The Bank's President knew these defects would be easy to slip past "old Man White.

38.     The motions for receiver were granted September 14, 2016.

39.     The order required Ruben and YRY to: (a) turn over records; (b) to cooperate with Ferleger; and (c) barred YRY from making distributions without prior notice to Ferleger. Counter-Plaintiffs continued to be unrepresented in the state court at this time.

### The Conditional Judgments

40.     On November 2, 2016, Teitelbaum sent the Bank's President an email, with the subject "Motion to Compel and Conditional Judgment," in which he stated: "still working and inching closer."

41.     On November 16, 2016, in Case Number 50077, the Court entered a conditional judgment against YRY in the amount of $1,142,414.88 for its alleged failure to comply with a third-party citation. The order went on to state that the conditional judgment order could be sent to Ruben "consistent with the Court's order of September 14, 2016 granting leave to serve YRY via

special order of court on YRY's managing member Ruben Ybarra." Once again, as known to Counter-Defendants Ruben was never a member of YRY. YRY was unrepresented in Case Number 50077 at this time.

### The Petitions to Revive

42.     On January 11, 2017, the Bank filed "Amended Notices of Motion" to present on January 18, 2017, the Motion(s) to Revive Judgment.  These Amended Notices of Motion(s) to Revive Judgment were filed in Case Nos. 10 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287. The Amended Notices of Motion stated the Petitions to Revive Judgment were attached.  They were not. The Amended Notices of Motion were directed via regular mail, only to Ruben, at a condominium complex in Boca Raton, Florida. Once again, as the Bank (and Counter-Defendants herein) knew, Ruben did not live in Boca Raton, Florida at this time.

43.     On January 28, 2017, the Bank's judgment in Case Number 50077 lapsed. The Bank's judgment lien on real property of Ruben also lapsed.

44.     On February 23, 2017, in Case Number 50077, the Court entered an order permitting service of the petition for revival by mailing the petition to Ruben's new lawyer Arnstein & Lehr.  The order also contemplated an agreed-upon deposition of Ruben in the near future.

45.     On April 4, 2017, the Bank attempted to revive the judgment in the amount of $1,853,685.51 in Case Number 50077.

### Yolanda Sits for a Citation

46.     On January 22, 2019, Yolanda sat for her citation exam in Case Number 50007. Yolanda testified that she makes the decisions for YRY and BHA; Ruben did not have an interest in YRY; Ruben cannot access YRY's account; she is the sole breadwinner for the family; and she created YRY as part of estate planning created by Michael Tuchman who was introduced to the

Ybarras by Teitelbaum.

47.     The Bank's President and Teitelbaum knew at the time they were simply harassing Yolanda. As the Bank's President wrote in an email, "that's how we/you got those judgments against him which are using to beat him into submission. Using his own wife as the club."

48.     On February 13, 2019, the Bank's President wrote an email to Teitelbaum stating, in relevant part, "I can't wait to visit our grand apartment complex when you get the keys soon."

49.     In Spring 2019, the Bank's counsel was permitted to withdraw as counsel of record. Kluever cited unspecified "irreconcilable differences" as grounds for withdrawal.

50.     Teitelbaum sent an email to the Bank's President stating, "I am changing lawyers to Markoff Law… they think my old lawyers were approaching it wrong (receivership would take 18 months with Ruben the crook) and they are going to try to force a quick []..sale of the property…."

### The "Motion for Judicial Determination"

51.     On April 10, 2019 the Bank, filed a motion entitled "Motion for Judicial Determination" to sell the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402.

52.     When this motion was filed, there was no attorney of record for Ruben or YRY and BHA.

53.     Yet again, the motion was unverified.

54.     Yet again, the motion falsely alleged that Ruben was a member of YRY.

55.     On June 21, 2019, Teitelbaum wrote, among other things, "good news, current lender very pissed off…." This email shows that it was always the Bank's intent to interfere with Plaintiffs' relations with their lenders – i.e., to "piss" them off. The full text of the email Teitelbaum was as follows:

    Good news, current lender very pissed off. Ruben will have another attorney to pay. Should

move the needle a little bit on the settlement. Believe there is a tiny legal opinion that your judgments can prime the first mortgage.

56.     As a result of the filing of the Motion for Judicial Determination, YRY was restrained from alienating, transferring, or selling the Boulder Hill Apartments.

57.     Also, Ruben was prevented from receiving any money or income due to freeze orders entered in conjunction with Case number 50077 (the "Freeze Orders").

58.     On July 12, 2019, in Case number 50077, YRY and BHA filed petitions to intervene in Case number 50077 to, among other things, dispute and try to secure relief from the Freeze Orders and prevent the efforts from Counter-Defendants' seizing and selling the Boulder Hill Apartments, in which Teitelbaum relinquished interest due to the *Shayarin* Settlement.

59.     On July 15, 2019, the Bank's President wrote, "Rubin is going to put up a struggle before settling. This looks like his last hand before folding…."

60.     On July 17, 2019, Real Realty produced documents responsive to the Bank's third-party citation rider.

61.     The documents produced by Real Realty re-enforced that Ruben did not own or control BHA's operating accounts and that the Boulder Hill Apartments were competently managed.

62.     After Real Realty produced documents, there was undoubtedly no good-faith basis to continue with either the Motion for Judicial Determination or the Freeze Orders (indeed, these motions were knowingly frivolous even before the documents were produced; but production of the documents eliminated any doubt as to this issue). Nonetheless, Counter-Defendants continued with their improper and abusive Interference Scheme to interfere with Ruben's contracts and prospective economic advantage, and Tetielbaum's efforts to circumvent the *Shayarin* Settlement.

63.     On August 13, 2019, in Case Number 50077, the Bank refused to voluntarily hand

41

over any agreement that set forth the relationship Teitelbaum and itself, and instead directed YRY and BHA to issue a formal document production request for this data, which they did.

64.    On August 21, 2019, the Bank filed a so-called "emergency" motion in Case Number 50077 for an *in-camera* inspection of the Agreement. The motion was denied on the ground there was no emergency.

65.    The State Court directed the parties to craft a protective order that would permit YRY and BHA to see the "Assignment Agreement," (i.e., the Agreement) but would limit its dissemination.

66.    On August 23, 2019, the Bank, through its counsel, distributed a proposed protective order to counsel for YRY and BHA, as well as to counsel for adverse claimants T2 and Real Realty.

67.    On August 28, 2019, the parties appeared on the motion for an *in-camera* inspection of the agreement between the Bank and CNTRST.  The Court denied the motion to withhold the agreement from YRY and BHA.

68.    The Court also  ruled that Counter-Defendants could not shield from YRY and BHA materials relating to the negotiation of the agreement. During the hearing, Markoff stated that Ferleger was employed by Teitelbaum and that Teitelbaum referred to Ferleger as his "librarian and translator."

69.    On December 17, 2019, the Bank's President sent an email that stated, in relevant part: "Much ado about nothing. Pages of legal fees being generated in order to get legal fees. When does Bruce get the deed and master keys to all of the apartments."

70.    On December 31, 2019, in Case No. 10 L 50077, YRY and BHA filed their notice of adverse claim in opposition to the Motion for Judicial Determination.

71.     During the late winter 2019 and early spring 2020, in Case Number 50077, YRY and BHA filed their submissions, amended submissions, and replies relating to the right to and scope of discovery pertinent to resolve their notice of adverse claim and to defend against the Bank's so-called "Motion for Judicial Determination."

72.     On July 1, 2020, the parties appeared before the Court per the Court's *sua sponte* order for status on pending motions.  All matters were continued until July 10, 2020. The Court ordered the President of the Bank, and Teitelbaum, the President of CNTRST, to be present on July 10, 2020, so that discovery and the briefing of motions could be addressed.

73.     Over Counter-Plaintiffs' objection, the Freeze Orders remained in place.

74.     On July 10, 2020, the parties appeared before the Court for status. Markoff's motion to withdraw was granted.  The Court ordered new counsel file an appearance on behalf of the Bank by July 31, 2020.  The Court further ordered that the Bank's President and Teitelbaum participate in the next court proceeding on August 4, 2020. The Court repeatedly reiterated that it wanted to move the case along. Teitelbaum announced that the Agreement was soon to be terminated and CNTRST will "be exiting the case."

75.     Markoff's withdrawal sent Teitelbaum and McMahon scrambling. On July 13, 2020, Teitelbaum sent the President of the Bank, for his review, "a simple termination agreement between the Bank and Centrust." Teitelbaum was also careful to note he'd lawyered up – "Mr. Mack will be representing me in this matter," he wrote, "If Mr. Rappin or yourself has any questions or comments, please call Mr. Mack."

76.     The President of the Bank responded, "This looks like half the story, per a call I received from one of your other advisors, Bruce. Who continues with the litigation to collect on the Centrust judgments? Not Steve Rappin and me. So, let's see that other half when you are ready

43

to identify that investor. And that investor's documentation to take over prosecution of the case."

77.     On July 28, 2020, Teitelbaum sent an email to the parties and to the Court advising that the Agreement had been terminated and that the Bank's President would distribute proof shortly.

78.     On July 29, 2020, the Bank's President circulated the Termination Agreement to the parties and to the Court and announced the Bank would not be engaging counsel. The Termination Agreement was dated July 10th, the same day as the last court appearance.  The Termination Agreement recited: (i) mutual releases between the Bank and CNTRST; (ii) CNTRST was not entitled to payment or reimbursement of costs while the Agreement of Creditors was in effect; and (iii) required CNTRST to indemnify the Bank for damages and attorneys' fees incurred or asserted against the Bank.

79.     On October 09, 2020, Teitelbaum sent an email to the Bank's President that stated, "Believe NO! I can be like ruben (sic) 12 months later. Sorry you are involved. Do not believe either of us did anything wrong."

### Allegations of Joint Venture

80.     Through the Agreement, the Bank, Teitelbaum and CNTRST entered were engaged in a joint venture (the "Joint Venture").

81.     Counter-Defendants, and each of them, engaged in acts in furtherance of the Joint Venture; as such, they are jointly and severally liable for the claims alleged herein.

### Allegations of Civil Conspiracy

82.     Through the Agreement, the Bank, Teitelbaum and CNTRST entered into an agreement to commit a tort, or other wrong, specifically, intentional interference with contract.

83.     Counter-Defendants, and each of them, engaged in wrongful acts in furtherance

of this agreement, including, among other things as alleged herein: concealing the agreement from the State Court and Plaintiffs; improperly moving for appointment of a receiver, as alleged above; improperly subjecting Ruben to a body attachment; improperly interfering with junior lenders, as alleged above, thereby seeking to circumvent the *Shayarin* Settlement.

84.     Counter-Defendants' acts, as alleged herein, were in furtherance of the Agreement.

85.     Counter-Plaintiffs suffered damages as a result of Counter-Defendants' acts in furtherance of their conspiracy.

86.     As a result of Counter-Defendants' conspiracy, they are jointly and severally liable for the claims alleged herein.

### Allegations of Alter-Ego

87.     CNTRST was not adequately capitalized, or capitalized at all and was a mere "shell" entity to sign the Cooperation Agreement, it was – and is – a mere "alter-ego" of Teitelbaum, created for the purpose of committing the torts alleged herein. As a result, Teitelbaum is liable for all actions taken in the name of CNTRST.

### Count I
### Tortious Interference with Contract
### (Interference with BHA and YRY and their Operating Agreements)

88.     Counter-Plaintiffs incorporate and re-allege allegations 1-87 as if set forth in full herein.

89.     In September 2018, the Bank, at the direction of Teitelbaum and CNTRST who were controlling the litigation pursuant to the Cooperation Agreement, filed an emergency motion in Case Number 50077 to appoint a receiver for the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402.

90.     As Teitelbaum noted in an email dated September 21, 2018, "Following same pattern as small case."

91.     In connection with this motion, the Bank requested an expedited briefing schedule. As a part of the order, BHA agreed that pending resolution of the Bank's emergency motion for appointment of receiver BHA's operating account would be frozen for the month during which the receiver motion was pending.

92.     On October 2, 2018, Judge McGing denied a virtually identical petition pursuant to Section 2-1402 of the Illinois Code of Civil Procedure, which sought (on a supposed "emergency" basis) to appoint a receiver for the Boulder Hill Apartments. In denying CNTRST's emergency motion, Judge McGing discussed the *Shayarin* Case and the release Shayarin and Teitelbaum executed with YRY.  Judge McGing noted that Shayarin and Teitelbaum received $1.16 million dollars; the *Shayarin* Case was dismissed with prejudice, and "as a result, the [Shayarin] case was dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Counter-Defendants [YRY] now control."

93.     CNTRST did not appeal the order denying its motion for receiver.

94.     On October 16, 2018, the Bank did not proceed to hearing in Case Number 50077 on its emergency motion to appoint a receiver of the Boulder Hill Apartments.

95.     On June 4, 2019, the Bank withdrew its emergency motion per Section 2-1402 to appoint a receiver for the Boulder Hill Apartments, which had been fully briefed since early October 2018.

96.     The Bank, at the direction of Teitelbaum and CNTRST who were controlling the litigation pursuant to the Cooperation Agreement, did not agree to withdraw or vacate the portion of the briefing schedule which froze BHA's operating account.

97.     In making this direction, Teitelbaum and CNTRST knew that BHA was an LLC and pursuant to its operating contract would make distributions to its member: YRY.

46

98.     The Bank, Teitelbaum and CNTRST maliciously and for no legitimate purpose froze the accounts of BHA and unreasonably refused to unfreeze the accounts in order to interfere with the BHA operating agreement and contractual relationship with YRY.

99.     The freezing of that account caused substantial economic damage to YRY in that it could not receive contractual distributions.

100.    The actions of Counter-Defendants caused damages to BHA and YRY by freezing its bank accounts, causing it to lose liquidity and profits, preventing distributions to YRY.

WHEREFORE, Counter-Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Counter-Defendants in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

### Count II
### Tortious Interference with Contract
### (Interference with Union Bank Loan)

101.    Counter-Plaintiffs incorporate and re-allege allegations 1-87 as if set forth in full herein.

102.    On September 16, 2016, Eric Ferleger acting as an agent on behalf of Counter-Defendants sent an email to T2, stating:

> Thank you for taking my call this morning. As stated, I have been appointed the receiver over YRY Holdings, as well as any of its member, as per the attached orders. There are about 5 cases consolidated. I have an investor that would be interested in purchasing your interest in the second mortgage of the property in Montgomery, Ill. It is likely that Union Bank will be calling a default in its first two mortgagees upon notice of my appointment. I can be reached at Select Funding at 847-559-9400, after you have had a chance to review. Thank you. Eric Ferleger

103.    This email was false in several respects. First, there had been no petition (at that time) as to Receivership over YRY Holdings. Ferleger had only been appointed "receiver," pursuant to an obscure and arcane provision of Illinois collection law, to receive distributions from YRY (to Ruben, who was not entitled to distributions because he was not a member of YRY,

as known to all Defendants and alleged in detail herein). There was no order of receivership as to YRY Holdings, LLC. Indeed, there was no litigation or judgment involving YRY Holdings whatsoever.

104.    But Counter-Defendants did not care. Their intent, as alleged in detail herein, was to interfere with Ruben's businesses, business relationships and family business relationship.

105.    As Ferleger, acting as agent of Counter-Defendants noted and knew, a "receivership" was indeed an event of default with Union Bank, and the fact he mentioned this to second position lender T2 is evidence of Defendants' knowledge of the loan with Union Bank and intent to interfere with the same.

106.    Even though Ferleger was not a formal "receiver" or YRY (and only a "receiver" of non-existent distributions to Ruben), the Defendants' continued their litigation campaign, including service of a Citation to Discover Assets on Union Bank.

107.    Defendants used the litigation to interfere with Union Bank's relationship with YRY, and did in fact succeed.

108.    Due to the litigation, Union Bank did not "renew" the loan in 2018. Moreover, notwithstanding a diligent inquiry by Counter-Plaintiffs, no other lender would touch the loan.

109.    Although YRY was able to convince the second position "Mezz" financier, T2, to take on the entire $9,000,000 obligation, it was only able to do so at substantial cost and expense, including 1.5 in upfront "points" and a higher adjustable interest rate (with a floor of 7%) instead of a 5% fixed rate. See **Exhibit 1**.

110.    As a result of Defendants' intentional interference with the Union Bank loan, Counter-Plaintiff YRY and BHA were damaged by $135,000 in additional "points" and 2% additional interest on a $9,000,000 loan.

WHEREFORE, Counter-Plaintiffs pray that this Court: (a) enter judgment in their favor for

actual damages against all Counter-Defendants in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count III**
**Tortious Interference with Prospective Economic Advantage**
**(BHA's contractual relationship with T2 and Real Realty)**

111.     Counter-Plaintiffs incorporate and re-allege allegations 1-87 as if set forth in full herein.

112.     By virtue of the Motion for Judicial Determination, the restraining citations, the motion(s) for appointment of receiver, and judicial freeze orders entered, Plaintiffs' ability to alienate or sell the BHA apartment building was held up for years, and Plaintiff Ruben was denied access to funds.

113.     Boulder Hill obtained title to the Boulder Hill Apartments and recorded special warranty deeds in June 2015.

114.     Counter-Plaintiffs sought to sell Boulder Hill at various times between 2016 and 2020, and received a number of good faith and bona fide offers and letters of intent, including:

(a)     An offer in the amount of $12.75 million from Pinnacle Asset Management in July 2016

(b)     An offer in the amount of 12.25 million from Dr. Bedi in August 2016;

(c)     An offer in the amount of $14.25 million ($95,000 per union on the 150-unit building) from Victorian Apartments in August 2016;

(d)     An offer of $15,000 million in October 2018;

(e)     An offer of $13.75 million in November 2017 from Burrow's Logistics;

(f)     An offer of $15,000 from United Development Group;

Copies of documents memorializing these offers and/or letters of intent are attached hereto as **Group Exhibit 2.**

115.     BHA was unable to proceed with the closing and sale on any of these offers due to the bad faith conduct and interference as alleged herein.

116.     All of the offers were in excess of the $9,000,000 owed on the property and would have netted millions of dollars in profit to Counter-Plaintiffs (as well as making money off the profit from the time of the lost sale to the present) and the elimination of interest obligations to T2. Thus Counter-Plaintiffs were damaged from not being able to sell due to Counter-Defendants interference, as alleged herein.

WHEREFORE, Counter-Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Counter-Defendants in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

### Count IV
### Intentional Interference with Prospective Economic Advantage
### (the Avant Capital Partners Contemplated Loan)

115.     Counter-Plaintiffs incorporate and re-allege allegations 1-87, as if set forth in full herein.

116.     In April 2021, Counter-Plaintiffs made a Loan Application with Avant Capital Partners ("Avant") in an effort to reduce the interest on the loan with T2 (the "Contemplated Loan"), which was documented with a letter of intent and emails.

117.     In connection with the Contemplated Loan, Counter-Plaintiffs made a $50,000 "due diligence" deposit for items such as application fees, site assessments, site visits, insurance review, background checks, zoning reports and lender legal fees

118.     Due diligence proceeded with the Contemplated Loan, with McGuire Woods LLP representing Avant.

119.     The Contemplated Loan was for the amount of $10 million and would have been several interest points lower than the T2 loan, saving BHA & YRY hundreds of thousands of dollars

over the life of the loan.

120. By virtue of the Motion for Judicial Determination, the restraining citations, the motion(s) for appointment of receiver, and judicial freeze orders, Plaintiffs' ability to enter into the Contemplated Loan did not occur.

121. Due to Counter-Defendants' interference, as alleged herein, Counter-Plaintiffs could not and did not meet Avant's requirements for the Contemplated Loan.

122. Counter-Defendants were aware of Counter-Plaintiff's contractual relationships with its lender T2, and desires to re-finance the loan.

123. Counter-Defendants intentionally and unjustifiably interfered with Counter-Plaintiff's prospective economic advantage and caused the Contemplated Loan to fail, costing out of pocket loss of approximately $50,000, and lost future interest savings in the amount of hundreds of thousands of dollars.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against Defendants in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count V**
**Breach of Contract**
**(Against Teitelbaum)**

124. Plaintiffs incorporate and re-allege allegations 1-87 as if set forth in full herein.

125. Pursuant to the *Shayarin* Settlement, Teitelbaum relinquished any claim to, or interest in, the Boulder Hill Apartments, or profits therefrom. A copy of the Settlement Agreement is attached hereto as **Exhibit 3**.

126. Under this Contract, Teitelbaum (defined in Exhibit 3 as part of the "Shayarin Parties") agreed to relinquish any interest in the Boulder Hill Apartments in exchange for the payment stated in Paragraph 1.1.

127. Under this Contract, Teitelbaum (defined in Exhibit 3 as part of the "Shayarin Parties") agreed to cease communicating with Union National Bank (through the Closing date).

128. Under this Contract, Teitelbaum (defined in Exhibit 3 as part of the "Shayarin Parties") agreed to release Counter-Plaintiffs from any and all claims, including any claims to the Boulder Hill Apartments.

129. As noted by Judge McGing, the litigation efforts orchestrated by Teitelbaum, using CNTRST as a "front" and the Cooperation Agreement to control the Bank as a shill likely violated the release and payment for peace made by Counter-Plaintiffs in the Contract attached as Exhibit 3.

130. Counter-Plaintiffs made the payments promised under the Contract and performed its material obligations thereunder.

131. By his conduct as alleged herein, Teitelbaum breached his obligations under the Contract attached as Exhibit 3.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Teitelbaum, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count VI**
**Abuse of Process**
**(Using the Citation and Rule to Show Cause**
**Against Ruben to intimidate and bully YRY)**

132. Plaintiffs incorporate and re-allege allegations 1-87, as if set forth in full herein.

133. Defendants engaged in willful acts in the use of process that was not proper in the regular conduct of the proceeding, as alleged above, including, but not limited to deceiving Ruben into coming to a citation, which was set as a trap to seize him pursuant to a body attachment in order to intimidate him bully him into using the assets of YRY to settle the judgments against Ruben (which

Ruben had no obligation to do) to extort a "$$settlement." YRY was not a judgment debtor and Ruben not a member and had no obligation to settle Ruben's debts.

134.    Defendants possessed an ulterior purpose other than resolving a legal dispute in connection with the above-alleged conduct. Specifically, Teitelbaum was attempting to do indirectly what he could not do directly (as a result of the Shayarin Settlement) – obtain an interest in the Boulder Hill Apartments.

135.    Defendants allowed Teitelbaum to use CNTRST as a sham or straw entity to conceal his involvement.

136.    Had Ruben known the truth from the inception, be would have been able to, among other things, dismiss the State Court litigation pursuant to Section 2-619 of the Illinois Code of Civil Procedure, as barred by prior release.

137.    Although some of the actions taken by Defendants occurred more than 2 years ago, which is the limitations period for abuse of process, Plaintiffs only discovered – on November 20, 2020 – a when the Bank served its Interrogatory Answers – that the Bank disclaimed any knowledge or involvement of the collection proceedings in Case Number 50007.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

### Count VI
### Abuse of Process
### (Using the Citation to Discover Assets to Cause Union Bank to Terminate its Relationship with YRY)

138.    Plaintiffs incorporate and re-allege allegations 1-87, as if set forth in full herein.

139.    On July 5, 2017 Counter-Defendants, through the Bank (that they controlled under the Cooperation Agreement) served a Citation to Discover Assets on Union Bank, YRY's lender.

140.    There was no legitimate basis to serve this process on Union Bank, as it's relationship was with YRY, not judgment debtor Ruben.

141.    The sole purpose of serving this process was to harass YRY and interfere with its relationship with its lender. There was no legitimate reason to serve this process on Union Bank other than to harass Ruben and attempt to intimidate YRY into paying money to satisfy Ruben's debts, which it had no obligation to do.

142.    Although some of the actions taken by Defendants occurred more than 2 years ago, which is the limitations period for abuse of process, Plaintiffs only discovered – on November 20, 2020 – a when the Bank served its Interrogatory Answers – that the Bank disclaimed any knowledge or involvement of the collection proceedings in Case Number 50007.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

Respectfully Submitted,

/s/ Christopher V. Langone

Christopher V. Langone

205 North Michigan Ave., Suite 810
Chicago, IL 60601
(312) 720-9191
Chris@LangoneLaw.com