UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CNTRUST DEBT RECOVERY and BRUCE TEITELBAUM, </br></br>  Plaintiffs/Counter-Defendants, </br></br> v. </br></br> RUBEN YBARRA, YRY HOLDINGS, LLC, and BOULDER HILL APARTMENTS, LLC, </br></br>  Defendants/Counter-Plaintiffs. | No. 21 C 2702 </br></br> Judge Sara L. Ellis |

**OPINION AND ORDER**

In the latest installment of this longstanding commercial dispute, Counter-Plaintiffs Ruben Ybarra, YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA") have filed an amended counterclaim against Counter-Defendants CNTRST Debt Recovery, LLC ("CDR") and Bruce Teitelbaum.[1] In their amended counterclaim, Counter-Plaintiffs bring claims for tortious interference with contract, tortious interference with prospective economic advantage, and abuse of process against CDR and Teitelbaum. They also bring a claim for breach of contract against Teitelbaum. Counter-Defendants have moved to dismiss the amended counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Counter-Plaintiffs have failed to sufficiently allege their claims or they are otherwise barred by *res judicata*, the Court dismisses the amended counterclaim with prejudice.

---

[1] Counter-Defendants have a pending abuse of process claim against Counter-Plaintiffs, claiming that Counter-Plaintiffs engaged in abuse of process by serving abusive discovery in connection with post-judgment proceedings in state court. Some of the facts relevant to that claim overlap with those in the amended counterclaim, but the Court's focus in this Opinion is on the viability of the amended counterclaim only.

1

## BACKGROUND[2]

### I. Counter-Plaintiffs

Between 2006 and 2008, Ybarra served as a vice president and loan officer at Centrust Bank. Ybarra also obtained loans from Centrust to establish a real estate portfolio. After Ybarra and his companies defaulted on their Centrust loans, Centrust filed several collection suits against Ybarra in the Circuit Court of Cook County, Illinois in 2010. The state court awarded judgments to Centrust, totaling over $2.6 million, against Ybarra.

In June 2010, Teitelbaum approached Ybarra's wife, Yolanda, to solicit her participation in certain business ventures. Yolanda then formed various entities that would allow her and Teitelbaum to participate in real estate transactions despite Ybarra's debts and the judgments against him. In 2011, the Yolanda Ybarra Revocable Trust, Ybarra Children Investment Trust, and Ruben Ybarra Family Insurance Trust formed YRY, a Delaware manager-managed limited liability company. Ybarra served as YRY's manager, although he was not a YRY member. Teitelbaum knew that Ybarra did not hold a membership interest in YRY.

In May 2015, YRY created BHA, a limited liability company based in Illinois, with YRY as its only member. It appears that YRY created BHA to hold certain apartments in Montgomery, Illinois (the "BHA Apartments"), to which BHA obtained title in June 2015.

---

[2] The Court takes the facts in the background section from Counter-Plaintiffs' amended counterclaim and presumes them to be true for the purpose of resolving Counter-Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

## II. Teitelbaum and the *Shayarin* Settlement

In October 2011, Teitelbaum helped incorporate Boulder 2011 LLC in Illinois. Boulder 2011 had as its members YRY, Shayarin LLC (with Teitelbaum as its manager), and Susan Goldner. Teitelbaum and Ybarra served as Boulder 2011's managers.

In August 2014, seeking to dissolve Boulder 2011 and compel the sale of the BHA Apartments, Teitelbaum and Shayarin filed suit in state court against YRY, Ybarra, and Boulder 2011. In the *Shayarin* case, Teitelbaum falsely represented that Ybarra was the sole member of YRY. The parties settled the *Shayarin* case in April 2015. Pursuant to the *Shayarin* settlement, YRY purchased Teitelbaum's and Shayarin's membership interest in Boulder 2011 for $1.16 million. Teitelbaum also agreed to relinquish interest in the BHA Apartments and release the Counter-Plaintiffs from any and all claims, including those related to the BHA Apartments. The state court then dismissed the *Shayarin* case.

## III. Creation of CDR and its Agreement with Centrust to Pursue Centrust's Judgments Against Ybarra

By the summer of 2015, Ybarra owed more than $3.3 million on the Centrust judgments. Centrust had not actively pursued collection of the judgments, however, until Teitelbaum contacted Centrust around that time. Teitelbaum formed CDR on August 8, 2015 and assumed the role of CDR's president. Ten days later, CDR and Centrust executed a confidential "Agreement of Creditors" that gave CDR the authority to collect the Centrust judgments against Ybarra on Centrust's behalf. The parties agreed that CDR would receive 70% of any recovered funds after the reimbursement of legal expenses, with Centrust receiving the remaining 30%.

On September 2, 2015, CDR also obtained the right to pursue litigation against Ybarra with respect to property owned by 7550 Kingston LLC (the "Kingston Property"). Select Funding LLC held certain mortgage loans against the Kingston Property and assigned the

3

Kingston Property's underlying mortgage and the right to pursue litigation to CDR on that date. Select Funding's Office Manager Eric Ferleger, a disbarred attorney and friend of Teitelbaum, organized the assignment. In December 2015, CDR formally substituted in for Select Funding as the plaintiff in the Kingston Property litigation.

### IV. Motions for Charging Order Against Ybarra

In January 2016, Centrust filed motions for charging orders[3] against Ybarra's alleged interest in YRY in several of the cases in which Centrust had obtained judgments against Ybarra, including Case No. 2010 L 50077 (the "50077 case"). However, Centrust withdrew its motion in the 50077 case after Ybarra and YRY's counsel advised Centrust's counsel that Centrust had not yet served citations on Ybarra or YRY and that Ybarra was the manager—not a member—of YRY.[4] In July 2016, Centrust filed motions for charging orders in all of the cases except the 50077 case, again seeking the imposition of a lien on Ybarra's supposed membership interest in YRY. The day before the state court was to hear these motions in August 2016, Centrust filed "corrected" motions that changed the amount owed on the judgments. Doc. 91 ¶ 30. Counsel for Centrust sent notices of these motions via regular mail to Ybarra at an address in Boca Raton, Florida, where he did not reside.

On September 9, 2016, in all but the 50077 case, Centrust filed motions to appoint Ferleger as the receiver to enforce the charging orders, which it served by regular mail to Ybarra in his individual capacity and as YRY's manager. The motions did not reveal Ferleger's prior involvement in assigning Select Funding's interest in the Kingston Property to CDR, and they

---

[3] "A charging order constitutes a lien on a judgment debtor's distributional interest and requires the limited liability company to pay over to the person to which the charging order was issued any distribution that would otherwise be paid to the judgment debtor." 805 Ill. Comp. Stat. 180/30-20.

[4] The amended counterclaim does not indicate what happened with the remaining charging orders filed in the other cases.

4

also continued to represent that Ybarra served as YRY's managing member and received income from YRY. Centrust's president knew of the misrepresentations. Despite the fact that YRY and Ybarra did not have counsel at the time, the state court granted the motions on September 14, requiring Ybarra and YRY to turn over records and cooperate with Ferleger. The court also barred YRY from making distributions without prior notice to Ferleger.

V.      **Conditional Judgments and Petitions to Revive**

On November 16, 2016, the state court entered a conditional judgment against YRY for $1,142,414.88 in the 50077 case for its alleged failure to comply with a third party citation. The order also authorized Centrust to serve YRY by sending the order via certified mail to Ybarra.

On January 11, 2017, Centrust filed amended notices of motion to revive the 2010 judgments it had obtained against Ybarra. The amended notices did not attach the actual motions, however, and were sent by regular mail to the same Boca Raton address where Ybarra did not reside, a fact that Counter-Defendants knew at the time.

On January 28, 2017, Centrust's judgment in the 50077 case lapsed, as did Centrust's judgment lien on certain of Ybarra's property. On February 23, 2017, the state court allowed Centrust to serve its petition for revival of the judgment by mailing it to Ybarra's new lawyer. On April 4, 2017, Centrust attempted to revive the $1,853,685.51 judgment in the 50077 case.[5]

VI.     **Subsequent Proceedings**

On April 21, 2017, Ybarra traveled from Texas to Illinois to sit for a preliminary citation examination at Centrust's counsel's office. There, the Cook County Sheriff arrested Ybarra pursuant to a rule to show cause and body attachment issued by the state court.

---

[5] The amended counterclaim does not clarify whether this attempt succeeded.

In September 2018, Centrust filed an emergency motion in the 50077 case to appoint a receiver for the BHA Apartments. BHA agreed to a freeze of its operating account while the parties briefed the motion and before its presentment date on October 16, 2018. Centrust did not proceed with the motion in the 50077 case, however, and ultimately withdrew it on June 4, 2019. In withdrawing the motion, Centrust did not agree to withdraw or vacate the portion of the briefing schedule that froze BHA's operating account. Centrust's decision not to proceed on the motion likely had to do with the fact that another judge denied a virtually identical motion filed by CDR on October 2, 2018. In doing so, the judge remarked that "the [*Shayarin*] case was dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Counter-Defendants [YRY] now control." Doc. 91 ¶ 92 (alterations in original).

In January 2019, Yolanda sat for a citation examination in the 50077 case, explaining that Ybarra had no interest in YRY and that she made the decisions for YRY and BHA. She further testified that Ybarra could not access YRY's account and that she formed YRY as part of an estate planning strategy created by an attorney whom Teitelbaum introduced to her. After the examination, Teitelbaum and Centrust's president discussed their strategy of using Yolanda to obtain concessions from Ybarra.

In April 2019, through new counsel retained by Teitelbaum, Centrust filed a motion in the 50077 case for a judicial determination to sell the BHA Apartments pursuant to 735 Ill. Comp. Stat. 5/2-1402. That motion again incorrectly represented that Ybarra was a member of YRY. The motion had the effect of freezing YRY's ability to sell or transfer the BHA Apartments and Ybarra's ability to receive income. On June 21, 2019, Teitelbaum wrote that the freeze had

"pissed off" the "current lender" and that it should "move the needle a little bit on the settlement." Doc. 91 ¶ 55.

YRY and BHA sought to intervene in the 50077 case in July 2019 to challenge the freeze orders. Several days later, Real Realty, which managed the BHA Apartments for BHA, produced documents indicating that Ybarra did not own or control BHA's operating accounts and that the BHA Apartments were competently managed. Subsequent litigation ensued over YRY and BHA's attempts to obtain a copy of the Agreement of Creditors between Centrust and CDR, with the court ultimately ordering its production and the production of other materials relating to the agreement's negotiation. The parties also continued to litigate Centrust's motion for judicial determination. But in July 2020, Teitelbaum informed the state court that CDR and Centrust had terminated their agreement, after which Centrust's president announced that Centrust would not engage additional counsel to further pursue the motion for judicial determination.

## VII. Alleged Interference with BHA Apartments and YRY's Lenders

On September 16, 2016, Ferleger emailed T2, YRY's junior lender, that he had been appointed the receiver of YRY and its members. Ferleger also claimed that his appointment as a receiver would likely default the senior mortgage in favor of Union Bank. Finally, he claimed to have an unidentified investor interested in purchasing T2's junior mortgage interest in the BHA Apartments.

On July 5, 2017, Centrust served a citation to discover assets on Union Bank, YRY's senior lender at the time. Union Bank decided not to renew YRY's loan when it came up in 2018. YRY convinced T2 to take on the entire $9 million obligation, paying 1.5 points and accepting a higher adjustable interest rate (with a floor of 7% instead of the 5% fixed rate it had with Union Bank) in order to close the loan.

7

BHA sought to sell the BHA Apartments at various times between 2016 and 2020. It received a number of offers and letters of intent, including (1) a $12.75 million offer from Pinnacle Asset Management in July 2016, (2) a $12.25 million offer from Dr. Bedi in August 2016, (3) a $13.25 million offer from Victorian Apartments in August 2016, (4) a $13.75 million offer from Burrow's Logistics in November 2017, (5) a $15 million offer in October 2018, and (6) a $15 million offer from United Development Group at an unspecified time.[6] None of these offers led to the sale of BHA Apartments, however, due to Counter-Defendants' conduct. A sale would have eliminated BHA's loan obligations and also netted it a profit.

In April 2021, Counter-Plaintiffs applied for a loan with Avant Capital Partners ("Avant") in an effort to reduce the interest on the T2 loan. The loan was for $10 million and several interest points lower than the T2 loan. Counter-Plaintiffs made a $50,000 due diligence deposit in connection with their application. But the loan did not close because of Counter-Defendants' various filings and the judicial freeze orders.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.*

---

[6] Counter-Plaintiffs indicated that they attached copies of documents memorializing the offers and letters of intent, as well as the 2018 T2 loan and the *Shayarin* settlement, to their amended counterclaim, but no such attachments were actually filed on the docket.

*Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Tortious Interference with Contract (Counts I and II)

To state a claim for tortious interference with contract, Counter-Plaintiffs must allege "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages." *Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 967–68 (7th Cir. 2011) (citing *Purmal v. Robert W. Wadington & Assocs.*, 354 Ill. App. 3d 715, 727 (2004)). Counter-Plaintiffs claim two instances of alleged interference: (1) interference with BHA's operating agreement with YRY by failing to withdraw or vacate the portion of the agreed briefing schedule on the motion for a receiver in the 50077 case that froze BHA's operating account during the time the motion remained pending, and (2) interference with YRY's loan with Union Bank, causing Union Bank not to renew its loan with YRY in 2018.

Counter-Plaintiffs' tortious interference with contract claims fail. The amended counterclaim again does not explain how any of Counter-Defendants' actions caused a third party (in this situation, BHA and Union Bank) to breach a contract with YRY. *See Cartwright v. Cooney*, 788 F. Supp. 2d 744, 754 (N.D. Ill. 2011) (a plaintiff cannot maintain a tortious interference with contract claim absent allegations of a breach of contract). Counter-Plaintiffs appear to contend that BHA had a contractual obligation to distribute funds to YRY. But BHA's

9

operating agreement provides that "[i]nterim distributions from [BHA] shall be payable at the times and in the amounts determined by [YRY] in its sole discretion." Doc. 97-1 at 54. In other words, YRY had the ability to determine if and when it received any distributions, meaning that YRY cannot complain about any breach that it, and not Counter-Defendants, would have caused by seeking distributions during the pendency of the freeze order.[7] *See Wells Fargo Bank, N.A. v. Worldwide Shrimp Co.*, No. 17 CV 4723, 2018 WL 6696607, at *14 (N.D. Ill. Dec. 20, 2018) (tortious interference claim fails where the allegations indicate that the defendant's actions caused the plaintiff to breach an agreement, not a third party to breach an agreement with the plaintiff).

As for Union Bank, Counter-Plaintiffs plead only that Union Bank did not renew its loan with YRY in 2018. Apparently recognizing that Union Bank had no contractual obligation to renew the loan, Counter-Plaintiffs pivot in their response to argue that the Court should treat this claim as one for tortious interference with prospective economic advantage. To state a tortious interference with prospective economic advantage claim, Counter-Plaintiffs must allege "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that

---

[7] To the extent that Counter-Plaintiffs contend that Counter-Defendants caused a breach of the covenant of good faith and fair dealing, the Court agrees with Counter-Defendants that BHA's alleged failure to make distributions to YRY does not amount to a breach of this covenant because the covenant "does not enable a [party] to read an obligation into a contract that does not exist." *N. Tr. Co. v. VIII S. Mich. Assocs.*, 276 Ill. App. 3d 355, 368 (1995); *see also Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 396 (7th Cir. 2003) ("[A]n implied covenant of good faith cannot overrule or modify the express terms of a contract.").

Additionally, to the extent that Counter-Plaintiffs ask the Court to construe their claim with respect to the BHA operating agreement as one for tortious interference with prospective economic advantage, such a claim does not lie when a contract exists. *See Delphi Indus., Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 221 (7th Cir. 1991) ("An existing agreement precludes an action for intentional interference with prospective economic advantage.").

10

induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 300–01 (2001)). A reasonable expectancy requires more than YRY's hope that Union Bank would renew its loan. *Kiebala v. Boris*, No. 1:16 CV 7478, 2017 WL 4339947, at *4 (N.D. Ill. Sept. 29, 2017) ("A reasonable expectancy requires more than the hope or the opportunity of a future business relationship." (citation omitted) (internal quotation marks omitted)), *aff'd*, 928 F.3d 680 (7th Cir. 2019). That is all that Counter-Plaintiffs allege here, and so their restyled tortious interference with prospective economic advantage claim fails. *Id.*

Because Counter-Plaintiffs have again failed to sufficiently state a tortious interference with contract claim, or alternatively a tortious interference with prospective economic advantage claim, with respect to both the BHA operating agreement and the loan with Union Bank, the Court dismisses these claims.

## II. Tortious Interference with Prospective Economic Advantage (Counts III and IV)

Counter-Defendants also move to dismiss Counter-Plaintiffs' pleaded tortious interference with prospective economic advantage claims. In Count III, Counter-Plaintiffs set forth various offers and letters of intent BHA allegedly received in its efforts to sell the BHA Apartments, contending that BHA could not proceed on these offers due to Counter-Defendants' bad faith conduct and interference. "[A] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *Ammons v. Dart*, No. 13 C 8817, 2015 WL 1740086, at *4 (N.D. Ill. Apr. 13, 2015) (citation omitted). The amended counterclaim provides details that were lacking in the original counterclaim, identifying specific parties and offers. But it still fails to suggest

11

that Counter-Defendants took any actions directed at these third parties or that Counter-Defendants even knew of any of the offers. Without any such allegations, Counter-Plaintiffs' claims related to the attempted sale of the BHA Apartments cannot proceed. *See*; *Douglas Theater Corp. v. Chi. Title & Tr. Co.*, 288 Ill. App. 3d 880, 887–88 (1997) ("[D]efendant's interference must be directed toward a third party.").[8]

In Count IV, Counter-Plaintiffs contend that Counter-Defendants interfered with Counter-Plaintiffs' expectation of entering into a loan with Avant. While Counter-Plaintiffs allege that Counter-Defendants knew of their relationship with T2 and their desire to refinance the loan, they have not alleged that Counter-Defendants had any awareness of Counter-Plaintiffs' expectation of a relationship with Avant or that Counter-Defendants took any specific action directed toward Avant. The fact that Avant's due diligence revealed the various motions, citations, and freeze orders from the state court litigation only suggests that Counter-Defendants' prior actions impacted Avant's decision with respect to the contemplated loan, not that Counter-Defendants directed specific action at Avant. *See Sweports, Ltd. v. Abrams*, 2021 IL App (1st) 200139-U, ¶ 59 ("The generic allegation that the mere existence of litigation interfered with the plaintiffs' business expectancies is thus inadequate."); *Boffa Surgical Grp. LLC v. Managed Healthcare Assocs. Ltd.*, 2015 IL App (1st) 142984, ¶ 28 ("It is not enough for the defendant's

---

[8] Counter-Plaintiffs argue that "direct contact" with a third party is not required, citing to *Schuler v. Abbott Laboratories*, 265 Ill. App. 3d 991, 994–95 (1993). But even in *Schuler*, the court noted that while direct contact with the third party is not required, the "interfering action [must] be directed in the first instance at the third party." *Id.* at 995. Here, Counter-Plaintiff have failed to allege that Counter-Defendants took action specifically directed at one of the parties that made an offer to purchase the BHA Apartments, and so any actions Counter-Defendants took in the state court proceedings that had the effect of dissuading the third parties from purchasing the BHA Apartments does not suffice. *See id.* (rejecting the argument that the defendant took action directed at third parties because the defendant knew that enforcement of the non-competition agreement would dissuade those third parties from hiring the plaintiff where the enforcement action was not directed at the third parties).

action to impact a third party; rather, the defendant's action must be directed towards the third party."). Thus, these tortious interference claims fail as well.

### III. Breach of Contract (Count V)

Counter-Plaintiffs allege that Teitelbaum breached the *Shayarin* settlement because he relinquished all claims against Counter-Plaintiffs, including to the BHA Apartments, in the settlement but then took actions to obtain an interest in those apartments through CDR. In other words, Counter-Plaintiffs contend that Teitelbaum breached the *Shayarin* settlement's release provision. Teitelbaum again seeks dismissal of Counter-Plaintiffs' breach of contract claim, arguing that Counter-Plaintiffs have failed to state a claim and that any such claim is barred by *res judicata*.

Even assuming that Counter-Plaintiffs have sufficiently pleaded breach of the release provision, they cannot proceed on this claim because they litigated the same claim in state court and lost. *Res judicata* is an affirmative defense, but the Court can consider it under Rule 12(b)(6) where the plaintiffs have pleaded themselves out of court through the allegations in their complaint. *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). The Court applies Illinois law on *res judicata* because Teitelbaum seeks to give preclusive effect to proceedings that occurred in Illinois state court. *See Chi. Title Land Tr. Co. v. Potash Corp. of Saskatchewan Sales Ltd.*, 664 F.3d 1075, 1079 (7th Cir. 2011). *Res judicata* applies here if (1) the state court rendered a final judgment on the merits, (2) the identity of the parties or their privies is the same in this suit as in the state court proceeding, and (3) the claims in this and the state court proceeding are the same. *Id.* Teitelbaum bears the burden of proving that *res judicata* applies. *Rooding v. Peters*, 92 F.3d 578, 580 (7th Cir. 1996).

Teitelbaum argues that Ybarra, Yolanda, and another related limited liability company, 7550 S. Kingston LLC, raised the affirmative defense of release based on the *Shayarin* settlement agreement in the Kingston Property litigation, in which CDR was the plaintiff. *See* Doc. 114 at 145–46. Ybarra, Yolanda, and 7550 S. Kingston LLC argued that CDR's 100% shareholder, Teitelbaum, had released them and any other entity affiliated with them from all claims in the *Shayarin* settlement, meaning Teitelbaum's use of CDR to pursue claims against them violated the release provision. *Id.* The state court granted summary judgment for CDR on this affirmative defense in April 2017. Doc. 97-1 at 51. And in September 2017, the state court entered judgment for CDR, although post-judgment proceedings continued thereafter. *See Cntrst Debt Recovery Corp. v. 7550 Kingston LLC*, 2022 IL App (1st) 200591-U, ¶ 5. A release and satisfaction of judgment was entered in the case on February 7, 2019. *Id.* ¶ 8.

As the Illinois Appellate Court recognized, the state court entered a final judgment in the Kingston Property litigation in September 2017, meeting the first element of *res judicata*. *Id.* ¶ 5. As for the second element, Ybarra was a named party in the Kingston Property litigation. And *res judicata* can also extend to a party's privies, with privity existing "between parties who adequately represent the same legal interests." *Chi. Title Land Tr. Co.*, 664 F.3d at 1080 (citation omitted). YRY and BHA have "a sufficiently close identity of interests" with Ybarra and Yolanda for privity to exist, given Yolanda's admission of control of YRY and BHA, as well as their shared interest in stopping Teitelbaum from continuing to antagonize them through litigation. *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998) (citation omitted); *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 50 ("For purposes of *res judicata*, '[i]t is the identity of interest that controls in determining privity, not the nominal identity of the parties.'" (alteration in original) (quoting *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill. 2d 285,

296 (1992))). And Teitelbaum, while not named as a party in the Kingston Property litigation, clearly shared an interest with CDR in resolution of the release defense asserted in that case. Finally, Counter-Plaintiffs' breach of contract claim, predicated on Teitelbaum's alleged violation of the *Shayarin* settlement's release provision, covers the exact same ground as the affirmative defense of release that the Ybarra parties asserted and the state court necessarily decided in the Kingston Property litigation in CDR's favor. Therefore, *res judicata* bars Counter-Plaintiffs' breach of contract claim against Teitelbaum.

## IV. Abuse of Process (Counts VI and VII)

In Illinois, "[a]buse of process is defined as the misuse of the legal process to accomplish some purpose outside the scope of the process itself." *Farwell v. Senior Servs. Assocs., Inc.*, 2012 IL App (2d) 110669, ¶ 21 (citation omitted). "[A]n abuse of process claim requires proof of two elements: (1) the existence of an ulterior motive or purpose; and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings." *McDuffie v. Loney*, No. 16 C 8860, 2017 WL 6039949, at *3 (N.D. Ill. Dec. 6, 2017) (quoting *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 372 (7th Cir. 1998)). Critically, "[c]laims for 'abuse of process [are] not favored under Illinois law.'" *Harvey v. City of Chicago*, No. 19-CV-05450, 2021 WL 4401328, at *4 (N.D. Ill. Sept. 27, 2021) (second alteration in original) (quoting *Kumar v. Bornstein*, 354 Ill. App. 3d 159, 166 (2004)).

Counter-Plaintiffs contend that Counter-Defendants (1) "deceiv[ed] [Ybarra] into coming to a citation, which was set as a trap to seize him pursuant to a body attachment in order to intimidate him [and] bully him into using the assets of YRY to settle the judgments against [him] . . . to extort a '$$settlement,'" Doc. 91 ¶ 133, and (2) served a citation to discover assets on Union Bank to "harass YRY and interfere with its relationship with its lender," *id.* ¶ 141.

15

Assuming the existence of an ulterior purpose for both claimed abuses of process, *see Cmty. Nat'l Bank in Monmouth v. McCrery*, 156 Ill. App. 3d 580, 583 (1987) ("The usual case of abuse of process is one of some form of extortion, using the process to put pressure on someone to compel him to pay a different debt or to take or refrain from taking some other action."), Counter-Plaintiffs' claims still fail on the second element.

To satisfy the second element, Illinois law requires allegations that process "has been used to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing that he or she could not legally be compelled to do." *Kumar*, 354 Ill. App. 3d at 168; *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 969 (1972) ("To constitute an abuse of the process in the legal sense, there must be some act in use of the process which is not proper in the regular course of the proceedings."). Here, Counter-Plaintiffs did not correct the deficiencies identified by the Court in its prior Opinion with respect to the citation or body attachment issued to Ybarra, *see* Doc. 87 at 13–14, failing again to provide any type of specifics as to the circumstances surrounding the issuance of these orders. Thus, the Court cannot infer that Counter-Defendants used the show cause order or body attachment to compel Counter-Plaintiffs "to do something [they] [were] not legally required to do." *Slep-Tone Ent. Corp. v. Elwood Enters., Inc.*, 165 F. Supp. 3d 705, 714 (N.D. Ill. 2015). The same goes for the citation served on Union Bank, for which the allegations similarly do not suggest the inference that Counter-Defendants used the citation to compel Union Bank to take some action it "could not legally be compelled to do." *Id.* Without allegations that Counter-Defendants' use of the citations did not follow the "usual course," the abuse of process claims cannot proceed. *See Orozco v. Orozco*, No. 22 CV 3122, 2023 WL 2895750, at *2 (N.D. Ill. Apr. 11, 2023) (N.D. Ill. Apr. 11, 2023) ("[I]mproper motivation for a process that follows the usual course isn't abuse of

process."); *Villarreal v. Arnold*, No. 16 CV 00603, 2016 WL 7374272, at *3 (N.D. Ill. Dec. 20, 2016) ("[E]ven when someone with the most immoral motive initiates a proceeding, so long as the process is used for its intended purpose, that person cannot be liable for abuse of process."); *Holiday Magic*, 4 Ill. App. 3d at 967, 969 (abuse of process requires an "act in the use of process which is not proper in the regular course of the proceedings," even where the defendant had a "malicious intent or motive" for its use).

## V.    Dismissal with Prejudice

Given the fact that the Court provided Counter-Plaintiffs with the opportunity to cure their pleading deficiencies and they failed to do so, the Court dismisses the amended counterclaim with prejudice. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 734–35 (7th Cir. 2014) (affirming dismissal with prejudice of first amended complaint after initial complaint was dismissed without prejudice); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *1 (N.D. Ill. Feb. 18, 2010) (dismissing amended complaint with prejudice after previous dismissal of ICFA and unjust enrichment claims without prejudice), *aff'd*, 631 F.3d 436.

## CONCLUSION

For the foregoing reasons, the Court grants Counter-Defendants' motion to dismiss [97]. The Court dismisses the amended counterclaim with prejudice.

Dated: April 2, 2024

SARA L. ELLIS
United States District Judge